

'08 CIV 5353

Judge McMahon

RECEIVED
JUN 11 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Christopher F. Graham (CG 2455)
McKENNA LONG & ALDRIDGE LLP
230 Park Avenue
Suite 1700
New York, NY 10169
(212) 905-8300
(212) 922-1819 (facsimile)

*Attorneys for Plaintiff MM Arizona Holdings LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MM Arizona Holdings LLC,

                Plaintiff,

v.

Nicholas W. Bonanno, Jr., Rita Bonanno,
Allen D. Jenkins, individually and Allen D.
Jenkins, as executor of the last will and
testament of Tamera R. Jenkins late of that
State of Arizona and County of Maricopa ("T.
Jenkins"), as personal representative of the
estate of T. Jenkins, or as successor in title, by
survivorship, to property formerly jointly
owned by T. Jenkins and A. Jenkins as tenancy
by the entirety with right of survivorship or as
joint tenancy with right of survivorship or as
community property with right of survivorship,
as the case may be,

                Defendants.

---

**COMPLAINT FOR JUDGMENT ON GUARANTY**

Jury Trial:    ☐ Yes      ☒ No

08 civ 5353 (CM)(AJP)
ECF CASE

---

Plaintiff MM Arizona Holdings LLC. ("Plaintiff" or "Lender"), hereby files its

Complaint against Nicholas W. Bonanno, Jr., Rita Bonanno, Allen D. Jenkins, and the estate of

Tamera R. Jenkins by and through Allen D. Jenkins, as executor of the last will and testament of

Tamera R. Jenkins late of the State of Arizona and County of Maricopa ("T. Jenkins"), as

personal representative of the estate of T. Jenkins, or as successor in title, by survivorship, to

property formerly jointly owned by T. Jenkins and A. Jenkins as tenancy by the entirety with

right of survivorship or as joint tenancy with right of survivorship or as community property with right of survivorship, as the case may be (collectively, the "Guarantors"), and respectfully shows the Court as follows:

## I. PARTIES, JURISDICTION AND VENUE

1.    Plaintiff is a Delaware limited liability company, with its principal place of business being New York, New York.

2.    Nicholas W. Bonanno, Jr. is an individual and resident of the State of Arizona, residing at 20837 North 41st Avenue, Glendale, Arizona 85308.

3.    Rita Bonanno is an individual and resident of the State of Arizona, residing at 20837 North 41st Avenue, Glendale, Arizona 85308.

4.    Allen D. Jenkins is an individual and resident of the State of Arizona, residing at 5417 West Ironwood Drive, Glendale, Arizona 85302.

5.    The late Tamera R. Jenkins was an individual and resident of the State of Arizona. Allen D. Jenkins is the executor of the last will and testament of Tamera R. Jenkins late of the State of Arizona and county of Maricopa ("T. Jenkins"), or is the personal representative of the estate of T. Jenkins, or is the successor in title, by survivorship, to property formerly jointly owned by T. Jenkins and Allen D. Jenkins as tenancy by the entirety with right of survivorship or as joint tenancy with right of survivorship or as community property with right of survivorship ("Jenkins Executor").

6.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.  The matter in controversy herein exceeds the sum of $75,000.00, exclusive of interest and costs.  This action is between citizens of different States.

7.    Jurisdiction is also proper pursuant to the express written consent of each of the Guarantors.

2

8.    Venue is proper in this Court under 28 U.S.C. § 1391.

9.    Venue is also proper pursuant to the express written consent of each of the Guarantors.

10.    Plaintiff does not elect a trial by jury.

11.    Guarantors expressly and in writing waived their rights to a trial by jury.

## II.  BACKGROUND REGARDING THE UNDERLYING LOAN, THE GUARANTY AND EXISTING DEFAULTS

12.    On or about July 13, 2006, Middle Mountain ("Middle Mountain" or "Borrower") entered into that certain loan agreement with Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc. ("Lehman"), as lender (the "Loan Agreement"). A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

13.    The loan ("Loan"), in the original principal sum of Forty-Four Million and 00/100 Dollars ($44,000,000.00), is evidenced by that certain Promissory Note dated July 13, 2006 executed and delivered by Borrower in favor of Lehman (the "Note"). A true and correct copy of the Note is attached as Exhibit B.

14.    On or about July 13, 2006, Mr. Bonanno, Mrs. Bonanno, Mr. Jenkins, and Mrs. Jenkins, each executed and delivered that certain Guarantor Full Repayment Guaranty effective as of July 13, 2006 in favor of Lehman (the "Guaranty"). A true and correct copy of the Guaranty is attached hereto as Exhibit C. The Loan Agreement, the Note, and the Guaranty together with any and all other documents which evidence, secure or otherwise relate to the Loan are sometimes collectively referred to herein as the "Loan Documents."

15.    Pursuant to the Guaranty, each of the Guarantors agreed, jointly and severally and absolutely and unconditionally to guarantee to Lehman the prompt and unconditional payment of

the obligations of Middle Mountain to Lehman under the Loan and Loan Documents, as described more fully hereinbelow.

16.     The Guaranty "is a guaranty of payment and not of collection." *Guaranty*, p.2, at ¶ 1(a).  It provides that each Guarantor:  "unconditionally, absolutely, and irrevocably, as primary obligor and not merely as a surety guarantees to Lender the punctual and complete payment when due, whether at or after maturity, upon acceleration or otherwise, of that portion of the amounts due and outstanding under the Loan, including, without limitation, the principal sum, all accrued interest, default interest and amounts advanced by Lender under the Loan Documents (such payment obligation is referred to hereinafter as the "Guaranteed Obligation")." *Guaranty*, p.2, at ¶ 1(a).  The Guaranty further provides that each "Guarantor also agrees to pay on demand any and all expenses, including, without limitation, reasonable attorneys fees and disbursements incurred by Lender in enforcing or collecting any or all of the obligations under this Guaranty ("Lender's Expenses")." *Guaranty,* p.2, ¶ 1(b).

17.     The Guarantors also agreed that the "Guaranty shall be directly enforceable against Guarantor without first resorting to any other guaranty or exhausting remedies against any other Guarantor and regardless of whether or not Lender elects to also pursue its remedies against Borrower and/or any collateral or other security available to Lender...." *Guaranty*, p.4, ¶ 3(a)(i).

18.     The Guaranty further provides that "ANY SUIT, ACTION OR PROCEEDING AGAINST GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT MAY AT LENDER'S SOLE OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, AND, GUARANTOR WAIVES ANY OBJECTIONS WHICH GUARANTOR MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS

4

OF ANY SUCH SUIT, ACTION OR PROCEEDING.  GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  GUARANTOR DOES HEREBY DESIGNATE AND APPOINT DELANEY CORPORATE SERVICES, 41 STATE STREET, SUITE 405, ALBANY, NEW YORK 12207 AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK." *Guaranty*, p.10, at ¶ 14(b).

19.    Paragraph 14(e) of the Guaranty provides that the Guarantors agree "NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS

PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR[S]." *Guaranty*, p.11, at ¶ 14(e).

20.    The Loan matured, and became due and payable in full together with interest, fees and charges, on August 1, 2007 (the "Maturity Date").

21.    Middle Mountain failed and refused to make payment in full or otherwise satisfy its obligations to Lehman under the Loan Documents on or prior to the Maturity Date.

22.    By way of letter dated August 3, 2007, Lehman notified Middle Mountain and Guarantors, among others, that Middle Mountain was in default under the Loan Documents due to Middle Mountain's failure to make payment in full on the Loan on or before the maturity date (the "August 2007 Demand Letter"). In the August 2007 Demand Letter, Lehman also made demand on Middle Mountain for immediate payment in full of the entire outstanding balance of the Loan, including principal, interest and all other amounts due and payable to the full extent provided under the Loan Documents. A true and correct copy of the August 2007 Demand Letter is attached hereto as Exhibit D.

23.    In response to the August 2007 Demand Letter, neither the Borrower nor the Guarantors paid the Loan in full.

24.    On or about October 18, 2007, Lehman, by and through its counsel, made demand by letter on the Guarantors under the Guaranty for immediate payment in full of all of the Borrower's obligations under the Loan Documents and the Guarantors' obligations under the Guaranty, to the full extent provided under the Loan Documents and the Guaranty (the "October 2007 Demand Letter"). A true and correct copy of the October 2007 Demand Letter is attached hereto as Exhibit E.

25.    In response to the October 2007 Demand Letter, Guarantors failed and refused to make any payment on their obligations to Lender under the Guaranty.

6

26.     On or about April 16, 2008, Lehman entered into a Forbearance Agreement with Middle Mountain, Mr. Bonanno, Mrs. Bonanno, Allen Jenkins, Jenkins Executor and other parties. A true and correct copy of the Forbearance Agreement is attached hereto as Exhibit F.

27.     The Forbearance Agreement provides that, among other things, Lehman would not seek to impose personal liability on any of the Guarantors unless and until a Termination Event (as defined in Section 6.01 of the Forbearance Agreement) shall have occurred. One specific Termination Event was and is the occurrence of the Termination Date (May 15, 2008), without the Loan being paid in full or having been restructured on or before that date. Such Termination Event has occurred.

28.     In the Forbearance Agreement, Guarantors reaffirmed the validity and legally binding nature of their obligations under the Loan Documents. *Forbearance Agreement,* p. 6, at ¶ 2.03(a).

29.     Guarantors also acknowledged and agreed, among other things, that as of February 29, 2008, the outstanding unpaid principal balance of the Loan was $42,649,554.02 (excluding protective advances of $132,854.14 made by Lehman) and that the Loan matured on August 1, 2007. *Forbearance Agreement*, p. 6, at ¶ 2.03(b).

30.     Guarantors also reaffirmed that "each of the Guaranties constitutes the valid, legally binding obligation of the applicable Guarantor who is a party thereto and of the estate of T. Jenkins, enforceable against such Guarantor in accordance with its terms...." *Forbearance Agreement*, p. 8, at ¶ 2.03(e).

31.     The total amount outstanding under the Loan Documents as of May 19, 2008, exclusive of attorneys fees and other expenses was $48,195,412.67, consisting of $42,649,554.02 principal; $1,018,722.93 in pre-maturity interest; $4,394,281.58 in post-maturity interest; and

$132,854.14 protective advance to pay real estate taxes. Interest, attorneys' fees and other charges continue to accrue in accordance with the terms of the Loan Documents.

32.      Guarantors are each in default under the Guaranty.

33.      Pursuant to, among other documents, that certain Allonge dated May 19, 2008 (the "Allonge") and that certain Assignment of Loan Documents dated May 19, 2008 (the "Assignment") Lehman assigned to Plaintiff all of its right, title and interest in the Loan and the Loan Documents. True and correct copies of the Allonge and the Assignment are attached hereto as Exhibit G and Exhibit H, respectively,

## FIRST CAUSE OF ACTION

(For Breach of Guaranty Against Defendant Nicholas Bonanno)

34.      Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 33 inclusive, as though fully set forth herein.

35.      Pursuant to the Guaranty, defendant Nicholas Bonanno unconditionally, absolutely, and irrevocably guaranteed to Lender complete payment when due of all of Middle Mountain's obligations under the Loan Documents.

36.      As alleged above, Middle Mountain defaulted, and remains in default, under the Loan Documents.

37.      In the October Demand Letter, demand was made upon defendant Nicholas Bonanno to perform his obligations under the terms of the Guaranty, and to pay in full the indebtedness owed to Lender by Middle Mountain under the Loan Documents.

38.      Defendant Nicholas Bonanno has failed and refused to pay to Lender any amounts under the Guaranty.

39.      Defendant Nicholas Bonanno's failure and refusal to make payments due under the Guaranty constitutes a breach of the Guaranty.

40.     Lender has been damaged as a result of defendant Nicholas Bonanno's breach of the Guaranty.

41.     Lender is entitled to recover from defendant Nicholas Bonanno all amounts due, owing and accruing under the Loan Documents, and the Guaranty, including attorneys' fees and other expenses, provided for and allowed under the Loan Documents and applicable law, as alleged hereinabove.

## SECOND CAUSE OF ACTION

(For Breach of Guaranty Against Defendant Rita Bonanno)

42.     Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 33 inclusive, as though fully set forth herein.

43.     Pursuant to the Guaranty, defendant Rita Bonanno unconditionally, absolutely, and irrevocably guaranteed to Lender complete payment when due of all of Middle Mountain's obligations under the Loan Documents.

44.     As alleged above, Middle Mountain defaulted, and remains in default, under the Loan Documents.

45.     In the October Demand Letter, demand was made upon defendant Rita Bonanno to perform her obligations under the terms of the Guaranty, and to pay in full the indebtedness owed to Lender by Middle Mountain under the Loan Documents.

46.     Defendant Rita Bonanno has failed and refused to pay to Lender any amounts under the Guaranty.

47.     Defendant Rita Bonanno's failure and refusal to make payments due under the Guaranty constitutes a breach of the Guaranty.

48.     Lender has been damaged as a result of defendant Rita Bonanno's breach of the Guaranty.

49.     Lender is entitled to recover from defendant Rita Bonanno all amounts due, owing and accruing under the Loan Documents, and the Guaranty, including attorneys' fees and other expenses, provided for and allowed under the Loan Documents and applicable law, as alleged hereinabove.

## THIRD CAUSE OF ACTION

(For Breach of Guaranty Against Defendant Allen Jenkins)

50.     Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 33 inclusive, as though fully set forth herein.

51.     Pursuant to the Guaranty, defendant Allen Jenkins unconditionally, absolutely, and irrevocably guaranteed to Lender complete payment when due of all of Middle Mountain's obligations under the Loan Documents.

52.     As alleged above, Middle Mountain defaulted, and remains in default, under the Loan Documents.

53.     In the October Demand Letter, demand was made upon defendant Allen Jenkins to perform his obligations under the terms of the Guaranty, and to pay in full the indebtedness owed to Lender by Middle Mountain under the Loan Documents.

54.     Defendant Allen Jenkins has failed and refused to pay to Lender any amounts under the Guaranty.

55.     Defendant Allen Jenkins' failure and refusal to make payments due under the Guaranty constitutes a breach of the Guaranty.

56.     Lender has been damaged as a result of defendant Allen Jenkins' breach of the Guaranty.

57.     Lender is entitled to recover from defendant Allen Jenkins all amounts due, owing and accruing under the Loan Documents, and the Guaranty, including attorneys' fees and other

10

expenses, provided for and allowed under the Loan Documents and applicable law, as alleged hereinabove.

## FOURTH CAUSE OF ACTION

(For Breach of Guaranty Against the Estate of Tamera Jenkins)

58.    Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 33 inclusive, as though fully set forth herein.

59.    Pursuant to the Guaranty, defendant Tamera Jenkins unconditionally, absolutely, and irrevocably guaranteed to Lender complete payment when due of all of Middle Mountain's obligations under the Loan Documents.

60.    As alleged above, Middle Mountain defaulted, and remains in default, under the Loan Documents.

61.    In the October Demand Letter, demand was made upon defendant Tamera Jenkins to perform her obligations under the terms of the Guaranty, and to pay in full the indebtedness owed to Lender by Middle Mountain under the Loan Documents.

62.    Defendant Tamera Jenkins, and subsequently her estate, has failed and refused to pay to Lender any amounts under the Guaranty.

63.    The defendant estate of Tamera Jenkins' failure and refusal to make payments due under the Guaranty constitutes a breach of the Guaranty.

64.    Lender has been damaged as a result of defendant Tamera Jenkins', and her estate's, breach of the Guaranty.

65.    Lender is entitled to recover from the defendant estate of Tamera Jenkins all amounts due, owing and accruing under the Loan Documents, and the Guaranty, including attorneys' fees and other expenses, provided for and allowed under the Loan Documents and applicable law, as alleged hereinabove.

WHEREFORE, Lender prays for judgment as follows:

(a)     On the First Cause of Action, against defendant Nicholas Bonanno for breach of the Guaranty, for all amounts due under the Loan Documents, including without limitation, all attorneys fees and costs;

(b)     On the Second Cause of Action, against defendant Rita Bonanno for breach of the Guaranty, for all amounts due under the Loan Documents, including without limitation, all attorneys fees and costs ;

(c)     On the Third Cause of Action, against Allen D. Jenkins for breach of the Guaranty, for all amounts due under the Loan Documents, including without limitation, all attorneys fees and costs ;

(d)     On the Fourth Cause of Action, against the estate of Tamera Jenkins for breach of Guaranty, for all amounts due under the Loan Documents, including without limitation, all attorneys fees and costs; and

(e)     For such other and further relief against all defendants as this Court may deem just and proper.

Dated: June *11*, 2008
        New York, New York

McKENNA LONG & ALDRIDGE LLP

Christopher F. Graham (CG 2455)
230 Park Avenue
Suite 1700
New York, NY 10169
(212) 905-8300
(212) 922-1819 (facsimile)

Of Counsel:

Gary W. Marsh
Georgia Bar No. 471290
David A. Geiger
Georgia Bar No. 288898
MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, Georgia  30308
(404) 527-4000
(404) 527-4198 (facsimile)


*Attorneys for Plaintiff, MM Arizona Holdings LLC*

**EXHIBIT A**

LOAN AGREEMENT

Dated as of July 13, 2006

between

MIDDLE MOUNTAIN 156, LLC
as Borrower

and

LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL, a division of
LEHMAN BROTHERS HOLDINGS INC.
individually and as Agent for one or more Co-Lenders,
as Lender

{10347125:14}

# TABLE OF CONTENTS

**Page**

ARTICLE 1    DEFINITIONS; PRINCIPLES OF CONSTRUCTION
   Section 1.1    Definitions.................................................................... 1
   Section 1.2    Principles of Construction........................................... 1
   .................................................................................................. 14

ARTICLE 2    GENERAL TERMS
   Section 2.1    Loan Commitment; Disbursement to Borrower. ........... 14
     2.1.1    Agreement to Lend and Borrow. .................................. 14
     2.1.2    The Loan. ........................................................................ 14
     2.1.3    The Note, Security Instrument and Loan Documents...... 14
     2.1.4    Use of Proceeds............................................................. 15
     2.1.5    Loan Closing Fee. ........................................................ 15
     2.1.6    Loan Administration Fee. ............................................. 15
     2.1.7    Option to Extend. .......................................................... 15
   Section 2.2    Interest; Loan Payments; Late Payment Charge. ......... 15
     2.2.1    Payments. ...................................................................... 16
     2.2.2    Interest Calculation. ..................................................... 16
     2.2.3    Intentionally Omitted. ................................................... 16
     2.2.4    Payment on Maturity Date. ......................................... 16
     2.2.5    Payments after Default. ............................................... 16
     2.2.6    Late Payment Charge. .................................................. 16
     2.2.7    Usury Savings. ............................................................... 17
     2.2.8    Governmental Taxes. ................................................... 17
   Section 2.3    Prepayments. ................................................................. 17
     2.3.1    Prepayments. ................................................................. 18
     2.3.2    Mandatory Prepayments. ............................................. 18
     2.3.3    Prepayments After Default. ......................................... 19
     2.3.4    Intentionally Omitted. ................................................... 19
     2.3.5    Making of Payments. .................................................... 19
     2.3.6    Application of Principal Prepayments. ........................ 19

ARTICLE 3    INTENTIONALLY OMITTED.
   .................................................................................................. 20

ARTICLE 4    REPRESENTATIONS AND WARRANTIES
   Section 4.1    Borrower Representations............................................ 20
     4.1.1    Organization. ................................................................ 20
     4.1.2    Proceedings. .................................................................. 20
     4.1.3    No Conflicts. ................................................................. 20
     4.1.4    Litigation. ...................................................................... 20
     4.1.5    Agreements. ................................................................... 21
     4.1.6    Solvency. ........................................................................ 21
     4.1.7    Full and Accurate Disclosure. .................................... 21
     4.1.8    No Plan Assets. ............................................................. 22
   .................................................................................................. 22

<u>TABLE OF CONTENTS</u>
(cont.)

|  |  | Page |
|---|---|---|
| 4.1.9 | Compliance. | 22 |
| 4.1.10 | Financial Information. | 22 |
| 4.1.11 | Condemnation. | 23 |
| 4.1.12 | Federal Reserve Regulations. | 23 |
| 4.1.13 | Utilities and Public Access. | 23 |
| 4.1.14 | Not a Foreign Person. | 23 |
| 4.1.15 | Separate Lots. | 23 |
| 4.1.16 | Assessments. | 23 |
| 4.1.17 | Enforceability. | 23 |
| 4.1.18 | Intentionally Omitted. | 24 |
| 4.1.19 | Insurance. | 24 |
| 4.1.20 | Use of Property. | 24 |
| 4.1.21 | Intentionally Omitted. | 24 |
| 4.1.22 | Flood Zone. | 24 |
| 4.1.23 | Intentionally Omitted. | 24 |
| 4.1.24 | Boundaries. | 24 |
| 4.1.25 | Leases and Other Agreements. | 24 |
| 4.1.26 | Survey. | 25 |
| 4.1.27 | Intentionally Omitted. | 25 |
| 4.1.28 | Filing and Recording Taxes. | 25 |
| 4.1.29 | Equity Contribution. | 25 |
| 4.1.30 | Intentionally Omitted. | 25 |
| 4.1.31 | Illegal Activity. | 25 |
| 4.1.32 | No Change in Facts or Circumstances; Disclosure. | 25 |
| 4.1.33 | Investment Company Act. | 26 |
| 4.1.34 | Principal Place of Business; State of Organization. | 26 |
| 4.1.35 | Single Purpose Entity. | 26 |
| 4.1.36 | Business Purposes. | 30 |
| 4.1.37 | Taxes. | 30 |
| 4.1.38 | Forfeiture. | 31 |
| 4.1.39 | Environmental Representations and Warranties. | 31 |
| 4.1.40 | Taxpayer Identification Number. | 31 |
| 4.1.41 | OFAC. | 31 |
| 4.1.42 | Embargoed Person. | 31 |
| Section 4.2 | Survival of Representations. | 32 |
| ARTICLE 5   BORROWER COVENANTS | | 32 |
| Section 5.1 | Affirmative Covenants. | 32 |
| 5.1.1 | Existence; Compliance with Legal Requirements. | 32 |
| 5.1.2 | Taxes and Other Charges. | 33 |
| 5.1.3 | Litigation. | 34 |
| 5.1.4 | Access to Property. | 34 |
| 5.1.5 | Notice of Default. | 34 |
| 5.1.6 | Cooperate in Legal Proceedings. | 34 |
| 5.1.7 | Award and Insurance Benefits. | 34 |

## TABLE OF CONTENTS
(cont.)

| | | Page |
|---|---|---|
| 5.1.8 | Further Assurances | 34 |
| 5.1.9 | Mortgage and Intangible Taxes | 35 |
| 5.1.10 | Financial Reporting | 35 |
| 5.1.11 | Business and Operations | 38 |
| 5.1.12 | Costs of Enforcement | 39 |
| 5.1.13 | Estoppel Statement | 39 |
| 5.1.14 | Loan Proceeds | 39 |
| 5.1.15 | Performance by Borrower | 39 |
| 5.1.16 | Confirmation of Representations | 40 |
| 5.1.17 | Leasing Matters | 40 |
| 5.1.18 | Management Agreement | 40 |
| 5.1.19 | Environmental Covenants | 40 |
| 5.1.20 | Performance of the Work | 41 |
| 5.1.21 | OFAC | 43 |
| Section 5.2 | Negative Covenants | 43 |
| 5.2.1 | Liens | 43 |
| 5.2.2 | Dissolution | 43 |
| 5.2.3 | Change In Business | 43 |
| 5.2.4 | Debt Cancellation | 43 |
| 5.2.5 | Zoning; Alterations | 43 |
| 5.2.6 | No Joint Assessment | 44 |
| 5.2.7 | Name, Identity, Structure, or Principal Place of Business | 44 |
| 5.2.8 | ERISA | 44 |
| 5.2.9 | Affiliate Transactions | 44 |
| 5.2.10 | Transfers | 45 |

ARTICLE 6   INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS   47

| Section 6.1 | Insurance | 47 |
|---|---|---|
| Section 6.2 | Casualty | 51 |
| Section 6.3 | Condemnation | 51 |
| Section 6.4 | Restoration | 52 |

ARTICLE 7   RESERVE FUNDS   55

| Section 7.1 | Contingency Holdback | 55 |
|---|---|---|
| Section 7.2 | Tax and Insurance Escrow Fund | 55 |
| Section 7.3 | Water/Sewer Holdback | 56 |
| Section 7.4 | Debt Service Holdback | 58 |
| Section 7.5 | Reserve Funds, Generally | 58 |

ARTICLE 8   DEFAULTS   59

| Section 8.1 | Event of Default | 59 |
|---|---|---|
| Section 8.2 | Remedies | 62 |
| Section 8.3 | Remedies Cumulative; Waivers | 63 |

ARTICLE 9   SPECIAL PROVISIONS   64

| Section 9.1 | Sale of Notes and Securitization | 64 |
|---|---|---|

# TABLE OF CONTENTS
(cont.)

| | | Page |
|---|---|---|
| Section 9.2 | Securitization Indemnification. | 65 |
| Section 9.3 | Servicer. | 68 |
| Section 9.4 | Exculpation. | 68 |
| Section 9.5 | Intentionally Omitted. | 72 |
| Section 9.6 | Intentionally Omitted. | 72 |
| Section 9.7 | Syndication | 72 |
| 9.7.1 | Syndication. | 72 |
| 9.7.2 | Sale of Loan, Co-Lenders, Participations and Servicing. | 72 |
| 9.7.3 | Cooperation in Syndication. | 74 |
| 9.7.4 | Payment of Agent's, and Co-Lender's Expenses, Indemnity, etc. | 76 |
| 9.7.5 | No Joint Venture. | 77 |
| 9.7.6 | Voting Rights of Co-Lenders. | 77 |

**ARTICLE 10  MISCELLANEOUS** — 77

| | | |
|---|---|---|
| Section 10.1 | Survival. | 77 |
| Section 10.2 | Lender's Discretion. | 78 |
| Section 10.3 | Governing Law; Submission to Jurisdiction. | 78 |
| Section 10.4 | Modification, Waiver in Writing. | 79 |
| Section 10.5 | Delay Not a Waiver. | 80 |
| Section 10.6 | Notices. | 80 |
| Section 10.7 | Trial by Jury. | 81 |
| Section 10.8 | Headings. | 82 |
| Section 10.9 | Severability. | 82 |
| Section 10.10 | Preferences. | 82 |
| Section 10.11 | Waiver of Notice. | 82 |
| Section 10.12 | Remedies of Borrower. | 82 |
| Section 10.13 | Expenses; Indemnity. | 83 |
| Section 10.14 | Schedules and Exhibits Incorporated. | 84 |
| Section 10.15 | Offsets, Counterclaims and Defenses. | 84 |
| Section 10.16 | No Joint Venture or Partnership; No Third Party Beneficiaries. | 84 |
| Section 10.17 | Publicity. | 85 |
| Section 10.18 | Waiver of Marshalling of Assets. | 85 |
| Section 10.19 | Waiver of Counterclaim. | 85 |
| Section 10.20 | Conflict; Construction of Documents; Reliance. | 85 |
| Section 10.21 | Brokers and Financial Advisors. | 86 |
| Section 10.22 | Prior Agreements. | 86 |
| Section 10.23 | Limitation of Liability. | 86 |
| Section 10.24 | Cross Collateralization/Cross Default. | 86 |

**ARTICLE 11  PARTIAL RELEASE OF PARCELS** — 87

| | | |
|---|---|---|
| Section 11.1 | Release of Parcels. | 87 |
| Section 11.2 | Release of Additional Collateral Parcels. | 88 |

## TABLE OF CONTENTS
(cont.)

| | Page |
|---|---|
| Schedule I – Organizational Chart of Borrower | S-I-1 |
| Schedule II – Bankruptcy Matters | S-II-1 |
| Schedule III – Project Schedule | S-III-1 |
| Exhibit A-1 - Legal Description of Middle Mountain Parcel | A-1 |
| Exhibit A-2 - Legal Description of 163 Parcel | A-2 |
| Exhibit A-3 - Legal Description of Val Vista Parcel | A-3 |

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of July 13, 2006 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), between LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL, a division of LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation having an address at 399 Park Avenue, New York, New York 10022 ("Lender"), and MIDDLE MOUNTAIN 156, LLC, an Arizona limited liability company, having its principal place of business at 20837 North 41st Avenue, Glendale, Arizona 85308 ("Borrower").

### WITNESSETH:

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

ARTICLE 1          DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1     Definitions.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"163" shall have the meaning set forth in Section 11.2.

"163 Property" shall have the meaning set forth in the 163 Security Instrument.

"163 Security Instrument" shall mean that certain second priority Deed of Trust, Security Agreement and Fixture Filing, of even date herewith, executed and delivered by 163 as security for the Obligations and encumbering the 163 Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"A&N" shall have the meaning set forth in Section 11.2.

"Accountants" shall mean a firm of independent certified public accountants engaged by Borrower and approved by Lender.

"Act" shall have the meaning set forth in Section 4.1.35(cc).

"Additional Collateral Parcels" shall mean the parcels of land comprising the 163 Property and the Val Vista Property, which may be sold as separate developable lots to third parties.

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such.

"Agent" shall have the meaning set forth in Section 9.7.2(d).

"ALTA" shall mean American Land Title Association, or any successor thereto.

"Applicable Laws" shall mean all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations and court orders.

"Applicable Interest Rate" shall mean from and including the date of this Agreement through the Maturity Date, an interest rate per annum equal to the greater of (a) 12.5% or (b) the Prime Rate in effect from time to time plus five percent (5.0%) per annum.

"Appraisal" shall mean an appraisal prepared in accordance with the requirements of FIRREA, prepared by an independent third party appraiser holding an MAI designation, who is State licensed or State certified if required under the laws of the State where the Property is located, who meets the requirements of FIRREA and who is otherwise satisfactory to Lender.

"Assignment and Assumption" shall have the meaning set forth in Section 9.7.2(a).

"Assignment of Leases" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Permits" shall mean that certain Assignment of Permits, Agreements, Licenses, Franchises and Authorizations dated the date hereof given by Borrower to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" shall mean Title 11 U.S.C. § 101 *et seq.*, and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"Borrower" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Borrower Party" shall mean, individually and collectively, Borrower, Guarantor.

{10347125:14}

"Business Day" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"Business Party" shall have the meaning set forth in Section 4.1.35(aa).

"Casualty" shall have the meaning set forth in Section 6.2.

"Casualty Consultant" shall have the meaning set forth in Section 6.4(b)(iii).

"Casualty Retainage" shall have the meaning set forth in Section 6.4(b)(iv).

"Closing Date" shall mean the date of the funding of the Loan.

"Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" shall mean the Property, the Guaranty, the Personal Property, and all other real or personal property of Borrower or any Guarantor that is at any time pledged, mortgaged or otherwise given as security to Lender for the payment of the Debt under the Security Instrument, this Agreement or any other Loan Document.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"Condemnation Proceeds" shall have the meaning set forth in Section 6.4(b).

"Contingency Holdback" shall have the meaning set forth in Section 7.1.

"Control" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"Co-Lender" shall have the meaning set forth in Section 9.7.2(a).

"Co-Lending Agreement" shall mean the Co-Lending Agreement entered into between Lender, individually as a Co-Lender and as Agent and the other Co-Lenders in the event of a Syndication, as the same may be further supplemented modified, amended or restated.

"Creditors Rights Laws" shall have the meaning set forth in Section 4.1.35(cc).

"Crossed Properties" shall have the meaning set forth in Section 10.24.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums

3

due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, the Interest Only Payment Amount for such period.

"Debt Service Holdback" shall have the meaning set forth in Section 7.4.

"Debt Service Shortfall" shall have the meaning set forth in Section 7.4.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the Maximum Legal Rate, or (b) five percent (5%) above the Applicable Interest Rate.

"Disclosure Document" shall mean each disclosure document in connection with a Securitization, including, without limitation, a prospectus supplement, private placement memorandum, offering circular or other offering document.

"Dollars" and the symbol "$" each mean the lawful money of the United States of America.

"Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or State-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or State chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a State chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and State authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Institution" shall mean a depository institution or trust company, insured by the Federal Deposit Insurance Corporation, (a) the short term unsecured debt obligations or commercial paper of which are rated at least A-1+ by S&P, P-1 by Moody's and F-1+ by Fitch in the case of accounts in which funds are held for 30 days or less, or (b) the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's in the case of accounts in which funds are held for more than thirty (30) days.

"Embargoed Person" shall have the meaning set forth in Section 4.1.42.

"Environmental Indemnity" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Indemnitor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

{10347125:14}

"Environmental Law" shall mean any present and future federal, State and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, that apply to Borrower or the Property and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Arizona Environmental Quality Act, Title 49, Arizona Revised Statutes and Arizona Water Quality Control, Title 49, Arizona Revised Statutes.

"Environmental Liens" shall have the meaning set forth in Section 5.1.19(a).

"Environmental Report" shall have the meaning set forth in Section 4.1.39.

"Equity Contribution" shall mean the sum of Five Million and 00/100 Dollars ($5,000,000.00).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"Event of Default" shall have the meaning set forth in Section 8.1(a).

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Exchange Act Filing" shall have the meaning set forth in Section 9.2(a).

"Extended Maturity Date" shall mean February 1, 2008.

"Extension Fee" shall mean an amount equal to three percent (3.0%) of the original principal amount of the Loan.

"Extension Notice" shall have the meaning set forth in Section 2.1.7.

"Extension Period" shall have the meaning set forth in Section 2.1.7.

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"Fitch" shall mean Fitch, Inc.

"Flood Insurance Acts" shall have the meaning set forth in Section 6.1(a)(vii).

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"Governmental Authority" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"Governmental Taxes" shall have the meaning set forth in Section 2.2(8).

5

"Guarantor" shall mean Nicholas Bonanno, Jr., an individual, and Allen Jenkins, an individual, and any other Person (other than Borrower) guaranteeing any payment or performance obligation of Borrower.

"Guaranty" shall mean collectively, the Guaranty of Recourse Obligations and the Payment Guaranty.

"Guaranty of Recourse Obligations" shall mean that certain Guaranty of Recourse Obligations of Borrower, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law.

"Improvements" shall have the meaning set forth in Article 1 of the Security Instrument.

"Indebtedness" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (f) obligations secured by any Liens, whether or not the obligations have been assumed.

"Indemnified Liabilities" shall have the meaning set forth in Section 10.13(b).

"Indemnified Parties" shall mean Lender, any Affiliate of Lender who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, the holders of any Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or

6

following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"Indemnitee" shall have the meaning set forth in Section 9.7.4(c).

"Indemnitor" shall mean any Person (other than Borrower) indemnifying any payment or performance obligation of Borrower.

"Independent Manager" shall have the meaning set forth in Section 4.1.35(aa).

"Information" shall have the meaning set forth in Section 9.7.3(b).

"Initial Advance" shall have the meaning set forth in Section 2.1.2.

"Initial Maturity Date" shall mean August 1, 2007.

"Insolvency Opinion" shall mean, that certain bankruptcy non-consolidation opinion letter delivered by counsel for Borrower in connection with the Loan, if required and approved by Lender or the Rating Agencies, as the case may be.

"Insurance Premiums" shall have the meaning set forth in Section 6.1(b).

"Insurance Proceeds" shall have the meaning set forth in Section 6.4(b).

"Interest Only Payment Amount" shall have the meaning set forth in Section 2.2.1.

"Interest Period" means, in connection with the calculation of interest accrued with respect to any specified Payment Date, the period commencing on the immediately preceding Payment Date and expiring on the date immediately preceding such specified Payment Date; provided, however, that with respect to the Interest Period ending on July 31, 2006, the Interest Period shall be the period commencing on the Closing Date; if any Interest Period would otherwise expire on a day which is not an Business Day, such Interest Period shall expire on the next succeeding Business Day; provided however, if such Interest Period would otherwise expire on the Maturity Date, and the Maturity Date is not a Business Day, such Interest Period shall expire on the immediately preceding Business Day; no Interest Period shall extend beyond the Maturity Date.

"Interest Shortfall" shall have the meaning set forth in Section 2.3.1(b).

"Investment Grade" shall mean a rating of BBB- or its equivalent by the Rating Agencies.

"Investor" shall have the meaning set forth in Section 5.1.10(g).

"Leases" shall have the meaning set forth in Article 1 of the Security Instrument.

"Legal Requirements" shall mean all federal, State, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof, or the zoning,

7

construction, use, alteration, occupancy or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lehman" shall have the meaning set forth in Section 9.2(b).

"Lehman Group" shall have the meaning set forth in Section 9.2(b).

"Lender" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"Liabilities" shall have the meaning set forth in Section 9.2(b).

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"LLC Agreement" shall have the meaning set forth in Section 4.1.35(d).

"Loan" shall mean the loan made by Lender to Borrower pursuant to this Agreement and the other Loan Documents.

"Loan Administration Fee" shall have the meaning set forth in Section 2.1.6.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Guaranty, the Assignment of Permits, the Val Vista Security Instrument, the 163 Security Instrument and all other documents executed and/or delivered in connection with the Loan.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense).

"Maturity Date" shall mean the earliest to occur of Initial Maturity Date, (ii) the Extended Maturity Date or (iii) such earlier date on which the payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, or by declaration of acceleration, or otherwise.

"Maximum Legal Rate" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the

8

indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"Member" shall have the meaning set forth in Section 4.1.35(cc).

"Monthly Insurance Premium Deposit" shall have the meaning set forth in Section 7.2.

"Monthly Tax Deposit" shall have the meaning set forth in Section 7.2.

"Moody's" shall mean Moody's Investors Service, Inc.

"Net Proceeds" shall have the meaning set forth in Section 6.4(b).

"Net Proceeds Deficiency" shall have the meaning set forth in Section 6.4(b)(vi).

"Note" shall mean that certain Promissory Note of even date herewith in the original principal amount of FORTY-FOUR MILLION AND 00/100 DOLLARS ($44,000,000.00) or so much thereof as may be advanced pursuant to the terms of this Agreement, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"Obligations" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"Officers' Certificate" shall mean a certificate delivered to Lender by Borrower which is signed by a Responsible Officer of Borrower. For purposes of Section 5.1.10(h), the term "Officers' Certificate" shall mean a certificate delivered to Lender by Borrower which is signed by the chief financial officer of Borrower.

"Other Charges" shall mean all maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"Parcel" shall have the meaning set forth in Section 11.1.

"Parcel Release" shall have the meaning set forth in Section 11.1.

"Participant" shall have the meaning set forth in Section 9.7.2(i).

"Payment Date" shall mean the first (1st) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately succeeding Business Day.

"Payment Guaranty" shall mean that certain Guarantor Full Repayment Guaranty, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

9

"Permitted Encumbrances" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Personal Property" shall have the meaning set forth in Article 1 of the Security Instrument.

"Policies" shall have the meaning set forth in Section 6.1(b).

"Prepayment Date" shall have the meaning set forth in Section 2.3.1.

"Prepayment Premium" shall mean an amount equal to the difference, if any, between the aggregate amount of interest that would otherwise be payable on the Loan at the Applicable Interest Rate from the prepayment date to and including the sixth (6th) month anniversary of the Closing Date. No Prepayment Premium shall be payable if the applicable prepayment occurs on or after the sixth (6th) month anniversary of the Closing Date, or in connection with a Casualty or Condemnation pursuant to Article 6.

"Prime Rate" shall mean, on a particular date, a rate per annum equal to the rate of interest published in *The Wall Street Journal* as the "prime rate", as in effect on such day, with any change in the prime rate resulting from a change in said prime rate to be effective as of the date of the relevant change in said prime rate; provided, however, that if more than one prime rate is published in *The Wall Street Journal* for a day, the average of the prime rates shall be used; provided, further, however, that the Prime Rate (or the average of the prime rates) will be rounded to the nearest 1/16 of 1% or, if there is no nearest 1/16 of 1%, to the next higher 1/16 of 1%. In the event that *The Wall Street Journal* should cease or temporarily interrupt publication, then the Prime Rate shall mean the daily average prime rate published in another business newspaper, or business section of a newspaper, of national standing chosen by Lender. If *The Wall Street Journal* resumes publication, the substitute index will immediately be replaced by the prime rate published in *The Wall Street Journal*. In the event that a prime rate is no longer generally published or is limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index which is readily available to Borrower and verifiable by Borrower but is beyond the control of Lender. Lender shall give Borrower prompt written notice of its choice of a substitute index and when the change became effective. Such substitute index will also be rounded to the nearest 1/16 of 1% or, if there is no nearest 1/16 of 1%, to the next higher 1/16 of 1%. The determination of the Prime Rate by Lender shall be conclusive and binding absent manifest error.

"Principal" shall have the meaning set forth in Section 4.1.35.

"Prohibited Person" shall mean any Person:

(a)      listed in the Annexo, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism ("Executive Order");

(b)      that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed on the Annex to, or is otherwise subject to provisions of, the Executive Order;

(c)      with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)      who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)      that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or

(f)      who is an Affiliate of or affiliated with a Person listed above.

"Projections" shall have the meaning set forth in Section 9.7.3(b).

"Property" shall mean, each parcel of real property, any Improvements thereon and all Personal Property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to such Property and Improvements, as more particularly described in Exhibit A attached hereto.

"Provided Information" shall have the meaning set forth in Section 9.1(a).

"Qualified Insurer" shall have the meaning set forth in Section 6.1(b).

"Qualified Transferee" shall mean any of the following entities:

(a)      a pension fund, pension trust or pension account that (i) has total real estate assets of at least $500 million and (ii) is managed by a Person who controls at least $500 million of real estate equity assets; or

(b)      a pension fund advisor who (i) immediately prior to such transfer, controls at least $500 million of real estate assets and (ii) is acting on behalf of one or more pension funds that, in the aggregate, satisfy the requirements of clause (a) of this definition; or

(c)      an insurance company which is subject to supervision by the insurance commissioner, or a similar official or agency, of a state or territory of the United States (including the District of Columbia) (i) with a net worth, as of a date no more than six (6) months prior to the date of the transfer of at least $500 million and (ii), who, immediately prior to such transfer, controls real estate equity assets of at least $500 million; or

{10347125:14}

(d)       a corporation organized under the banking laws of the United States or any state or territory of the United States (including the District of Columbia) (i) with a combined capital and surplus of at least $500 million and (ii) who, immediately prior to such transfer, controls real estate equity assets of at least $500 million; or

(e)       any person (i) with a long-term unsecured debt rating from each of the Rating Agencies of at least investment grade or (ii) who owns or operates at least ten (10) properties (not including the Property) of a type, quality and size similar to the Property, each of whom has a net worth, as of a date no more than six (6) months prior to the date of such transfer, of at least $500 million, and, immediately prior to such transfer, controls real estate equity assets of at least $500 million.

"Rating Agencies" shall mean each of S&P, Moody's, and Fitch, and any other nationally-recognized statistical rating agency which has been approved by Lender and has rated the Securities.

"Register" shall have the meaning set forth in Section 9.7.2(h).

"Related Party" shall have the meaning set forth in Section 9.4(e).

"Release" with respect to any Hazardous Material means any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

"Rents" shall have the meaning set forth in Article 1 of the Security Instrument.

"Reserve Funds" shall mean the Tax and Insurance Escrow Fund, or any other escrow or reserve fund established by the Loan Documents.

"Responsible Officer" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president-finance of such Person.  For purposes of Section 5.1.10(h), the term "Responsible Officer" shall mean Borrower's chief financial officer.

"Restoration" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender.

"Restricted Party" shall mean Borrower, any Guarantor, any Indemnitor or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of, Borrower, any Guarantor, any Indemnitor or any non-member manager.

"S&P" shall mean Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc.

"Sale or Pledge" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a direct or indirect legal or beneficial interest.

"Securities" shall have the meaning set forth in Section 9.1.

12

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Securitization" shall have the meaning set forth in Section 9.1.

"Security Instrument" shall mean that certain first priority Deed of Trust, Security Agreement and Fixture Filing, of even date herewith, executed and delivered by Borrower as security for the Obligations and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Servicer" shall have the meaning set forth in Section 9.3.

"Servicing Agreement" shall have the meaning set forth in Section 9.3.

"Severed Loan Documents" shall have the meaning set forth in Section 8.2(c).

"Special Member" shall have the meaning set forth in Section 4.1.35.

"State" shall mean the State in which the Property or any part thereof is located.

"Survey" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"Syndication" shall have the meaning set forth in Section 9.7.2(a).

"Syndication Indemnified Liabilities" shall have the meaning set forth in Section 9.7.4(c).

"Tax and Insurance Escrow Fund" shall have the meaning set forth in Section 7.2.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"Title Insurance Policy" shall mean an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if the Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Security Instrument encumbering the Property.

"Transfer" shall have the meaning set forth in Section 5.2.10.

"Transferee" shall have the meaning set forth in Section 5.2.10.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

"Underwriter Group" shall have the meaning set forth in Section 9.2(b).

"U.S. Obligations" shall mean direct non-callable obligations of the United States of America.

13

{10347125:14}

"Val Vista Property" shall have the meaning set forth in the Val Vista Security Instrument.

"Val Vista Security Instrument" shall mean that certain first priority Deed of Trust, Security Agreement and Fixture Filing, of even date herewith, executed and delivered by A&N Investment Properties, L.L.C., as security for the Obligations and encumbering the Val Vista Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Water/Sewer Holdback" shall have the meaning set forth in Section 7.3(a).

"Water Work" shall have the meaning set forth in Section 7.3(a).

"Work" shall mean any work required to be performed by Borrower in order to subdivide the Property into saleable building lots, including the installation of roads and providing access for utilities and other infrastructure to the Property and any other work required to be performed by Borrower under any purchase and sale contract entered into in connection a Parcel Release.

Section 1.2    Principles of Construction.

All references to articles, sections, exhibits and schedules are to articles, sections, exhibits and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE 2   GENERAL TERMS

Section 2.1    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

2.1.2    The Loan.

Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make the Loan to Borrower on the Closing Date in the original principal amount of $44,000,000.00; *provided, however,* that on the Closing Date, Lender shall only disburse to Borrower an amount equal to $37,735,000.00 (the "**Initial Advance**"). Portions of the Loan not disbursed on the Closing Date may be advanced in accordance with the provisions of Sections 7.1, 7.3 and 7.4. Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

14

2.1.3   The Note, Security Instrument and Loan Documents.

The Loan shall be evidenced by the Note and is secured by the Security Instrument, the Assignment of Leases and the other Loan Documents.

2.1.4   Use of Proceeds.

Borrower shall use a portion of the proceeds of the Loan to (a) refinance the existing indebtedness on the Property, as approved by Lender on the Closing Date, (b) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, and (c) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender.  In addition, Lender shall holdback from disbursement of the Loan proceeds certain amounts to be disbursed subject to the provisions of Sections 7.1, 7.3 and 7.4.

2.1.5   Loan Closing Fee.

On the Closing Date, Borrower shall pay to Lender a Loan closing fee equal to three percent (3.0%) of the original principal amount of the Loan.

2.1.6   Loan Administration Fee.

On the Closing Date, Borrower shall pay to Lender a loan administration fee (the "**Loan Administration Fee**") equal to two and one-half percent (2.5%) of the original principal amount of the Loan.

2.1.7   Option to Extend.

Borrower shall only have the one time option to extend the term of the Loan from the Initial Maturity Date to the Extended Maturity Date, upon satisfaction of each of the following conditions precedent:

(a)   Borrower shall provide Lender with irrevocable written notice (the "Extension Notice") of Borrower's request to exercise this option to extend not more than one hundred twenty (120) days but not less than sixty (60) days prior to the Initial Maturity Date;

(b)   As of the date of Borrower's delivery of the Extension Notice, and as of the Initial Maturity Date, no Event of Default shall have occurred and be continuing, and Borrower shall deliver, if requested by Lender, an Officer's Certificate to such effect on each such date;

(c)   Borrower shall deliver to Lender, at Borrower's sole cost and expense, an updated title search that shall show no encumbrances on the Property other than the Permitted Encumbrances and shall otherwise not show any matter not permitted by the Loan Documents;

(d)   Borrower shall have provided to Lender an estoppel certificate in compliance with Section 5.1.13;

(e)   Borrower shall have paid to Lender the Extension Fee; and

(f)    Borrower shall have paid to Lender any accrued and unpaid interest on the Loan through the Initial Maturity Date.

During the period from the Initial Maturity Date through the Extended Maturity Date (the "**Extension Period**"), the terms and conditions of this Agreement and the other Loan Documents as modified and approved by Lender and Borrower shall remain unmodified and in full force and effect.

Section 2.2    Interest; Loan Payments; Late Payment Charge.

2.2.1    Payments.

(a)    Interest Payments. Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date to but excluding the Maturity Date at the Applicable Interest Rate. Borrower shall pay to Lender commencing on August 1, 2006, and on each Payment Date thereafter through and including the Maturity Date, interest only on the outstanding principal balance of the Loan (the "**Interest Only Payment Amount**").

(b)    All payments and other amounts due under the Note, this Agreement and the other Loan Documents shall be made without any setoff, defense or irrespective of, and without deduction for, counterclaims.

2.2.2    Interest Calculation.

Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Applicable Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance.

2.2.3    Intentionally Omitted.

2.2.4    Payment on Maturity Date.

Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest thereon and all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

2.2.5    Payments after Default.

Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Loan and, to the extent permitted by Applicable Law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the accrued and unpaid Debt (or that portion thereof that is then due). To the extent permitted by Applicable Law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instrument. This paragraph shall not be construed as an

16

agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

### 2.2.6    Late Payment Charge.

If any principal, interest or any other sums due under the Loan Documents is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by Applicable Law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment; provided, however, that such late charge shall not be due and payable with respect to the final payment of principal due on the Maturity Date. Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by Applicable Law.

### 2.2.7    Usury Savings.

This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### 2.2.8    Governmental Taxes.

(a)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, which are imposed, enacted or become effective after the date hereof (collectively, "**Governmental Taxes**"), excluding, however, income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein imposed upon Lender. If any Governmental Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Governmental Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Governmental Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if

17

available, or certified copy thereof showing payment of such Governmental Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Governmental Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(b)    In the event that any change in any requirement of law or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i)    shall hereafter impose, modify or hold applicable any additional cost or reserve, special deposit, compulsory loan or similar requirement, against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender;

(ii)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(iii)    shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this Section, Lender shall provide Borrower with not more than ninety (90) days written notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error.

(c)    This Section shall survive payment of the Note and the satisfaction of all other obligations of Borrower under the Note, this Agreement, the Security Instrument and the other Loan Documents.

Section 2.3    Prepayments.

2.3.1    Prepayments.

On any Payment Date, Borrower may, at its option, prepay the Loan, in whole, but not in part, upon satisfaction of the following conditions:

(a)    Borrower shall provide prior written notice to Lender specifying the date (the "Prepayment Date") upon which the prepayment is to be made, which notice shall be delivered to Lender not less than thirty (30) days prior to such payment. Borrower's notice of prepayment

18

in accordance with this subsection (a) shall be irrevocable, and the principal balance to be prepaid shall be absolutely and unconditionally due and payable on the date specified in such notice; and

(b)     Borrower shall pay to Lender, simultaneously with such prepayment (i) all accrued and unpaid interest on the amount of principal being prepaid through and including the Prepayment Date, (ii) if such payment is not made on a Payment Date, all interest on the principal amount being prepaid which would have accrued from the date of prepayment through and including the end of the Interest Period then in effect (the "**Interest Shortfall**"), (iii) the applicable Prepayment Premium (if the applicable prepayment occurs on or before the sixth (6th) month anniversary of the Closing Date), if any, and (iv) all other sums then due under this Agreement, the Note or the other Loan Documents.

2.3.2   Mandatory Prepayments.

On the next occurring Payment Date following the date on which Borrower actually receives any Net Proceeds, Borrower shall prepay the outstanding principal balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds. No Prepayment Premium shall be due in connection with any prepayment made pursuant to this Section 2.3.2, and all other provisions of Section 2.3.1(a) and Section 2.3.1(b) shall apply.

2.3.3   Prepayments After Default.

If, following an Event of Default, Borrower tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by Lender after such Event of Default such tender or recovery shall be deemed a voluntary prepayment by Borrower and Borrower shall pay, in addition to the Debt, (i) all accrued and unpaid interest on the amount of principal being prepaid through and including the Prepayment Date, (ii) if such payment is not made on a Payment Date, the Interest Shortfall with respect to the amount prepaid, (iii) the applicable Prepayment Premium, and (iv) all other sums due under this Agreement, the Note or the other Loan Documents in connection with a partial or total prepayment.

2.3.4   Intentionally Omitted.

2.3.5   Making of Payments.

Each payment by Borrower hereunder or under the Note shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 2:00 p.m., New York City time, on or prior to the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower. Whenever any payment hereunder or under the Note shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date.

2.3.6   Application of Principal Prepayments.

All prepayments received pursuant to this Section 2.3 shall be accompanied by accrued interest and all other sums due as provided in this Section 2.3 and shall be applied first, to

19

interest on the outstanding principal balance being prepaid that accrued through and including the date of prepayment, second, to interest on the outstanding principal balance being prepaid that would have accrued through the end of the Interest Period in which the prepayment occurred and third, to the payments of principal due under the Loan in the inverse order of maturity.

ARTICLE 3   INTENTIONALLY OMITTED.

ARTICLE 4   REPRESENTATIONS AND WARRANTIES

   Section 4.1    Borrower Representations.

Borrower represents and warrants as of the Closing Date that:

   4.1.1   Organization.

   Borrower is organized and is validly existing and in good standing in the jurisdiction in which it is organized, with requisite power and authority to own the Property and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in the State of Arizona. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own the Property and to transact the businesses in which it is now engaged. Attached hereto as Schedule 1 is a true, correct and complete organizational chart of Borrower.

   4.1.2   Proceedings.

   Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

   4.1.3   No Conflicts.

   The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or any of the Property or Borrower's other assets, or any license or other approval required to operate the Property, and any consent, approval, authorization, order, registration or qualification of or with any

20

Governmental Agency required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents have been obtained and is in full force and effect.

### 4.1.4   Litigation.

There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower or the Property, which actions, suits or proceedings, if determined against Borrower or the Property, might materially adversely affect the condition (financial or otherwise) or business of Borrower or the condition or ownership of the Property.

### 4.1.5   Agreements.

Borrower is not a party to any agreement or instrument or, to the best of Borrower's knowledge, subject to any restriction which might materially and adversely affect either Borrower or the Property. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound. Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property and (b) obligations under the Loan Documents.

### 4.1.6   Solvency.

Borrower (a) has not entered into the transaction or executed the Note, this Agreement or any other Loan Documents with the intent to hinder, delay or defraud any creditor and (b) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower). Except as set forth in Schedule II, no petition under the Bankruptcy Code or similar state bankruptcy or insolvency law has been filed against Borrower or any constituent Person in the last seven (7) years, and Borrower nor any constituent Person in the last seven (7) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor any of its constituent Persons are contemplating either the filing of a petition by it under the Bankruptcy Code or similar state bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

{10347125:14}

4.1.7    Full and Accurate Disclosure.

No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, or might materially and adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.

4.1.8    No Plan Assets.

Borrower is not an "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with either Borrower are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement.

4.1.9    Compliance.

Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, all Environmental Laws, building and zoning ordinances and codes. To the best of Borrower's knowledge after due inquiry, Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by Borrower any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. To the best of Borrower's knowledge after due inquiry, there has not been committed by any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

4.1.10    Financial Information.

To the best of Borrower's knowledge, all financial data that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent in all material respects the financial condition of Borrower and the Property, as applicable, as of the date of such reports, and (iii) have been prepared on an accrual basis in accordance with GAAP throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property except as referred to or reflected in said financial statements. To the best of Borrower's knowledge, since the date of such financial statements,

{10347125:14}

there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

4.1.11   Condemnation.

To the best of Borrower's knowledge, no Condemnation or other similar proceeding has been commenced or is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

4.1.12   Federal Reserve Regulations.

No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.1.13   Utilities and Public Access.

The Property has rights of access to public ways.  Except as otherwise disclosed to Lender in writing in that certain letter dated May 16, 2006 by the City of Phoenix Development Services Department with respect to water and sewer utilities, any public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy.

4.1.14   Not a Foreign Person.

Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

4.1.15   Separate Lots.

The Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

4.1.16   Assessments.

To the best of Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

4.1.17   Enforceability.

The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, including the defense of usury, and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

23

4.1.18 Intentionally Omitted.

4.1.19 Insurance.

Borrower has obtained and has delivered to Lender certified copies of all insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any such policy.

4.1.20 Use of Property.

The Property currently is vacant, and during the term of the Loan it is intended to be subdivided into saleable building lots to be developed for use as detached residential units, condominiums, apartments and for commercial development purposes and other appurtenant and related uses permitted pursuant to the current "R1-18", "R-3", "R-3A" and "C-2" zoning designations.

4.1.21 Intentionally Omitted.

4.1.22 Flood Zone.

The Property is not located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards.

4.1.23 Intentionally Omitted.

4.1.24 Boundaries.

Except as disclosed on the Survey or the Title Insurance Policy, no improvements on adjoining properties encroach upon the Property.

4.1.25 Leases and Other Agreements.

(a)     Except for (i) that certain Letter of Intent dated May 30, 2006, executed on behalf of D.R. Horton, Inc. with respect to the proposed sale of approximately 26 acres of the Property identified therein as Parcel B and (ii) that certain Purchase and Sale Agreement dated as of June 20, 2006, between Borrower and Colonial Realty Limited Partnership with respect to the proposed sale of approximately 29.6 acres of the Property identified therein as Parcel C, there are no Leases or other agreements which affect the Property and no Person has any possessory right or interest in, or right to use or occupy, the Property or any portion thereof or any claim, right, title or interest therein.

(b)     Based upon the Environmental Reports and information that Borrower knows, after due inquiry, no Hazardous Materials have been disposed, stored or treated by any Person nor does Borrower have any actual knowledge of any Person's intention to use the Property for any activity which, directly or indirectly, involves the use, generation, treatment, storage, disposal or transportation of any Hazardous Materials, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such

24

{10347125:14}

permits are required), and (ii) either (A) in amounts not in excess of that necessary to operate, clean, repair and maintain the Property, or (B) fully disclosed to and approved by Lender in writing pursuant to the Environmental Reports.

4.1.26  Survey.

To the best of Borrower's knowledge after due inquiry, the Survey for the Property delivered to Lender in connection with this Agreement does not fail to reflect any material matter affecting the Property or the title thereto.

4.1.27  Intentionally Omitted.

4.1.28  Filing and Recording Taxes.

All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid.

4.1.29  Equity Contribution.  As a condition to Lender's willingness to make the Loan, as of the date of this Agreement, Borrower has invested the Equity Contribution in the Property in a manner satisfactory to Lender, which investment does not include fees, payments or commission paid to Borrower, any Principal or Guarantor or any affiliates thereof.

4.1.30  Intentionally Omitted.

4.1.31  Illegal Activity.

There are no illegal activities or activities relating to any controlled substances at the Property.

4.1.32  No Change in Facts or Circumstances; Disclosure.

All information submitted by Borrower to Lender and in all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects.  To the best of Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the value of the Property or the business operations or the financial condition of Borrower.  Borrower has disclosed to Lender all material facts known to Borrower and has not failed to disclose any material fact known to Borrower that could cause any Provided Information or representation or warranty made herein to be materially misleading.

25

{10347125;14}

### 4.1.33 Investment Company Act.

Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or State law or regulation which purports to restrict or regulate its ability to borrow money.

### 4.1.34 Principal Place of Business; State of Organization.

Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement. Borrower is organized under the laws of the State of Arizona and its organizational identification number is L-1174489-2.

### 4.1.35 Single Purpose Entity.

Borrower represents, warrants, covenants, and agrees that (i) other than with respect to subsections (v), (aa), (bb) and (cc) below, it has not since formation and (ii) its organizational documents shall provide that it shall not, and that its general partner(s), if Borrower is a partnership, or its member(s), if Borrower is a limited liability company (in each case, "Principal") (I) have not since formation (other than with respect to subsections (v), (aa), (bb) and (cc) below) and (II) each Principal's organizational documents shall provide that it shall not:

(a)    with respect to Borrower, engage in any business or activity other than the acquisition, development, ownership, managing and maintenance of the Property, entering into the Loan, and activities incidental thereto;

(b)    with respect to Borrower, acquire or own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Property, and with respect to Principal, engage in any business or activity or acquire or own any assets, other than its interest in Borrower;

(c)    merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)    (i) fail to observe its organizational formalities or preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, qualification to do business in the State where the Property is located, if applicable, (ii) without the prior written consent of Lender, terminate or fail to comply with the provisions of Borrower's limited liability company operating agreement, dated as of November 8, 2005, and amended as of the date hereof (the "LLC Agreement"), certificate of formation, articles of organization or similar organizational documents, as the case may be, or (iii) without the prior written consent of Lender, amend or modify Sections 5(b) and (c), 7-10, 15, 18-22, 24 and 29 of the LLC Agreement (and all definitions utilized in such Sections), as well as the entire amendments to the limited liability company operating agreements for the two Members of Borrower;

26

(e)    other than Principal's ownership interest in Borrower, own any subsidiary or make any investment in, any Person without the prior written consent of Lender;

(f)    commingle its assets with the assets of any of its members, general partners, Affiliates, principals or of any other Person participate in a cash management system with any other Person or fail to use its own separate stationery, invoices and checks;

(g)    with respect to Borrower, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than its obligations set forth in the Note and hereunder, except for trade payables in the ordinary course of its business of owning and operating the Property, provided that such debt (i) is not evidenced by a note, (ii) is paid within sixty (60) days of the date incurred, (iii) does not exceed, in the aggregate, one percent (1%) of the outstanding principal balance of the Note and (iv) is payable to trade creditors and in amounts as are normal and reasonable under the circumstances, and with respect to Principal, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation);

(h)    become insolvent and fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(i)    (i) fail to maintain its records (including financial statements), books of account and bank accounts separate and apart from those of the members, general partners, principals and Affiliates of Borrower, or of Principal, as the case may be, the Affiliates of a member, general partner or principal of Borrower, or of Principal, as the case may be, and any other Person, (ii) permit its assets or liabilities to be listed as assets or liabilities on the financial statement of any other Person or (iii) include the assets or liabilities of any other Person on its financial statements;

(j)    enter into any contract or agreement with any member, general partner, principal or Affiliate of Borrower or of Principal, as the case may be, Guarantor, Indemnitor, or any member, general partner, principal or Affiliate thereof (other than a business management services agreement with an Affiliate of Borrower, or of Principal, as the case may be, provided that (i) such agreement is acceptable to Lender, (ii) the manager, or equivalent thereof, under such agreement holds itself out as an agent of Borrower, or of Principal, as the case may be, and (iii) the agreement meets the standards set forth in this subsection (j) following this parenthetical), except upon terms and conditions that are commercially reasonable, intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any member, general partner, principal or Affiliate of Borrower, or of Principal, as the case may be, Guarantor, Indemnitor or any member, general partner, principal or Affiliate thereof;

(k)    seek the dissolution or winding up in whole, or in part, of Borrower;

(l)    fail to correct any known misunderstandings regarding the separate identity of Borrower, or of Principal as the case may be, or any member, general partner, principal or Affiliate thereof or any other Person;

{10347125:14}

(m)    guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for the debts of another Person;

(n)    make any loans or advances to any third party, including any member, general partner, principal or Affiliate of Borrower, or of Principal, as the case may be, or any member, general partner, principal or Affiliate thereof, and shall not acquire obligations or securities of any member, general partner, principal or Affiliate of Borrower, or of Principal, as the case may be, or any member, general partner, or Affiliate thereof;

(o)    fail to file its own tax returns or be included on the tax returns of any other Person except as required by Applicable Law;

(p)    fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or a name franchised or licensed to it by an entity other than an Affiliate of Borrower, or of Principal, as the case may be, and not as a division or part of any other entity in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower, or Principal, as the case may be, is responsible for the debts of any third party (including any member, general partner, principal or Affiliate of Borrower, or Principal, as the case may be, or any member, general partner, principal or Affiliate thereof);

(q)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(r)    share any common logo with or hold itself out as or be considered as a department or division of (i) any general partner, principal, member or Affiliate of Borrower, or of Principal, as the case may be, (ii) any Affiliate of a general partner, principal or member of Borrower, or of Principal, as the case may be, or (iii) any other Person;

(s)    fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate;

(t)    pledge its assets for the benefit of any other Person other than with respect to the Loan;

(u)    fail to maintain a sufficient number of employees in light of its contemplated business operations;

(v)    fail to provide in its (i) articles of organization, certificate of formation and/or limited liability company operating agreement, as applicable, if it is a limited liability company, (ii) limited partnership agreement, if it is a limited partnership or (iii) certificate of incorporation, if it is a corporation, that for so long as the Loan is outstanding pursuant to the Note, this Agreement and the other Loan Documents, it shall not file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors without the affirmative vote of the Independent Manager and of all other general partners/members/directors;

28

(w)    fail to hold its assets in its own name;

(x)    fail to consider the interests of its creditors in connection with all company actions to the extent permitted by Applicable Law;

(y)    have any of its obligations guaranteed by an Affiliate except the Guarantor in connection with the Loan;

(z)    violate or cause to be violated the assumptions made with respect to Borrower in the Insolvency Opinion;

(aa)    with respect to Borrower and its member, fail at any time to have at least one (1) independent manager (the "**Independent Manager**") that is not and has not been for at least five (5) years: (a) a stockholder, director (other than an independent director), officer, employee, partner, member, manager (other than an independent manager), attorney or counsel of Borrower, its members, or Principal or any Affiliate of either of them, or any Person directly or indirectly controlling or controlled by or under direct or indirect common control with any of them; (b) a customer, supplier or other Person who derives its purchases or revenues (other than any fee paid to such Independent Manager as compensation for its services to serve as an Independent Manager) from its activities with Borrower, its members, Principal or any Affiliate of either of them (a "**Business Party**"); (c) a Person controlled by or controlling or under common control with any such stockholder, partner, member, manager, director, officer, attorney, counsel or Business Party; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, manager, attorney, counsel or Business Party; or

(bb)    with respect to Borrower, take any action which, under the terms of any certificate of incorporation, by-laws, voting trust agreement with respect to any common stock, certificate of formation, LLC Agreement or other applicable organizational documents, requires the unanimous vote of one hundred percent (100%) of the members of the board without the vote of the Independent Manager.

(cc)    The LLC Agreement shall provide that (i) upon the occurrence of any event that causes the sole member of Borrower ("**Member**") to cease to be the sole member of Borrower (other than (A) upon an assignment by Member of all of its limited liability company interest in Borrower and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Borrower in accordance with the terms of the Loan Documents and the LLC Agreement), any Person acting as the Independent Manager of Borrower shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower, automatically be admitted to Borrower ("**Special Member**") and shall continue Borrower without dissolution and (ii) no Special Member may resign from Borrower or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Borrower as Special Member in accordance with requirements of Delaware law in its place and (B) such successor Special Member has also accepted its appointment as an Independent Manager. The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Borrower upon the admission to Borrower of a substitute Member, (ii) each Special

29

Member shall be a member of Borrower that has no interest in the profits, losses and capital of Borrower and has no right to receive any distributions of Borrower assets, (iii) pursuant to the Arizona Limited Liability Company Act (the "Act"), the Special Member shall not be required to make any capital contributions to Borrower and shall not receive a limited liability company interest in Borrower, (iv) no Special Member, in its capacity as Special Member, may bind Borrower and (v) except as required by any mandatory provision of the Act, the Special Member, in its capacity as Special Members, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower, including, without limitation, the merger, consolidation or conversion of Borrower; provided, however, such prohibition shall not limit the obligations of the Special Member, in its capacity as an Independent Manager, to vote on such matters required by the Loan Documents or the LLC Agreement. In order to implement the admission to Borrower of the Special Member, the Special Member shall execute a counterpart to the LLC Agreement. Prior to their admission to Borrower as a Special Member, the Special Member shall not be a member of Borrower. Upon the occurrence of any event that causes the Member to cease to be a member of Borrower, to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower, agree in writing (i) to continue Borrower and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of Member in Borrower. Any action initiated by or brought against Member or the Special Member under any Creditors Rights Laws (as defined below) shall not cause Member or the Special Member to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution. The LLC Agreement shall provide that each of Member and the Special Member waives any right it might have to agree in writing to dissolve Borrower upon the occurrence of any action initiated by or brought against Member or the Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or the Special Member to cease to be a member of Borrower. The term "Creditors Rights Laws" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

4.1.36  Business Purposes.

The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

4.1.37  Taxes.

Borrower Parties have filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

{10347125:14}

4.1.38 <u>Forfeiture.</u>

Neither Borrower nor any other Person in occupancy of or involved with the operation or use of the Property has committed any act or omission affording the federal government or any State or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under the Note, this Agreement or the other Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

4.1.39 <u>Environmental Representations and Warranties.</u>

Borrower represents and warrants, except as disclosed in the written reports resulting from the environmental site assessments of the Property delivered to and approved by Lender prior to the Closing Date (the "**Environmental Report**") and information that Borrower knows that: (a) there are no Hazardous Materials, or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with current Environmental Laws and with permits issued pursuant thereto (if such permits are required), and (ii) in amounts not in excess of that necessary to maintain the Property, (b) there are no past, present or threatened Releases of Hazardous Materials in violation of any Environmental Law and which would require remediation by a Governmental Authority in, on, under or from the Property; (c) there is no threat of any Release of Hazardous Materials migrating to the Property; (d) there is no past or present non-compliance with current Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Reports; (e) Borrower does not know of, or has received, any written or oral notice or other communication from any Person (including but not limited to a Governmental Authority) relating to Hazardous Materials in, on, under or from the Property; and (f) Borrower has provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in either Borrower's files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

4.1.40 <u>Taxpayer Identification Number.</u>

Borrower's United States taxpayer identification number is 20-2135737.

4.1.41 <u>OFAC</u>

Borrower represents and warrants that neither Borrower, Guarantor, or any of their respective Affiliates is a Prohibited Person, and Borrower, Guarantor, and their respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

4.1.42 <u>Embargoed Person.</u>

As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Principal and Guarantor constitute property of, or are beneficially

31

{10347125:14}

owned directly or indirectly, by any person, entity or government subject to trade restrictions, under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§1701 et seq., The Trading with the Enemy Act: 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law ("Embargoed Person"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Principal, or Guarantor, as applicable, with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower, Principal, or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Principal, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

Section 4.2    Survival of Representations.

Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

# ARTICLE 5  BORROWER COVENANTS

Section 5.1    Affirmative Covenants.

From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Liens of the Security Instrument (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

5.1.1    Existence; Compliance with Legal Requirements.

(a)    Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises, and comply, in all material respects, with all Legal Requirements applicable to it and the Property. There shall never be committed by Borrower, and Borrower shall use its best efforts to ensure that any other Person involved with the Property or the use or operation thereof shall not commit any act or omission affording the federal government or any State or local government the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.

32

{10347125:14}

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein is subject to being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

5.1.2    Taxes and Other Charges.

Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Borrower shall furnish to Lender receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 7.2). Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Applicable Laws; (iii) neither the Property nor any part thereof or interest therein is subject to being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon. Lender may apply such security or part thereof held by Lender at any time when, in the reasonable judgment of Lender, the validity or applicability of such Taxes or Other Charges are established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited,

33

terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

### 5.1.3  Litigation.

Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Property.

### 5.1.4  Access to Property.

Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

### 5.1.5  Notice of Default.

Borrower shall promptly advise Lender of any material adverse change in either Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

### 5.1.6  Cooperate in Legal Proceedings.

Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

### 5.1.7  Award and Insurance Benefits.

Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses reasonably incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Award or Insurance Proceeds.

### 5.1.8  Further Assurances.

Borrower shall, at Borrower's sole cost and expense:

(a)  furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or reasonably requested by Lender in connection therewith;

{10347125;14}

(b)    execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require including, without limitation, the execution of UCC financing statements; and

(c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

5.1.9  Mortgage and Intangible Taxes.

, Borrower shall pay all State, county and municipal recording, mortgage, and intangible, and all other taxes imposed upon the execution and recordation of the Security Instrument and/or upon the execution and delivery of the Note.

5.1.10  Financial Reporting.

(a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with GAAP (or such other accounting basis acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation on an individual basis of the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default, Borrower shall pay all costs and expenses incurred by Lender to examine either Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year, a complete copy of Borrower's annual financial statements audited by a the Accountants in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual gross income, net cash flow, net operating income, and operating expenses. Borrower's annual financial statements shall be accompanied by (i) a certificate executed by a Responsible Officer or other appropriate officer of Borrower stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon and has been prepared on an accrual basis in accordance with GAAP and (ii) an unqualified opinion of the Accountant. Together with Borrower's annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to

{10347125:14}

remedy the same. In addition, on or prior to the Closing Date, Borrower shall provide Lender with a balance sheet of Borrower (taking into account the acquisition of the Property and the Loan), together with a certificate executed by a Responsible Officer or other appropriate officer of Borrower stating that such opening balance sheet presents fairly the financial condition and results of operations of Borrower and the Property and has been prepared on an accrual basis in accordance with GAAP.

(c)    Intentionally Omitted.

(d)    Intentionally Omitted.

(e)    Borrower shall furnish to Lender, within ten (10) Business Days after request such detailed information with respect to the operation of the Property, the financial affairs of Borrower and such other financial or statistical information as may be reasonably requested by Lender, including, without limitation, a statement of any tenants then in default under any of the Leases.

(f)    Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette or by e-mail, and (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form and prepared using a Microsoft Word for Windows or WordPerfect for Windows files (which files may be prepared using a spreadsheet program and saved as word processing files).

(g)    Borrower agrees that Lender may forward to each purchaser, transferee, assignee, servicer, participant, Co-Lender or investor in all or any portion of the Loan or any Securities (collectively, the "Investor") or any Rating Agency rating such participations and/or Securities and each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor or otherwise, as Lender determines necessary or desirable. Borrower irrevocably waives any and all rights they may have under any Applicable Laws to prohibit such disclosure, including, but not limited, to any right of privacy.

(h)    If requested by Lender, Borrower shall provide Lender, promptly upon request or within the time periods set forth in this subsection (h), with the following financial statements if, at the time a Disclosure Document is being prepared for a Securitization, it is expected that the principal amount of the Loan together with any Affiliated Loans at the time of Securitization may, or if the principal amount of the Loan together with any Affiliated Loans at any time during which the Loan and any Affiliated Loans are included in a Securitization does, equal or exceed 20% of the aggregate principal amount of all mortgage loans included or expected to be included, as applicable, in the Securitization:

(i)    To the extent in Borrower's possession, a balance sheet with respect to the Property for the two most recent fiscal years, meeting the requirements of Section 210.3 01 of Regulation S-X of the Securities Act and statements of income and statements of

{10347125:14}

cash flows with respect to the Property for the three most recent fiscal years, meeting the requirements of Section 210.3 02 of Regulation S-X, and, to the extent that such balance sheet is more than 135 days old as of the date of the document in which such financial statements are included, interim financial statements of the Property meeting the requirements of Section 210.3 01 and 210.3 02 of Regulation S-X (all of such financial statements, collectively, the "Standard Statements"); provided, however, that with respect to the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) that has been acquired by Borrower from an unaffiliated third party (such Property, "Acquired Property"), as to which the other conditions set forth in Section 210.3 14 of Regulation S-X for provision of financial statements in accordance with such Section have been met, in lieu of the Standard Statements otherwise required by this section, Borrower shall instead provide the financial statements required by such Section 210.3 14 of Regulation S-X ("Acquired Property Statements").

(ii)    Not later than 30 days after the end of each fiscal quarter following the date hereof, a balance sheet of the Property as of the end of such fiscal quarter, meeting the requirements of Section 210.3 01 of Regulation S-X, and statements of income and statements of cash flows of the Property for the period commencing following the last day of the most recent fiscal year and ending on the date of such balance sheet and for the corresponding period of the most recent fiscal year, meeting the requirements of Section 210.3 02 of Regulation S-X (provided, that if for such corresponding period of the most recent fiscal year Acquired Property Statements were permitted to be provided hereunder pursuant to subsection (i) above, Borrower shall instead provide Acquired Property Statements for such corresponding period).

(iii)   Not later than 75 days after the end of each fiscal year following the date hereof, a balance sheet of the Property as of the end of such fiscal year, meeting the requirements of Section 210.3 01 of Regulation S-X, and statements of income and statements of cash flows of the Property for such fiscal year, meeting the requirements of Section 210.3 02 of Regulation S-X.

(iv)    Within ten Business Days after notice from the Lender in connection with the Securitization of the Loan, such additional financial statements, such that, as of the date (each an "Offering Document Date") of each Disclosure Document, Borrower shall have provided Lender with all financial statements as described in subsection (h)(i) above; provided that the fiscal year and interim periods for which such financial statements shall be provided shall be determined as of such Offering Document Date.

(i)     If requested by Lender, Borrower shall provide Lender, promptly upon request (but in no event later than the time periods set forth in Section 5.1.10(h) hereof), with summaries of the financial statements referred to in Section 5.1.10(h) hereof if, at the time a Disclosure Document is being prepared for a Securitization, it is expected that the principal amount of the Loan and any Affiliated Loans at the time of Securitization may, or if the principal amount of the Loan and any Affiliated Loans at any time during which the Loan and any Affiliated Loans are included in a Securitization does, equal or exceed 10% (but is less than 20%) of the aggregate

37

{10347125:14}

principal amount of all mortgage loans included or expected to be included, as applicable, in a Securitization. Such summaries shall meet the requirements for "summarized financial information," as defined in Section 210.1 02(bb) of Regulation S-X, or such other requirements as may be determined to be necessary or appropriate by Lender.

(j)     All financial statements provided by Borrower hereunder pursuant to Section 5.1.10(h) and (i) hereof shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation S-X and other applicable legal requirements. All financial statements referred to in Subsections 5.1.10(h)(i) and 5.1.10(h)(iii) above shall be audited by independent accountants of Borrower acceptable to Lender in accordance with Regulation S-X and all other applicable legal requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-X and all other applicable legal requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act filing, all of which shall be provided at the same time as the related financial statements are required to be provided. All financial statements (audited or unaudited) provided by Borrower under this Section 5.1.10 shall be certified by the chief financial officer or administrative member of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this Section 5.1.10(j).

(k)     If requested by Lender, Borrower shall provide Lender, promptly upon request, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall determine to be required pursuant to Regulation S-X or any amendment, modification or replacement thereto or other legal requirements in connection with any Disclosure Document or any Exchange Act filing in connection with or relating to a Securitization or as shall otherwise be reasonably requested by the Lender.

(l)     In the event Lender determines, in connection with a Securitization, that the financial statements required in order to comply with Regulation S-X or other legal requirements are other than as provided herein, then notwithstanding the provisions of Section 5.1.10(h), (i) and (j) hereof, Lender may request, and Borrower shall promptly provide, such combination of Acquired Property Statement and/or Standard Statements or such other financial statements as Lender determines to be necessary or appropriate for such compliance.

(m)     The term "Affiliated Loans" shall mean a loan made by Lender to a parent, subsidiary or such other entity affiliated with Borrower, any Indemnitor or any Guarantor.

5.1.11 Business and Operations.

Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership and maintenance of the Property. Borrower will remain in good standing under the laws of the State of its organization and under the laws of each jurisdiction to the extent required for the ownership, maintenance, management and operation of the Property.

38

5.1.12 Costs of Enforcement.

In the event (a) that the Security Instrument is foreclosed in whole or in part or that the Security Instrument is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to the Security Instrument in which proceeding Lender is made a party, or (c) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, Borrower, and their successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

5.1.13 Estoppel Statement.

(a)    After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt then known to Borrower, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)    After request by Borrower, Lender shall within ten (10) days furnish Borrower with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Applicable Interest Rate of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt then known to Lender, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents have not been modified or if modified, giving particulars of such modification.

5.1.14 Loan Proceeds.

Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in Section 2.1.4.

5.1.15 Performance by Borrower.

Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

{10347125:14}

### 5.1.16 Confirmation of Representations.

Borrower shall deliver, in connection with any Securitization or Syndication, (a) one or more Officer's Certificates certifying as to the accuracy in all material respects of all representations made by Borrower in the Loan Documents as of the date of the closing of such Securitization or Syndication in all relevant jurisdictions, and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower as of the date of the closing of such Securitization or Syndication.

### 5.1.17 Leasing Matters.

Borrower shall not enter into any Leases for any portion of the Property or accept any Rents (including security deposits) in connection with such Leases without the Lender's prior written consent.

### 5.1.18 Management Agreement.

Borrower shall not enter into any management agreement relating to the Property without the Lender's prior written consent.

### 5.1.19 Environmental Covenants.

(a)    Borrower covenants and agrees that so long as the Loan is outstanding (i) all uses and operations on or of the Property, by Borrower shall, and Borrower shall use its best efforts to cause all uses and operations on or of the Property by any other Person to be in compliance in all material respects with all Environmental Laws and permits issued pursuant thereto; (ii) there shall be no Releases of Hazardous Materials in, on, under or from the Property by Borrower in violation of Environmental Law and Borrower shall use its best efforts to cause any other Person not to Release same in violation of Environmental Law; (iii) there shall be no Hazardous Materials in, on, or under any of the Property by Borrower and Borrower shall use its best efforts to cause no other Person to place any Hazardous Materials in, on or under any of the Property, except those that are both (A) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (B) (1) in amounts not in excess of that necessary to operate the Property or (2) fully disclosed to and approved by Lender in writing; (iv) Borrower shall keep the Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other Person (the "Environmental Liens"); (v) Borrower shall, at its sole cost and expense, reasonably cooperate in all activities pursuant to paragraph (b) below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (vi) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (vii) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (A) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Property; and (B) comply with any

40

Environmental Law; (viii) Borrower shall use its best efforts to prevent any user of any portion of the Property to violate any Environmental Law; and (ix) Borrower shall immediately notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property; and (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a Governmental Authority) relating in any way to Hazardous Materials.

(b)    Upon Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, Lender and any other Person designated by Lender, including but not limited to any representative of a Governmental Authority, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such Person designated by Lender.

5.1.20 <u>Performance of the Work.</u>

(a)    Borrower shall commence the Work in accordance with the project schedule attached hereto as Schedule III (the "Project Schedule") and shall at all times thereafter diligently pursue the completion of, and shall use best efforts to complete, the Work in accordance with the Project Schedule. Borrower shall complete all Work in accordance with the Loan Documents and in a good and workmanlike manner following the commencement of the Work. Borrower will notify Lender of any material delays from the estimated dates set forth in the Project Schedule in connection with the Work.

(b)    Lender reserves the right, at its option, to approve all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors or other parties providing labor or materials in connection with the Work, which approval shall be in Lender's reasonable discretion; provided, however, unless otherwise notified by Lender to the contrary, Lender's approval shall not be required for contracts (i) involving total expenditures less than $5,000 in the aggregate and (ii) involving a maximum time period of not more than two (2) months, but in any event, Borrower shall provide copies of the same to Lender and all such contracts, by their own terms and provisions, shall be assignable to Lender.

(c)    In the event Lender determines in its reasonable discretion that any portion of the Work has not been commenced as required by this Section, any portion of the Work is not being performed in a workmanlike or timely manner or that any portion of the Work has not been completed in a workmanlike or timely manner, Lender shall have the option to proceed under existing contracts or to contract with third parties to complete such portion of the Work and all sums so expended by Lender shall be deemed to have been advanced under the Loan to

{J0347J25:14}

Borrower and the provisions of subsection (d) of this Section 5.1.20 shall govern all sums so advanced by Lender.

(d)    In order to facilitate Lender's completion or performing of any Work pursuant to this Section, Borrower hereby grants Lender the right to enter onto the Property and perform any and all work and labor necessary to complete or perform any portion of the Work and/or employ watchmen to protect the Property from damage. All sums so expended by Lender shall be deemed to have been advanced under the Loan to Borrower and secured by the Security Instrument. For this purpose, Borrower hereby constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to (i) complete or undertake any portion of the applicable Work in the name of Borrower, (ii) make such additions, changes and corrections to the Work as shall be necessary to complete the same in accordance with applicable Legal Requirements or such other conditions previously approved and accepted by Lender; (iii) to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for such purposes; (iv) to pay, settle or compromise all existing bills and claims which are or may become Liens against the Property, or as may be necessary or desirable for the completion of the Work or for clearance of title; (v) to execute all applications and certificates in the name of Borrower which may be required by any of the contract documents; (vi) in its reasonable discretion, to prosecute and defend all actions or proceedings in connection with the Property or the rehabilitation and repair of the Property; and (vii) to do any and every reasonable act which Borrower might do in its own behalf to fulfill the terms of this Agreement.

(e)    Nothing in this Agreement shall: (i) make Lender responsible for performing or completing the Work or any portion thereof; (ii) require Lender to expend funds to make or complete any portion of the Work; or (iii) obligate Lender to demand from Borrower additional sums to make or complete any portion of the Work.

(f)    Borrower shall permit Lender and Lender's agents and representatives (including Servicer, Lender's or Servicer's construction consultant, engineer, architect or inspector) or third parties performing any portion of the Work pursuant to this Section to enter onto the Property during normal business hours to inspect the progress of any Work and all materials being used in connection therewith, to examine all plans and shop drawings relating thereto which are or may be kept at the Property, and to complete any Work pursuant to this Section. Borrower shall request all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described herein or the completion of the Work pursuant to this Section..

(g)    The Work and all materials, equipment, fixtures, or any other item comprising a part of any such Work shall be constructed, installed or completed, as applicable, in a good and workmanlike manner, free and clear of all mechanic's, materialman's or other Liens. Lender may require Borrower to provide Lender with a search of title to the Property effective to the date of the disbursement, which search shows that no mechanic's or materialmen's Liens or other Liens of any nature have been placed against the Property since the date hereof and that title to the Property is free and clear of all Liens (other than the Lien of the Security Instrument). All Work shall comply with all Legal Requirements and all requirements of the Loan Documents.

{10347125:14}

5.1.21  OFAC.

At all times throughout the term of the Loan, Borrower, Guarantor, Indemnitor and their respective Affiliates shall be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

Section 5.2     Negative Covenants.

From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Security Instrument in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

5.2.1  Liens.

Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except for Permitted Encumbrances.

5.2.2  Dissolution.

Borrower shall not (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower except to the extent expressly permitted by the Loan Documents, or (c) except as expressly permitted under the Loan Documents, modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction.

5.2.3  Change In Business.

Borrower shall not enter into any line of business other than the ownership and maintenance of the Property (including providing services in connection therewith), or make any material change in the scope or nature of its business objectives, purposes or operations or undertake or participate in activities other than the continuance of its present business.

5.2.4  Debt Cancellation.

Borrower shall not cancel or otherwise forgive or release any material claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

5.2.5  Zoning; Alterations.

(a)     Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, without the prior written consent of Lender.

43

{10347125:14}

(b)    Except with respect to the intended use of the Property as set forth in Section 4.1.20 above, Borrower shall not in any respect alter, add to or otherwise improve, excavate, develop or renovate the Property, or any part thereof, in connection with any development or otherwise, without the prior written consent of Lender, which consent may be given or withheld in Lender's sole and absolute discretion.

(c)    Borrower shall not (i) change the use of the Property, or (ii) take any steps whatsoever to convert the Property, or any portion thereof, to a condominium or cooperative form of ownership, without the prior written consent of Lender which consent may be given or withheld in Lender's sole and absolute discretion.

(d)    Borrower will not, without the prior written consent of Lender which consent may be given or withheld in Lender's sole and absolute discretion, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof.

5.2.6   No Joint Assessment.

Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

5.2.7   Name, Identity, Structure, or Principal Place of Business.

Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice. Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth in Section 4.1.34, without, in each case, the consent of Lender. Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

5.2.8   ERISA.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion and represents and covenants that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(32) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(3) of ERISA; (B) Borrower is

44

{10347125;14}

not subject to State statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) one or more of the following circumstances is true:

      (i)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

      (ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

      (iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e).

### 5.2.9   Affiliate Transactions.

Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower, or any of the partners of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

### 5.2.10   Transfers.

(a)    Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein or permit a Sale or Pledge of an interest in any Restricted Party (collectively, a "Transfer"). Lender may, but is under no obligation to, consent to such Transfer upon Borrower's satisfaction of the following conditions precedent: (i) the prior written consent of Lender shall have been obtained, and (ii) if a Securitization has occurred (A) Lender shall have obtained written confirmation from the Rating Agencies that the Transfer will not result in the downgrade, withdrawal or qualification of the then current ratings assigned to any Securities or the proposed rating of any Securities, (B) Lender shall have received satisfactory evidence that the transferee ("Transferee") in connection with such proposed Transfer shall be a Transferee who meets the requirements of clauses (a), (b), (c), (d) or (e) of the definition of "Qualified Transferee" herein or who is any other Person approved by Lender and the Rating Agencies, and Borrower shall have assigned, and such Transferee and replacement guarantor, as applicable, shall have assumed, all obligations and liabilities of Borrower or guarantor, as applicable, under the Loan Documents, (C) the Transferee's organizational documents contain provisions acceptable to Lender, including without limitation, the following single purpose entity and other provisions of the LLC Agreement: Sections 5, 7, 8, 9, 10, 18, 19, 20, 21, 22, 29 and 29 (and all definitions utilized in such Sections including but not limited to "Independent Manager"), (D) Transferee shall deliver an endorsement to the existing title policy insuring the Security Instrument, as modified by the assumption agreement, as a valid first lien on the Property and naming the Transferee as the owner of the fee estate of the Property, subject only to Permitted Encumbrances, (E) Borrower or Transferee shall pay any and all costs and expenses incurred in

{10347125:14}

connection with such Transfer (including, without limitation, Lender's counsel fees and disbursements and all recording fees, title insurance premiums and taxes), (F) Lender shall have received a substantive non-consolidation opinion, and other opinions of counsel reasonably requested by Lender or the Rating Agencies including, without limitation, opinions as to organization, authorization, due execution, enforceability and other matters in respect of the organization and assignment and assumption documents, acceptable to Lender and the Rating Agencies, (G) payment to Lender of an assumption fee equal to one percent (1.0%) of the outstanding principal balance of the Loan, and (H) any other requirements imposed by Lender shall have been satisfied.

The foregoing provisions of Section 5.2.10(a)(ii) shall also apply in the case of a Transfer of any legal or beneficial interest in the Property or a Transfer of an interest in any Restricted Party and shall be incorporated to the maximum extent possible so as to have the same substantive effect as when applied to a Transfer of the Property.

(b)     A Transfer shall include, but not be limited to: (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (vii) the removal or the resignation of the managing agent other than in accordance with Section 5.1.18; (vii) the dissolution or termination of a Restricted Party; (viii) any transfer of a direct or indirect interest in Borrower between Persons holding a direct or indirect ownership interest in Borrower on the Closing Date except for Transfers permitted in accordance with Section 5.2.10(c); (ix) any other transaction pursuant to which any Person not holding a direct or indirect ownership interest in Borrower on the Closing Date acquires a direct or indirect (and no matter how remote) ownership interest in Borrower; (x) any swap, derivative or other transaction shifting the risks and rewards of ownership of the Property, unless otherwise expressly required by the Loan Documents; (xi) any transaction pursuant to which any Person is granted an option to purchase all or any portion of the Property or any direct, indirect or beneficial interest in Borrower; and (xii) any transaction, agreement or arrangement pursuant to which any Person is given any right to control, direct or veto any material actions or decisions by Borrower, directly or indirectly, whether through an ownership interest, contract right or otherwise; provided, however, that any

46

of the foregoing Transfers that are also permitted in accordance with Section 5.2.10(c), shall be authorized and permitted.

(c)    Notwithstanding the provisions of Sections 5.2.10(a) and (b), the following transfers shall not be deemed to be a Transfer:

(i)    the transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party or a Restricted Party itself, which do not affect the management or control of Borrower; or

(ii)    a Parcel Release made in full compliance with the provisions of Section 11.1 below.

(d)    Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer in violation of this Section 5.2.10. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer. Notwithstanding anything to the contrary contained in this Section 5.2.10 in the event any transfer (whether or not such transfer shall constitute a Transfer) results in any Person owning in excess of forty-nine percent (49%) of the ownership interest in a Restricted Party, Borrower shall, prior to such transfer, deliver an updated Insolvency Opinion to Lender, which opinion shall be in form, scope and substance acceptable in all respects to Lender and the Rating Agencies.

## ARTICLE 6  INSURANCE; CASUALTY; CONDEMNATION; REQUIRED REPAIRS

Section 6.1    Insurance.

(a)    Borrower shall obtain and maintain, or cause to be maintained, Policies for Borrower and the Property providing at least the following coverages:

(i)    if and when any Improvements are constructed on the Property, comprehensive all risk insurance on the Improvements and the Personal Property, in each case (ii) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but such amount, when taken together with the amount of insurance required under Section 6.1(a)(iii), shall in no event be less than the outstanding principal balance of the Loan; (iii) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions updated at least annually; (iv) providing for no deductible in excess of $25,000 (or not in excess of five percent (5%) of the value of the Property at risk, but subject to a minimum of $100,000, for windstorm or hail coverage); and (v) providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements together with an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses. The Full Replacement Cost shall be redetermined from time to time (but not more frequently than once in any twenty-four (24) calendar months)

47

at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an engineer or appraiser in the regular employ of the insurer. After the first appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade. No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this Subsection;

(ii)     commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000.00 per occurrence; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all written and oral contracts; and (5) contractual liability covering the indemnities contained in Article 10 of the Security Instrument to the extent the same is available;

(iii)     if and when any Lease is entered into, business interruption/loss of rents insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Section 6.1(a)(i); (C) in an amount equal to 100% of the projected gross income from the Property (on an actual loss sustained basis) for a period continuing until the Restoration of the Property is completed; the amount of such business interruption/loss of rents insurance shall be determined prior to the Closing Date and at least once each year thereafter based on the greatest of: (x) Borrower's reasonable estimate of the gross income from the Property and (y) the highest gross income received during the term of the Note for any full calendar year prior to the date the amount of such insurance is being determined, in each case for the succeeding eighteen (18) month period and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; All insurance proceeds payable to Lender pursuant to this Section 6.1(a)(iii) shall be held by Lender and shall be applied to the obligations secured hereunder from time to time due and payable hereunder and under the Note and this Agreement; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note and this Agreement except to the extent such amounts are actually paid out of the proceeds of such business interruption/loss of rents insurance.

(iv)     at all times during which structural construction, repairs or alterations are being made with respect to the Improvements (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the insurance provided for in Section 6.1(c)(ii); and (B) the insurance provided for in Section 6.1(a)(i) shall be written in a so-called builder's risk completed value form (1) on a

48

non-reporting basis, (2) against all risks insured against pursuant to Section 6.1(a)(i), (3) shall include permission to occupy the Property, and (4) shall contain an agreed amount endorsement waiving co-insurance provisions;

(v)    workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000.00 per accident and per disease per employee, and $1,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)    if and when Improvements are constructed on the Property, comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under Section 6.1(a)(i);

(vii)    umbrella liability insurance in an amount not less than $15,000,000.00 per occurrence on terms consistent with the commercial general liability insurance policy required under Section 6.1(a)(ii); *provided, however,* that Lender reserves the right to require Borrower to increase, at Borrower's cost and expense, the minimum umbrella liability insurance coverage amount hereunder from $15,000,000.00 per occurrence to $25,000,000.00 per occurrence in Lender's sole and absolute discretion;

(viii)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of $1,000,000.00; and

(ix)    such other insurance and in such amounts or as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)    All insurance provided for in Section 6.1(a) shall be obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), in such forms and, from time to time after the date hereof, in such amounts as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the State in which the Property is located and approved by Lender. The insurance companies must have a claims paying ability/financial strength rating of "A" (or its equivalent) or better by at least two (2) Rating Agencies (one of which will be S&P if they are rating the Securities and one of which shall be Moody's if they are rating the Securities), or if only one Rating Agency is rating the Securities, then only by such Rating Agency (each such insurer shall be referred to below as a "Qualified Insurer"). No Policy shall contain an exclusion from coverage under such Policy for loss or damage incurred as a result of an act of terrorism, terrorist acts (including bioterrorism) or similar acts of sabotage, which coverage must be included in the Policies obtained on the Closing Date and shall be included in the Policies maintained throughout the term of the Loan. Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 6.1(a), Borrower shall deliver certified copies of the Policies marked

49

{10347125:14}

"premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "Insurance Premiums").

(c)    Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Agreement and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 6.1(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Section 6.1(a). Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a). Notwithstanding Lender's approval of any umbrella or blanket liability or casualty Policy hereunder, Lender reserves the right, in its sole discretion, to require Borrower to obtain a separate Policy in compliance with this Section 6.1.

(d)    All Policies provided for or contemplated by Section 6.1(a), except for the Policy referenced in Section 6.1(a)(v), shall name Lender and Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, and flood insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)    All Policies provided for in Section 6.1(a) shall contain clauses or endorsements to the effect that:

(i)    no act or negligence of Borrower, or anyone acting for Borrower, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)    the Policy shall not be materially changed (other than to increase the coverage provided thereby) or cancelled without at least 30 days' written notice to Lender and any other party named therein as an insured; and

(iii)    each Policy shall provide that the issuers thereof shall give written notice to Lender if the Policy has not been renewed thirty (30) days prior to its expiration; and

(iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)    Borrower shall furnish to Lender, on or before thirty (30) days after the close of each of Borrower's fiscal years, a statement certified by Borrower or a duly authorized officer of Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance company or companies which carry such insurance and, if

{10347125:14}

requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

(g)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate. Lender shall use its commercially reasonable efforts to notify Borrower prior to exercising any rights under this subsection (g), provided, however, that any failure or inability to deliver such notice shall in no way affect or impair any rights Lender may have hereunder.

(h)    In the event of a foreclosure of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies then in force and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

Section 6.2    Casualty.

If any Improvements that may be installed on the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), Borrower shall give prompt notice of such damage to Lender and provided Lender makes the Net Proceeds available to Borrower in accordance with Section 6.4, shall promptly commence and diligently prosecute the completion of the Restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.4. In the event Lender makes the Net Proceeds available to Borrower in accordance with Section 6.4, Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.

Section 6.3    Condemnation.

Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of

51

expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, provided Lender makes the Net Proceeds available to Borrower in accordance with Section 6.4, Borrower shall, promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 6.4. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 6.4   ·  Restoration.

The following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Net Proceeds shall be less than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) and the costs of completing the Restoration shall be less than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Section 6.4(b)(i) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) or the costs of completing the Restoration are equal to or greater than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 6.4. The term "Net Proceeds" shall mean:  (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1(a)(i), (iv), (vi), (vii) and (viii) as a result of such damage or destruction, after deduction of (A) Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same and (B) Borrower's reasonable costs and expenses in collecting same, if any ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of (A) Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same and (B) Borrower's reasonable costs and expenses in collecting same, if any ("**Condemnation Proceeds**"), whichever the case may be.

(i)    The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met:

(A)    no Default or Event of Default shall have occurred and be continuing;

(B)    (1) in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the square footage of the Improvements has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%)

52

·f the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

(C)     Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion in compliance with all Applicable Laws, including, without limitation, all applicable Environmental Laws;

(D)     Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in (iii), if applicable, or (3) by other funds of Borrower;

(E)     Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) six (6) months after the occurrence of such Casualty or Condemnation, or (3) the earliest date required for such completion under the terms of any Leases which are required in accordance with the provisions of this Section 6.4(b) to remain in effect subsequent to the occurrence of such Casualty or Condemnation and the completion of the Restoration, or (4) such time as may be required under Applicable Law, in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or Condemnation or (5) the expiration of the insurance coverage referred to in Section 6.1(a)(iii);

(F)     the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Laws;

(G)     such Casualty or Condemnation, as applicable, does not result in the total loss of access to the Property or the Improvements; and

(H)     the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of the Restoration.

(ii)     The Net Proceeds shall be held by Lender in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Debt and other obligations under the Loan Documents. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of

53

intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)    All plans and specifications required in connection with the Restoration, shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "Casualty Consultant"), which acceptance shall not be unreasonably withheld, conditioned or delayed so long as the same are substantially in accordance with the appearance, quality and materials of the Improvements prior to such Casualty or Condemnation. Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant, which acceptance shall not be unreasonably withheld, conditioned or delayed. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "Casualty Retainage" shall mean an amount equal to ten percent (10%), of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 6.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy for the Property, and Lender receives an endorsement to such Title Insurance Policy insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty

54

Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)    Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, if any, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4(b) shall constitute additional security for the Debt and other obligations under the Loan Documents.

(c)    All Net Proceeds not required to be made available for the Restoration may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, and, upon irrevocable and indefeasible payment in full of the Debt, any balance of such Net Proceeds remaining thereafter shall be paid to Borrower. If Lender shall receive and retain Net Proceeds, the Lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

## ARTICLE 7  RESERVE FUNDS

Section 7.1    Contingency Holdback.

At Closing, Lender shall holdback from disbursement of the Loan proceeds the amount of One Hundred Forty Thousand and 00/100 ($140,000.00) Dollars (the "Contingency Holdback") for use by Borrower for costs incurred by Borrower in connection with the development of the Property. Any disbursement of funds provided for under the Contingency Holdback shall be subject to Lender's reasonable approval and Borrower shall be required to submit copies of invoices for all items requested to be paid for with funds from the Contingency Holdback. Lender shall not be obligated to make disbursements more frequently than once every thirty (30) days. Interest under the Note shall commence to accrue on each and any disbursement of the Contingency Holdback as of the date of disbursement or wire transfer by Lender to or for the benefit of Borrower.

Section 7.2    Tax and Insurance Escrow Fund.

Borrower shall pay to Lender on each Payment Date (a) one-twelfth of the Taxes (the "Monthly Tax Deposit") that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates; and (b) at the option of Lender, if the liability or casualty Policy maintained by Borrower covering the Property shall not constitute an

{10347125:14}

app..oved blanket or umbrella Policy pursuant to Section 6.1(c), or Lender shall require Borrower to obtain a separate Policy pursuant to Section 6.1(c), one-twelfth of the Insurance Premiums (the "**Monthly Insurance Premium Deposit**") that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (said amounts in (a) and (b) above hereinafter called the "**Tax and Insurance Escrow Fund**"). The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note and this Agreement, shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.1.2. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Section 5.1.2, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property. Any amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay Taxes and Insurance Premiums by the dates set forth in (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be.

Section 7.3    <u>Water/Sewer Holdback.</u>

(a)    At Closing, Lender shall holdback from disbursement of the Loan proceeds the amount of One Million Two Hundred-Fifty Thousand and 00/100 ($1,250,000.00) Dollars (the "**Water/Sewer Holdback**") for use by Borrower for costs to be incurred in connection with Borrower extending and connecting water and sewer utilities to the Property (the "**Water Work**"). Lender shall make disbursements to Borrower, subject to the terms and conditions hereof. Lender shall not be obligated to make disbursements more frequently than once every thirty (30) days. Interest under the Note shall commence to accrue on each and any disbursement of the Water/Sewer Holdback as of the date of disbursement or wire transfer by Lender to or for the benefit of Borrower.

(b)    Each request for disbursement shall be in a form or forms specified by Servicer and shall specify (i) the dollar amount for the specific Water Work for which such payment is requested, (ii) the quantity and price of each item purchased, if the request includes the purchase or replacement of specific items, (iii) the price of all materials (grouped by type or category) other than the purchase or replacement of specific items, and (iv) the cost of all contracted labor or other services (if applicable) to each matter for which such request for disbursement is made. With each request, Borrower shall, to the extent applicable, certify that any Water Work that is

56

{10347]25:14}

the subject of the requisition has been completed in accordance with all Legal Requirements and all requirements of the Loan Documents. Each request for disbursement shall include copies of invoices for all items or materials purchased and all contracted labor or services provided. Except as otherwise provided herein, each request for disbursement shall be made only after completion, as applicable, of the related Water Work for which such disbursement is requested. In no event shall Borrower be entitled to request more than one (1) disbursement per month from the Water/Sewer Holdback and in an amount of not less than Twenty-Five Thousand Dollars ($25,000.00) per disbursement request. Provided no Event of Default exists and further provided Lender does not require an inspection of the Property prior to authorizing the disbursement request, Lender shall endeavor to approve and process such request for payment within twenty (20) days of Borrower having submitted such disbursement request and all backup materials reasonably requested by Lender. Borrower shall provide Lender evidence of completion satisfactory to Lender in its reasonable judgment.

(c)    Lender may disburse the amount for all invoices for materials purchased (or to be purchased) and all contracted labor or services directly to the applicable vendors, suppliers, mechanics, materialmen, subcontractors or any other Person or directly to Borrower and, to the extent the funds are disbursed to Borrower, Borrower covenants and agrees to promptly pay such invoices. Borrower shall provide evidence reasonably satisfactory to Lender (including, without limitation, access to the Property by Lender, Servicer and an architect and/or engineer specified by Lender for the purpose of an inspection of work done, at Borrower's expense, if requested by Lender) that the Water Work for which the disbursement is being requested has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements. Additionally, if required by Lender, Lender may require Borrower to obtain Lien waivers from each vendor, contractor, supplier, materialman, mechanic, subcontractor or any other Person who receives payment in an amount equal to or greater than $10,000.00 for completion of its work or delivery of its materials. Any Lien waiver delivered hereunder shall conform to the requirements of applicable Legal Requirements and the requirements of the Loan Documents and shall cover all work performed and materials supplied (including equipment and fixtures) for the Property by that vendor, contractor, supplier, subcontractor, mechanic or materialman through the date covered by the current disbursement request. No further disbursements from the Water/Sewer Holdback shall be made unless and until Borrower provides Lender or Servicer with evidence that amounts previously disbursed to Borrower from Water/Sewer Holdback on account of Water Work were paid to the appropriate vendors, suppliers, contractors, mechanics, materialmen and/or subcontractors.

(d)    If (i) the time required to complete a portion of the Water Work reasonably exceeds one month, (ii) the contractor performing such Water Work requires periodic payments pursuant to the terms of a written contract, and (iii) Lender has approved in writing in advance such periodic payments, then disbursements shall be made as the Water Work progresses and prior to full completion; provided (A) such contract requires payment upon completion of such portion of the Water Work, (B) the materials (if applicable) for which the request is made are located and stored on site at the Property, are properly insured in accordance with the terms of the Loan Documents and are properly secured or have been installed in the Property, (C) all other conditions in this Agreement for disbursement have been satisfied, and (D) each contractor, subcontractor and/or other Person receiving payments under such contract shall provide a waiver

57

{10347125;14}

of Lien, reasonably acceptable to Lender in Lender's sole and absolute discretion, with respect to amounts which have been paid to that contractor, subcontractor, and/or any other Person.

(e)     Lender shall have no obligation and shall not be required to disburse or otherwise release any amounts from the Water/Sewer Holdback unless (i) there is no Event of Default then existing, and (ii) there are sufficient amounts in the Water/Sewer Holdback in Lender's reasonable judgment, to make the requested disbursement. In addition, Lender shall have no obligation and shall not be required to disburse or release amounts in the Water/Sewer Holdback until (i) Lender shall have approved the general contractor or construction manager and architect, if any, retained to do the Water Work and (ii) all other conditions specified in the Loan Agreement for the use of Loan proceeds have been satisfied.

(f)     Notwithstanding anything to the contrary contained in this Section 7.3, Borrower acknowledges that the portion of the Loan proceeds to be made available for the Water/Sewer Holdback will be funded entirely by IMH Secured Loan Fund, LLC, a Delaware limited liability company ("IMH"), which is acquiring a participation interest in the Loan. If for any reason, IMH fails to provide funds for the Water/Sewer Holdback, Lender shall have no obligation to make such funds available to Borrower.

Section 7.4     Debt Service Holdback.

At Closing, Lender shall holdback from disbursement of the Loan proceeds the amount of Four Million Eight Hundred Thousand and 00/100 Dollars ($4,800,000.00) (the "Debt Service Holdback"), which shall be used, absent the occurrence of an Event of Default, to fund on a monthly basis the Debt Service, together with any late payment charges or interest accruing at the Default Rate (collectively, the "Debt Service Shortfall") for such month. On the date immediately preceding each Payment Date, if a Debt Service Shortfall shall exist, Lender shall advance, on behalf of Borrower, an amount equal to such Debt Service Shortfall. Lender may make advances from the Debt Service Holdback from time to time without in each case the consent of or notice to Borrower. Interest under the Note shall commence to accrue on each and any disbursement of the Debt Service Holdback as of the date of disbursement or wire transfer by Lender to the Servicer. Lender has no obligation to advance any amount in excess of the balance of the remaining Debt Service Holdback, if any, on any Payment Date. Notwithstanding anything to the contrary contained herein, the insufficiency of the Debt Service Holdback or Lender's failure to advance proceeds from the Debt Service Holdback as a result of the occurrence and continuation of an Event of Default shall not relieve Borrower from its obligation under the Loan Documents to make payment to Lender of the monthly Debt Service together with any late payment charges or interest accruing at the Default Rate.

Section 7.5     Reserve Funds, Generally.

(a)     Borrower grants to Lender a first-priority perfected security interest in each of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Fund as additional security for payment of the Debt. Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Debt.

58

{10347125:14}

(b)     Upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Funds to the payment of the Debt in any order in its sole discretion.

(c)     The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.

(d)     The Reserve Funds shall be held in interest bearing accounts and all earnings or interest on a Reserve Fund shall be added to and become a part of such Reserve Fund and shall be disbursed in the same manner as other monies deposited in such Reserve Fund, except that earnings or interest on the Tax and Insurance Escrow Fund shall not be added to or become a part thereof and shall be the sole property of and shall be paid to Lender.

(e)     Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any Lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

(f)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees. Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

## ARTICLE 8  DEFAULTS

Section 8.1     Event of Default.

(a)     Each of the following events shall constitute an event of default hereunder (an "Event of Default"):

(i)     if any portion of the Debt is not paid on or before the date the same is due and payable;

(ii)     if any of the Taxes, unless Lender has received sufficient funds for Taxes pursuant to Section 7.2, or Other Charges are not paid on or before the date when the same are due and payable, subject, however, to Borrower's right to contest set forth in Section 5.1.2;

(iii)     if the Policies are not kept in full force and effect or if certified copies of the Policies are not delivered to Lender on request;

59

{10347125:14}

(iv)    if any breach of any of the covenants set forth in Section 5.2.10 or Article 7 of the Security Instrument occurs;

(v)    if any representation or warranty made by Borrower, Indemnitor or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made;

(vi)    if Borrower, Indemnitor, Guarantor or any other guarantor under any guaranty issued in connection with the Loan shall make an assignment for the benefit of creditors;

(vii)    if a receiver, liquidator or trustee shall be appointed for Borrower, Indemnitor, Guarantor or any other guarantor under any guarantee issued in connection with the Loan or if Borrower, Indemnitor, Guarantor or such other guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or any similar federal or State law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Indemnitor, Guarantor or such other guarantor, or if any proceeding for the dissolution or liquidation of Borrower, Indemnitor, Guarantor or such other guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Indemnitor, Guarantor or such other guarantor, upon the same not being discharged, stayed or dismissed within sixty (60) days;

(viii)    if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)    if Borrower breaches any of its respective negative covenants contained in Section 5.2;

(x)    if Borrower violates or does not comply with any of the provisions of Section 4.1.35;

(xi)    if the Property becomes subject to any mechanic's, materialman's or other Lien other than a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days after Borrower receives actual or constructive notice thereof;

(xii)    if any federal tax Lien or state or local income tax Lien is filed against Borrower, any Guarantor, Indemnitor or the Property and same is not discharged of record within thirty (30) days after same is filed; provided, however, that Borrower shall have the right to contest such Lien in the same manner set forth in Section 5.1.2 with respect to Taxes or Other Charges;

60

{10347125:14}

(xiii)    (A) Borrower fails to timely provide Lender with the written certification and evidence referred to in Section 5.2.8, or (B) Borrower consummates a transaction which would cause the Security Instrument or Lender's exercise of its rights under the Security Instrument, the Note, this Agreement or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA or a State statute;

(xiv)    if Borrower shall fail to deliver to Lender, within ten (10) days after request by Lender, the estoppel certificates required pursuant to the terms of Section 5.1.13(a);

(xv)    if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Guaranty and the Environmental Indemnity) and such default continues after the expiration of applicable grace periods, if any;

(xvi)    if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(xvii)    if Borrower shall be in default beyond applicable notice and grace periods under the 163 Security Instrument;

(xviii)    if Borrower shall be in default beyond applicable notice and grace periods under the Val Vista Security Instrument;

(xix)    with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xx)    if any of the assumptions contained in the Insolvency Opinion, or in any other "non-consolidation" opinion delivered to Lender in connection with the Loan, or in any other "non-consolidation" opinion delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect;

(xxi)    if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xviii) above, for fifteen (15) days after written notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after written notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30-day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall

61

be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days; or

(xxii) if there shall be default under the Security Instrument or any of the other Loan Documents beyond any applicable notice and cure periods contained in such documents, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

(b)    Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi) or (vii) above) and at any time thereafter, in addition to any other rights or remedies available to Lender under this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waive any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2    Remedies.

(a)    Subject to the terms of Section 9.4, upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property or any other Collateral. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by Applicable Law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by Applicable Law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the other Collateral and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

62

(b)    With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property or Collateral for the satisfaction of any of the Debt in preference or priority to any other Collateral, and Lender may seek satisfaction out of the Property or all of the Collateral or any part thereof, in its absolute discretion in respect of the Debt. In addition, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(c)    Lender shall have the right, from time to time, to sever the Note and the other Loan Documents into one or more separate notes, Security Instruments and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoint Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power. The Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

Section 8.3    Remedies Cumulative; Waivers.

Subject to the terms of Section 9.4, the rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one or more Defaults or Events of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

63

## ARTICLE 9  SPECIAL PROVISIONS

Section 9.1      Sale of Notes and Securitization

Lender may, at any time, sell, transfer or assign the Note, this Agreement, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or split the Note on a pari passu or senior/subordinate basis or issue mortgage pass-through certificates or other securities (the "Securities") evidencing a beneficial interest in one or more rated or unrated public offerings or private placements (in any such case, a "Securitization").  At the request of the holder of the Note and, to the extent not already required to be provided by Borrower under this Agreement, Borrower, at Borrower's expense shall satisfy the market standards to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with a Securitization or the sale of the Note or the participations or split of the Note as aforesaid or Securities, including, without limitation, to:

(a)      (i)      provide such financial and other information with respect to the Property and Borrower, (ii) provide any information that may reasonably be required by Lender in connection with the Securitization, including budgets, operating statements and updated financial information relating to the Property, (iii) participate with Lender in one or more meetings with prospective investors or with Rating Agencies, (iv) work with Lender to procure a rating for the Loan by the Rating Agencies and (v) to perform or permit or cause to be permitted such site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), engineering reports and other due diligence investigations of the Property, as may be reasonably requested by the holder of the Note or the Rating Agencies (the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information through letters of auditors or opinions of counsel of independent attorneys acceptable to Lender and the Rating Agencies;

(b)      if required by the Rating Agencies, deliver (i) a revised Insolvency Opinion, (ii) revised opinions of counsel as to due execution and enforceability with respect to the Property, Borrower, Guarantor, Indemnitor, and their respective Affiliates and the Loan Documents, and (iii) revised organizational documents for Borrower (including, without limitation, such revisions as are necessary to comply with the provisions of Section 4.1.35), which counsel opinions and organizational documents shall be satisfactory to Lender and the Rating Agencies;

(c)      if required by the Rating Agencies, exercise commercially reasonable efforts to obtain and deliver estoppel letters, subordination agreements or other agreements from any parties to agreements that affect the Property, which estoppel letters, subordination agreements or other agreements shall be satisfactory to Lender and the Rating Agencies.

(d)      execute such amendments to the Loan Documents and organizational documents as may be requested by the holder of the Note or the Rating Agencies or otherwise to effect the Securitization, including, without limitation, (1) requiring two (2) Independent Directors, (2) changing interest periods under the Loan to conform to interest and payment periods in the Securitization and/or Rating Agency requirements, (3) changing the date of the Payment Date

(including that if such changed payment date does not fall on a Business Day, the payment date shall be on the preceding Business Day) and Maturity Date under the Loan to conform to interest and payment periods in the Securitization and/or Rating Agency requirements (provided that Lender shall use reasonable commercial efforts not to change the Payment Date to a date prior to the ninth day of the month), and (4) providing that in connection with any prepayment or repayment of the Loan, interest accrued through the end of the interest period in which such payment occurs must be paid and, if a payment is made after a payment date (as same may be changed in connection with the Securitization), interest accrued through the next succeeding interest period must also be paid; provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (except for modifications and amendments required to be made pursuant to Section (e) below,) (i) change the interest rate or the stated maturity or the amortization of principal set forth in the Note, (ii) modify or amend any other material economic term of the Loan, or (iii) otherwise materially increase its obligations under the Loan (it being agreed that the items in clauses (1) through (4) of this Section 9.1(d) are not material for the purposes of clause (ii) and shall not be deemed to materially increase Borrower's obligations for the purposes of clause (iii)).

(e)     if Lender elects, in its sole discretion, prior to or upon a Securitization, to split the Loan into two or more parts, or the Note into multiple component notes or tranches which may have different interest rates and principal amounts, Borrower agrees to cooperate with Lender in connection with the foregoing and to execute, or cause to be executed, the required modifications and amendments to the Note, this Agreement and the Loan Documents and to provide opinions necessary to effectuate the same. Such Notes or components may be split on a pari passu basis or into a senior first mortgage portion and a subordinate first mortgage portion, in Lender's sole discretion, and may be assigned different interest rates, amortization payments, principal amounts and maturities, so long as the initial weighted average of such interest rates does not exceed the Applicable Interest Rate;

(f)     make such representations and warranties as of the closing date of the Securitization with respect to the Property, Borrower and the Loan Documents as are customarily provided in such transactions and as may be reasonably requested by the holder of the Note or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents;

(g)     supply to Lender such documentation, financial statements and reports in form and substance required for Lender to comply with Regulation S-X of the federal securities law, if applicable.

All reasonable third party costs and expenses incurred by Lender or Borrower in connection with Borrower complying with requests made under this Section 9.1 shall be paid by Borrower.

Section 9.2     Securitization Indemnification.

(a)     Borrower understands that certain of the Provided Information may be included in Disclosure Documents in connection with the Securitization, and may also be included in filings

{10347125:14}

(an "Exchange Act Filing") with the Securities and Exchange Commission pursuant to the Securities Act or the Exchange Act, or provided or made available to Investors or prospective Investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, subject to the provisions of this Agreement, Borrower will cooperate with the holder of the Note in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b)     Borrower agrees to provide in connection with each of (i) a preliminary and a private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Borrower has examined the sections of the memorandum or prospectus, as applicable, making specific reference to the Loan, including without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Property," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include its officers and directors), the Affiliate of Lehman Brothers Inc. ("Lehman") that has filed the registration statement relating to the Securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each Person who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Lehman Group"), and Lehman, each of its directors and each Person who controls Lehman within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any losses, claims, damages or liabilities (collectively, the "Liabilities") to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections described in clause (A) above, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Lehman Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender the Lehman Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the debt, including, without limitation, financial statements of Borrower, operating statements, environmental site assessment reports and property condition reports with respect to the Property. Subject to Section 9.4 hereof, this indemnification will be in addition to any liability which Borrower may otherwise have. Moreover, the indemnification provided for in Clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Borrower or its Affiliates if Borrower does not provide the indemnification certificate.

66

(c)     In connection with filings under the Exchange Act, Borrower agrees to indemnify (i) Lender, the Lehman Group and the Underwriter Group for Liabilities to which Lender, the Lehman Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading and (ii) reimburse Lender, the Lehman Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lehman Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission so to notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2 the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party to parties. The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnifications provided for in Section 9.2(a) or (b) is or are for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(a) or (b), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Lehman's and Borrower's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct

67

and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined solely by pro rata or per capita allocation.

(f)    Subject to Section 9.4 hereof, the liabilities and obligations of Borrower under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

Section 9.3    Servicer.

At the option of Lender or Agent, the Loan may be serviced by a servicer/trustee (the "Servicer") selected by Lender or Agent and Lender or Agent may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Lender or Agent and Servicer.

Section 9.4    Exculpation.

(a)    Except as otherwise provided herein, in the Security Instrument or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in this Agreement, the Note, the Security Instrument or any other Loan Document by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon this Agreement, the Note, the Security Instrument, the other Loan Documents, and the interest in the Property, the Rents, the Collateral and any other collateral given to Lender pursuant to this Agreement, the Note, the Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, the Rents, the Collateral and in any other collateral given to Lender. Lender, by accepting this Agreement, the Note, the Security Instrument and the other Loan Documents, agrees that it shall not, except as otherwise provided herein or in the Security Instrument, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the Security Instrument or the other Loan Documents. The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the Security Instrument or the other Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument or this Agreement; (iii) affect the validity or enforceability of any indemnity (including, without limitation, the Environmental Indemnity), guaranty (including, without limitation, the Guaranty), master lease or similar instrument made in connection with this Agreement, the Note, the Security Instrument, or the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) impair the right of Lender to enforce the provisions of Sections 10.2 of the Security Instrument or Sections 4.1.8, 4.1.28, 5.1.9, 5.2.8 and 10.13; or (vii) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower if necessary to (A) preserve or enforce its rights and remedies against the Property or (B) obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under the terms of this Agreement or the

68

Security Instrument; provided however, Lender shall only enforce such judgment to the extent of the Insurance Proceeds and/or Awards.

(b)     Notwithstanding the provisions of Section 9.4(a) to the contrary, Borrower and the Guarantor shall be personally liable to Lender for the Losses it incurs due to:

(i)     except as set forth in Section 9.4(c), Borrower or Guarantor, or any Affiliate of any thereof commits gross negligence (which continues after notice from Lender that such activity is occurring) or willful misconduct with respect to the management and operation of the Property or Borrower's financial affairs;

(ii)     Borrower's failure to maintain the Property as required pursuant to the Loan Documents, including but not limited to the failure to comply with any of the provisions of Sections 6.1 (which shall include the failure to pay any deductible amount pursuant to the Policies), 5.1.1 (which, other than with respect to the insurance requirement set forth therein, continues for more than three (3) Business Days after notice from Lender of such failure), 5.1.2. (unless the failure to comply with any of such provisions is due to a lack of sufficient cash flow from the Property whether from Rents, Loan proceeds, Insurance Proceeds or otherwise), 4.1.39, 5.1.19 or 5.2.5;

(iii)     The physical waste or willful destruction of the Property by Borrower or Guarantor, or any Affiliate of any thereof, including, but not limited to, the removal or disposal by Borrower or Guarantor, or any Affiliate of any thereof, of any equipment, fixtures or other property (personal or otherwise) from the Property, in violation of the terms of any of the Loan Documents;

(iv)     Breach by Borrower or Guarantor of any of the indemnification obligations contained in this Agreement or the Environmental Indemnity;

(v)     The failure by Borrower or Guarantor (or where applicable, any member thereof) to comply with any of the provisions of Sections 4.1.8, 5.2.8. or 4.1.35, if applicable;

(vi)     The Property becoming subject to any mechanic liens or materialman liens regarding work not approved in writing by Lender or regarding work for which sufficient cash flow exists from the Property (whether from Rents, Loan proceeds, Insurance Proceeds or otherwise) to pay for such work;

(vii)     Borrower's failure to obtain the prior written consent of Lender prior to entering into, materially modifying or amending any material agreement (and in the case of sale contracts for any portion of the Property, such material modifications shall include but not be limited to any modifications which decrease the purchase price of such portion of the Property, adjournments of closing dates beyond 30 days of the date specified in the applicable sale contract, and modifying any conditions to closing which would increase Borrower's obligations under such contract) which would have the result of adversely affecting the Property, Borrower, the Loan, agreements with any affiliate of Borrower or Guarantor, any of the organizational or formation documents of Borrower or any direct or

{10347125:14}

indirect member thereof and any other material agreements affecting the use, operation, construction, maintenance or zoning of the Property;

(viii)    Borrower or Guarantor or any Affiliate of any thereof, or any party acting at the behest of any thereof, challenges the validity or enforceability of any provision of the Loan Documents and/or Borrower or Guarantor, or any Affiliate of any thereof, or any party acting at the behest of any thereof, asserts defenses to the validity or enforceability of any provision of the Loan Documents unless such party alleges, in good faith, that no Event of Default has occurred pursuant to the Loan Documents and Borrower is in full compliance with the Loan Documents; or

(ix)    in the event Borrower or Guarantor, or any Affiliate of any thereof, or any party acting at the behest thereof, raises a claim or asserts a defense that any of the waivers contained in Sections 10.7 or 10.15 are not enforceable.

(c)    Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Section 9.4(a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect in the event:

(i)    there exists fraud or an intentional material misrepresentation on the part of Borrower or Guarantor, or any Affiliate of any thereof, in connection with any representation, warranty or submission provided to Lender or its representative, or any intentional material omission or an intentional misrepresentation of fact in any material respect (made fraudulently or otherwise) on the part of Borrower or Guarantor, or any Affiliate of any thereof, regarding their respective financial conditions, including statements made or materials produced or delivered (1) both prior to or after the making of the Loan, (2) in connection with the Loan Documents, and (3) which has a material adverse affect on the value of the Property or Collateral;

(ii)    Borrower or Guarantor, or any Affiliate of any thereof, or any party acting at the behest of any thereof, commits any misappropriation, misapplication or conversion of funds (including but not limited to the following: (i) any Rents, deposits, Net Sale Proceeds, Loan proceeds or other funds or income arising with respect to the Property, the Collateral or any part thereof, or (ii) any proceeds under any Policies or Awards resulting from Condemnation or the exercise of the power of eminent domain by reason of damage, loss or destruction of any portion of the Property) in breach of the Loan Documents and which breach has not been cured within ten (10) days after receipt of notice thereof from Lender;

(iii)    there occurs a violation of any of the terms and provisions of Section 5.2.10;

(iv)    if (1) Borrower or Guarantor (each, a "**Bankruptcy Default Party**"), shall file any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization,

70

arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Bankruptcy Default Party shall make a general assignment for the benefit of its creditors; or (2) there shall be commenced against any Bankruptcy Default Party, or the Property or any part thereof shall become an asset in, any case, proceeding or other action of a nature referred to in clause (1) above which is facilitated, coordinated, conducted or directed by any Bankruptcy Default Party, and which (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed or undischarged for a period of sixty (60) days; or (3) there shall be commenced against any Bankruptcy Default Party, or the Property or any part thereof shall become an asset in, any case, proceeding or other action which is facilitated, coordinated, conducted or directed by any Bankruptcy Default Party seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets, and which results in the entry of any order for any such relief which shall not have been vacated or discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof;

(v)    if Borrower or any other person restricted by the Loan Documents incurs any indebtedness (secured or unsecured) or account payable obligations, in each case in violation of any express restrictions or prohibitions contained in the Loan Documents, and such violation is not cured within twenty (20) days after receipt of notice from Lender.

(d)    Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt secured by this Agreement, the Security Instrument and the other Loan Documents or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Note, this Agreement, the Security Instrument and the other Loan Documents.

(e)    Notwithstanding anything to the contrary contained in this Section 9.4 or the other Loan Documents, no direct or indirect, shareholder, partner, member, principal, affiliate, employee, officer, director, agent or representative of Borrower or the Guarantor (each a "Related Party") shall have any personal liability for, nor be joined as a party to any action (except as may be required by any applicable laws, rules, regulations or ordinances) with respect to (i) the payment of any sum of money which is or may be payable hereunder or under the Note, the Security Instrument, this Agreement or the other Loan Documents, including, but not limited to, the repayment of the Debt, or (ii) the performance or discharge of any covenants, obligations or undertakings of Borrower with respect thereto other than pursuant to a written instrument executed by such Related Party specifically providing for such liability. In addition to the foregoing, anything in this Agreement, the Note, the Security Instrument or the other Loan Documents to the contrary notwithstanding, in no event will the assets of any Related Party (including any distributions made by Borrower to its direct or indirect members, partners or shareholders as permitted hereunder, but excluding any such distributions specifically prohibited to be made by the Loan Documents), be available to satisfy any obligation of Borrower in respect of the Debt, this Agreement or other obligations evidenced by the Loan Documents.

71

Notwithstanding the foregoing, in no event shall the provisions of this Section 9.4(e) in any way be construed to waive, limit, abridge or otherwise impair the (i) obligations of Guarantor or Borrower, as applicable (in each case, but not any other Related Party) under each of the Guaranty or Environmental Indemnity or (ii) the ability of Lender to enforce its rights or remedies against the Collateral.

Section 9.5    Intentionally Omitted.

Section 9.6    Intentionally Omitted.

Section 9.7    Syndication

9.7.1    Syndication.

The provisions of this Section 9.7 shall only apply in the event that the Loan is syndicated in accordance with the provisions of this Section 9.7 set forth below.

9.7.2    Sale of Loan, Co-Lenders, Participations and Servicing.

(a)    Lender and any Co-Lender may, at their option, without Borrower's consent (but with notice to Borrower), sell with novation all or any part of their right, title and interest in, and to, and under the Loan (the "**Syndication**"), to one or more additional lenders (each a "**Co-Lender**"). Each additional Co-Lender shall enter into an assignment and assumption agreement (the "**Assignment and Assumption**") assigning a portion of Lender's or Co-Lender's rights and obligations under the Loan, and pursuant to which the additional Co-Lender accepts such assignment and assumes the assigned obligations. From and after the effective date specified in the Assignment and Assumption (i) each Co-Lender shall be a party hereto and to each Loan Document to the extent of the applicable percentage or percentages set forth in the Assignment and Assumption and, except as specified otherwise herein, shall succeed to the rights and obligations of Lender and the Co-Lenders hereunder and thereunder in respect of the Loan, and (ii) Lender, as lender and each Co-Lender, as applicable, shall, to the extent such rights and obligations have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights and be released from its obligations hereunder and under the Loan Documents.

(b)    The liabilities of Lender and each of the Co-Lenders shall be several and not joint, and Lender's and each Co-Lender's obligations to Borrower under this Agreement shall be reduced by the amount of each such Assignment and Assumption. Neither Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender. Lender and each Co-Lender shall be liable to Borrower only for their respective proportionate shares of the Loan. If for any reason any of the Co-Lenders shall fail or refuse to abide by their obligations under this Agreement, Lender and the other Co-Lenders shall not be relieved of their obligations, if any, hereunder; notwithstanding the foregoing, Lender and the Co-Lenders shall have the right, but not the obligation, at their sole option, to make the defaulting Co- Lender's pro rata share of such advance pursuant to the Co-Lending Agreement.

(c)    Borrower agrees that it shall, in connection with any sale of all or any portion of the Loan, whether in whole or in part, to an additional Co-Lender or Participant, within ten (10) Business Days after requested by Agent, furnish Agent with the certificates required under

72

Sections 5.1.10 and 5.1.13 and such other information as reasonably requested by any additional Co-Lender or Participant in performing its due diligence in connection with its purchase of an interest in the Loan.

(d)    Lender (or an Affiliate of Lender) shall act as administrative agent for itself and the Co-Lenders (together with any successor administrative agent, the "Agent") pursuant to this Section 9.7. Borrower acknowledges that Lender, as Agent, and any successor Agent as provided hereunder shall have the sole and exclusive authority to execute and perform this Agreement and each Loan Document on behalf of itself, as Lender and as agent for itself and the Co-Lenders subject to the terms of the Co-Lending Agreement. Except as otherwise provided in Sections 9.7.2(a), 9.7.2(g) and 9.7.3(a), Borrower shall not have any obligation to recognize or deal directly with any Co-Lender, and no Co-Lender shall have any right to deal directly with Borrower with respect to the rights, benefits and obligations of Borrower under this Agreement, the Loan Documents or any one or more documents or instruments in respect thereof. Borrower may rely conclusively on the actions of Lender as Agent to bind Lender and the Co-Lenders, notwithstanding that the particular action in question may, pursuant to this Agreement or the Co-Lending Agreement be subject to the consent or direction of some or all of the Co-Lenders. Lender may resign as Agent of the Co-Lenders, in its sole discretion, without the consent of Borrower; provided however, that Lender may only resign as Agent (i) after an Event of Default has occurred or (ii) if required to by the Co-Lenders in accordance with the term of the Co-Lending Agreement. Upon any such resignation, a successor Agent shall be determined pursuant to the terms of the Co-Lending Agreement. The term Agent shall mean any successor Agent.

(e)    Notwithstanding any provision to the contrary in this Agreement, the Agent shall not have any duties or responsibilities except those expressly set forth herein (and in the Co-Lending Agreement) and no covenants, functions, responsibilities, duties, obligations or liabilities of Agent shall be implied by or inferred from this Agreement, the Co-Lending Agreement, or any other Loan Document, or otherwise exist against Agent.

(f)    Except to the extent its obligations hereunder and its interest in the Loan have been assigned pursuant to one or more Assignments and Assumption, Lender, as Agent, shall have the same rights and powers under this Agreement as any other Co-Lender and may exercise the same as though it were not Agent, respectively. The term "Co-Lender" or "Co-Lenders" shall, unless otherwise expressly indicated, include Lender in its individual capacity. Lender and the other Co-Lenders and their respective Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, Borrower, or any Affiliate of Borrower and any Person who may do business with or own securities of Borrower or any Affiliate of Borrower, all as if they were not serving in such capacities hereunder and without any duty to account therefor to each other.

(g)    If required by any Co-Lender, Borrower hereby agrees to execute supplemental notes in the principal amount of such Co-Lender's pro rata share of the Loan substantially in the form of the Note, and such supplemental note shall (i) be payable to order of such Co-Lender, (ii) be dated as of the Closing Date, and (iii) mature on the Maturity Date. Such supplemental note shall provide that it evidences a portion of the existing indebtedness hereunder and under the Note and not any new or additional indebtedness of Borrower. The term "Note" as used in this Agreement and in all the other Loan Documents shall include all such supplemental notes.

73

{10347125:14}

Notwithstanding the execution of any such supplemental notes, (i) Borrower shall not have obligation to recognize or deal directly with any Co-Lender, and no Co-Lender shall have any right to deal directly with Borrower with respect to the rights, benefits and obligations of Borrower under this Agreement, the Loan Documents or any one or more documents or instruments in respect thereof, and (ii) Borrower may rely conclusively on the actions of Lender as Agent to bind Lender and the Co-Lenders, notwithstanding that the particular action in question may, pursuant to this Agreement or the Co-Lending Agreement be subject to the consent or direction of some or all of the Co-Lenders.

(h)    Lender, as Agent, shall maintain at its domestic lending office or at such other location as Lender, as Agent, shall designate in writing to each Co-Lender and Borrower a copy of each Assignment and Assumption delivered to and accepted by it and a register for the recordation of the names and addresses of the Co-Lenders, the amount of each Co-Lender's proportionate share of the Loan and the name and address of each Co-Lender's agent for service of process (the "**Register**"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Borrower, Lender, as Agent, and the Co-Lenders may treat each Person whose name is recorded in the Register as a Co-Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection and copying by Borrower or any Co-Lender during normal business hours upon reasonable prior notice to the Agent. A Co-Lender may change its address and its agent for service of process upon written notice to Lender, as Agent, which notice shall only be effective upon actual receipt by Lender, as Agent, which receipt will be acknowledged by Lender, as Agent, upon request.

(i)    Notwithstanding anything herein to the contrary, any financial institution or other entity may be sold a participation interest in the Loan by Lender or any Co-Lender without Borrower's consent (such financial institution or entity, a "**Participant**") (x) if such sale is without novation and (y) if the other conditions set forth in this paragraph are met. No Participant shall be considered a Co-Lender hereunder or under the Note or the Loan Documents. No Participant shall have any rights under this Agreement, the Note or any of the Loan Documents and the Participant's rights in respect of such participation shall be solely against Lender or Co-Lender, as the case may be, as set forth in the participation agreement executed by and between Lender or Co-Lender, as the case may be, and such Participant. No participation shall relieve Lender or Co-Lender, as the case may be, from its obligations hereunder or under the Note or the Loan Documents and Lender or Co- Lender, as the case may be, shall remain solely responsible for the performance of its obligations hereunder.

(j)    Notwithstanding any other provision set forth in this Agreement, Lender or any Co-Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, amounts owing to it in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System), provided that no such security interest or the exercise by the secured party of any of its rights thereunder shall release Lender or Co-Lender from its funding obligations hereunder.

9.7.3    Cooperation in Syndication.

(a)    Borrower agrees to assist Lender in completing a Syndication satisfactory to Lender. Such assistance shall include (i) direct contact between senior management and advisors

74

of Borrower and the proposed Co-Lenders, (ii) assistance in the preparation of a confidential information memorandum and other marketing materials to be used in connection with the Syndication, (iii) the hosting, with Lender, of one or more meetings of prospective Co-Lenders or with the Rating Agencies, (iv) the delivery of appraisals satisfactory to Lender if required, (v) providing any information that may reasonably be required by Lender in connection with the Syndication, including updated financial and operating statements, and (vi) working with Lender to procure a rating for the Loan by the Rating Agencies.

(b)    Lender shall manage all aspects of the Syndication of the Loan, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocations of the commitments among the Co-Lenders and the amount and distribution of fees among the Co-Lenders.  To assist Lender in its Syndication efforts, Borrower agrees promptly to prepare and provide to Lender all information with respect to Borrower and the Property contemplated hereby, including all financial information and projections (the "**Projections**"), as Lender may reasonably request in connection with the Syndication of the Loan.  Borrower hereby represents and covenants that (i) all information other than the Projections (the "**Information**") that has been or will be made available to Lender by Borrower or any of their representatives is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (ii) the Projections that have been or will be made available to Lender by Borrower or any of their representatives have been or will be prepared in good faith based upon reasonable assumptions.  Borrower understands that in arranging and syndicating the Loan, Lender, the Co-Lenders and, if applicable, the Rating Agencies, may use and rely on the Information and Projections without independent verification thereof.

(c)    If required in connection with the Syndication, Borrower hereby agrees to:

(i)    amend the Loan Documents to give Lender the right, at Borrower's sole cost and expense, to have the Property reappraised on an annual basis;

(ii)    deliver updated financial and operating statements and other information reasonably required by Lender to facilitate the Syndication;

(iii)    deliver reliance letters reasonably satisfactory to Lender with respect to the environmental assessments and reports delivered to Lender prior to the Closing Date, which will run to Lender and its successors and assigns;

(iv)    deliver an Insolvency Opinion acceptable to Lender in all respects; and

(v)    execute modifications to the Loan Documents required by the Co-Lenders, provided that such modification will not change any material or economic terms of the Loan Documents, or otherwise materially increase the obligations or materially decrease the rights of Borrower pursuant to the Loan Documents.

75

(d)    All reasonable third party costs and expenses incurred by Lender or Borrower in connection with Borrower's complying with requests made under this Section 9.7.3 shall be paid by Borrower.

9.7.4    <u>Payment of Agent's, and Co-Lender's Expenses, Indemnity, etc.</u>

Borrower shall:

(a)    whether or not the transactions contemplated in this Section 9.7 are consummated, pay all reasonable out-of-pocket costs and expenses (A) of Agent's counsel fees and expenses relating to the negotiation, preparation, execution and delivery of the Note, this Agreement, the Security Instrument, and the other Loan Documents and the documents and instruments referred to therein, the creation, perfection or protection of Lender's and Co-Lender's liens on the Property (including, without limitation, fees and expenses for title insurance, property inspections, appraisals, if required for Syndication, surveys, lien searches, filing and recording fees, and escrow fees and expenses), and any amendment, waiver or consent relating to any of the Loan Documents including releases, (but Agent and the Co-Lender's shall pay their own respective counsel fees) and (B) of Agent and Co-Lenders in connection with the preservation of rights under, any amendment, waiver or consent relating to, and enforcement of, the Loan Documents and the documents and instruments referred to therein or in connection with any restructuring or rescheduling of the Obligations (including, without limitation, the reasonable fees and disbursements of counsel for Agent and the Co-Lenders);

(b)    pay, and hold Agent and each Co-Lender harmless from and against, any and all present and future stamp, excise and other similar taxes with respect to the foregoing matters and hold Agent and each Co-Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to Agent or such Co-Lender) to pay such taxes; and

(c)    indemnify Agent, (in its capacity as Lender and as Agent), and each Co-Lender, its officers, directors, employees, representatives and agents and any persons or entities owned or Controlled by, owning or Controlling, or under common Control or Affiliated with Agent, Agent, or each Co-Lender (each an "**Indemnitee**") from, and hold each of them harmless against, any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitee in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitee shall be designated a party thereto) that may at any time (including, without limitation, at any time following the payment of the Obligations) be imposed on, asserted against or incurred by any Indemnitee as a result of, or arising in any manner out of, or in any way related to or by reason of, (i) the execution, delivery or performance of any Loan Document by Borrower, (ii) the breach of any of Borrower's representations and warranties or of any of Borrower's Obligations, (iii) a default under Section 5.2.8, including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, and (iv) the exercise by Agent and the Co-Lenders of their rights and remedies (including,

{10347125:14}

without limitation, foreclosure) under any Loan Documents, but excluding, as to any Indemnitee, any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements incurred solely by reason of the gross negligence or willful misconduct of such Indemnitee as finally determined by a court of competent jurisdiction (collectively, "**Syndication Indemnified Liabilities**"). Borrower further agrees that, without Agent's or the Co-Lenders' prior written consent, it will not enter into any settlement of a lawsuit, claim or other proceeding arising or relating to any Syndication Indemnified Liability unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of each Indemnitee. Borrower's obligations under this Section shall survive the termination of this Agreement and the payment of the Obligations. Borrower shall have the right to undertake, conduct and control through counsel of its own choosing (which counsel shall be acceptable to the Indemnitee acting reasonably), the conduct and settlement of the Syndication Indemnified Liabilities, and the Indemnitee shall cooperate with Borrower in connection therewith; provided that Borrower shall permit the Indemnitee to participate in such conduct and settlement through counsel chosen by the Indemnitee, but reasonable fees and expenses of such counsel shall be borne by the Indemnitee. Notwithstanding the foregoing, the Indemnitee shall have the right to employ its own counsel, and the reasonable fees and expenses of such counsel shall be at Borrower's cost and expense if the Indemnitee reasonably determines that (i) Borrower's counsel is not adequately defending any claim or proceeding in a manner reasonably acceptable to Indemnitee or (ii) the interests of Borrower and the Indemnitee have become adverse in any such claim or course of action; provided, however Borrower, in such event, shall only be liable for the reasonable legal expenses of one counsel for all such Indemnitees. Neither Borrower nor any Indemnitee shall be liable for any settlement of any Syndication Indemnified Liability effected without its prior written consent, such consent not to be unreasonably withheld. No Indemnitee shall be liable for any indirect or consequential damages in connection with its activities related to the Loan, the Securitization or the Syndication.

9.7.5    No Joint Venture.

Notwithstanding anything to the contrary herein contained, neither Agent, nor any Co-Lender by entering into this Agreement or by taking any action pursuant hereto, will be deemed a partner or joint venturer with Borrower.

9.7.6    Voting Rights of Co-Lenders.

Borrower acknowledges that the Co-Lending Agreement may contain provisions which require that amendments, waivers, extensions, modifications, and other decisions with respect to the Loan Documents shall require the approval of all or a number of the Co-Lenders holding in the aggregate a specified percentage of the Loan or any one or more Co-Lenders that are specifically affected by such amendment, waiver, extension, modification or other decision.

## ARTICLE 10 MISCELLANEOUS

Section 10.1    Survival.

This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 10.2   Lender's Discretion.

Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

Section 10.3   Governing Law; Submission to Jurisdiction.

(a)   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY LEGAL REQUIREMENTS OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE APPLICABLE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THIS CHOICE OF GOVERNING LAW IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATION LAW SECTION 5-1401.

(b)   ANY SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, OR AT LENDER'S SOLE OPTION AND ELECTION IN THE STATE WHERE THE PROPERTY IS LOCATED, AND, IN

{10347125;14}

EITHER INSTANCE, BORROWER WAIVES ANY OBJECTIONS WHICH BORROWER MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT DELANEY CORPORATE SERVICES, 41 STATE STREET, SUITE 405, ALBANY, NEW YORK 12207, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  THIS CHOICE OF FORUM IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1402.

(c)    NOTHING IN THIS AGREEMENT OR IN ANY OF THE OTHER LOAN DOCUMENTS WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

(d)    BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGE OF ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK, OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(e)    ANY SUIT, ACTION OR PROCEEDING AGAINST LENDER BROUGHT BY BORROWER AGAINST LENDER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF THE LENDER-BORROWER RELATIONSHIP CREATED BY THE LOAN DOCUMENTS (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) WHICH IN ANY EVENT SHALL BE SUBJECT TO THE LIMITATIONS OF SECTION 10.23, MAY ONLY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK AND BORROWER HEREBY WAIVES ANY RIGHT TO BRING ANY CLAIM OR CAUSE OF ACTION IN ANY OTHER JURISDICTION AND HEREBY AGREES NOT TO DO SO.

Section 10.4    Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a

79

writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 10.5    Delay Not a Waiver.

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 10.6    Notices.

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:                MIDDLE MOUNTAIN 156, LLC
                               20837 North 41st Avenue
                               Glendale, Arizona 85308
                               Attention: Nicholas Bonanno
                               Facsimile No.: (632) 587-4825

With a copy to:                Beus Gilbert PLLC
                               4800 North Scottsdale Road
                               Suite 6000
                               Scottsdale, Arizona 85251
                               Attention: Steven W. Bienstock, Esq.
                               Facsimile No.: (480) 429-3100

If to Lender/Agent:            Lehman Brothers Holdings, d/b/a Lehman Capital, a Division of
                               Lehman Brothers Holdings Inc.
                               399 Park Avenue
                               New York, New York 10022

{10347125:14}

Attention: Mr. Charles W. Schoenherr
Facsimile No.: (646) 758-5398
MTS# WH2565/Asset # 1141401

Lehman Brothers Holdings, d/b/a Lehman Capital, a Division of
Lehman Brothers Holdings Inc.
399 Park Avenue
New York, New York 10022
Attention: F. Robert Brusco, Esq.
Facsimile No.: (646) 758-4635
MTS# WH2565/Asset # 1141401

and

Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019
Attention: James J. Thomas, Esq.
Facsimile No.: (212) 262-1215

With a copy of all notices,          Trimont Real Estate Advisors, Inc.
certificates, and other              Monarch Tower
information under Section            3424 Peachtree Road NE, Suite 2200
5.1.10 to:                           Atlanta, Georgia 30326
                                     Attention: Mr. J. Gregory Winchester
                                     Facsimile No.: (404) 420-5600
                                     MTS# WH2565/Asset # 1141401

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

Section 10.7    Trial by Jury.

BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

81

Section 10.8    Headings.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.9    Severability.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 10.10    Preferences.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, State or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 10.11    Waiver of Notice.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower are not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 10.12    Remedies of Borrower.

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agree that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

{10347125:14}

Section 10.13  Expenses; Indemnity.

(a)     Borrower covenant and agree to pay or, if Borrower fails to pay, to reimburse, Lender within five (5) days of receipt of written notice from Lender for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation, any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (viii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender. Lender shall use its commercially efforts to deliver to Borrower prior written notice prior to exercising any rights set forth in the immediately preceding sentence, provided, however, that any failure to deliver such notice shall in no way limit or impair Lender's rights hereunder.

(b)     Borrower shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any breach by Borrower of their respective obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Indemnified Liabilities arise

from the gross negligence, illegal acts, fraud or willful misconduct of Lender. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under Applicable Law to the payment and satisfaction of all Indemnified Liabilities incurred by Lender.

(c)     Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless Lender and the Indemnified Parties from and against any and all losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 4.1.8 or 5.2.8.

(d)     Borrower covenants and agrees to pay for or, if Borrower fails to pay, to reimburse Lender for, any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

Section 10.14  Schedules and Exhibits Incorporated.

The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 10.15  Offsets, Counterclaims and Defenses.

Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim (other than compulsory counterclaims) or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 10.16  No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)     Notwithstanding the fact that an Affiliate of Lender is an indirect owner of Borrower as of the date hereof, Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon

84

or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 10.17  <u>Publicity.</u>

All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, or any of their Affiliates shall be subject to the prior written approval of Lender, which shall not be unreasonably withheld.  Notwithstanding the foregoing, disclosure required by any federal or State securities laws, rules or regulations, as determined by Borrower's counsel, shall not be subject to the prior written approval of Lender.

Section 10.18  <u>Waiver of Marshalling of Assets.</u>

To the fullest extent permitted by Applicable Law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of all or part of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 10.19  <u>Waiver of Counterclaim.</u>

Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 10.20  <u>Conflict; Construction of Documents; Reliance.</u>

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or

85

Instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 10.21  Brokers and Financial Advisors.

Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement, except for Schaub Financial. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this Section 10.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

Section 10.22  Prior Agreements.

This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, between Borrower and/or its Affiliates and Lender are superseded by the terms of this Agreement and the other Loan Documents.

Section 10.23  Limitation of Liability.

Notwithstanding anything contained herein to the contrary, no claim may be made by Borrower or any other Person (including any Guarantor or Indemnitor) against Lender, Servicer, Agent, or any Co-Lenders or the Affiliates, directors, officers, employees, attorneys or agent of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

Section 10.24  Cross Collateralization/Cross Default.

Borrower's obligations hereunder and under the Security Instrument are cross-defaulted with, and the Property described herein cross-collateralized with those certain properties as described in the 163 Security Instrument and the Val Vista Security Instrument, for the benefit of Lender, and both intended to be recorded in the land records of Yavapai County and Pinal County, respectively, relating to the properties described therein (collectively, the "Crossed

86

Properties"). The Crossed Properties are also described in <u>Exhibits A-2</u> and <u>A-3</u>, attached hereto and made a part hereof.

## ARTICLE 11 <u>PARTIAL RELEASE OF PARCELS</u>

Section 11.1    <u>Release of Parcels.</u>

Provided no Event of Default has occurred and is continuing, Lender shall permit a partial release of the lien of the Security Instrument upon the sale (the "**Parcel Release**") of any portion of the Property (each, a "**Parcel**") by Borrower upon Borrower's compliance with the following terms and conditions, in form and substance satisfactory to Lender:

(a)    The Parcel is, or subsequent to a transfer will be, a separate tax lot and is not, or subsequent to a transfer will not be, required to be included within the Property for purposes of any governmental rule or necessary or to satisfy or facilitate the requirements or terms of any other pending transaction to sell or transfer any other portion of the Property (and Lender reserves the right to require a proration of any property taxes that may be due and payable on such Parcel subsequent to a transfer but prior to the issuance of a new tax lot for such Parcel and such other assurances as may be reasonably satisfactory to Lender);

(b)    Borrower shall have given to Lender a written request for the Parcel Release not less than ten (10) days prior to the desired Parcel Release date, accompanied by all evidence, information and other items required by Lender, including, but not limited to, a copy of the purchase and sale contract for the applicable Parcel, the terms of which are satisfactory to Lender in its sole and absolute discretion;

(c)    Each Parcel and the remaining portion of the Property and the Parcel Release and the conveyance shall be in compliance with all applicable zoning, land use and other governmental rules and regulations of all governmental authorities (including, without limitation, Borrower's delivery of evidence satisfactory to Lender that the remaining portion of the Property has access to at least one publicly dedicated road, and has access to or shall have access to public utilities in accordance with the timeline for connecting such public utilities as set forth in the Project Schedule attached hereto as Schedule III);

(d)    Borrower shall have delivered to Lender a copy of the closing statement for the sale of the Parcel for Lender's review and approval, certified by Borrower as true and correct, not less than three (3) Business Day prior to the desired Parcel Release;

(e)    Borrower shall:

(i)    Pay to Lender a release price at the closing of the sale of the Parcel in immediately available funds which shall be no less than one hundred percent (100%) of the "Net Sale Proceeds" from the sale of such Parcel (defined as the gross sales price for such Parcel less ordinary and customary closing costs including transfer taxes and brokerage fees (not to exceed 10% of such gross sales price) if customarily paid by sellers, but in no event exceeding 12% of such gross sales price). Prior to an Event of Default, the Net Sale Proceeds shall be applied by Lender to (A) if the sale occurs within the first six (6) months after the Closing Date, a Prepayment Premium on the amount of

87

the Net Sale Proceeds applied to the outstanding principal of the Loan calculated for the period from Lender's receipt of the Net Sale Proceeds to the end of the sixth (6th) month anniversary of the Closing Date; and (B) (i) if the Net Sale Proceeds is paid on a Payment Date, all accrued and unpaid interest on the amount of principal being prepaid or (ii) if the Net Sale Proceeds is not paid on a Payment Date, the Interest Shortfall, and (C) the balance of such Net Sale Proceeds to repayment of the outstanding principal balance of the Loan. If an Event of Default exists, Lender may apply the Net Sale Proceeds to any portion of the Debt as Lender elects in its sole discretion;

(ii)    have delivered to the title company responsible for the closing of title to the Parcel (which title company shall be acceptable to Lender in its reasonable discretion) a copy of a notice in form and substance satisfactory to Lender providing that such title company is authorized to close on the sale of such Parcel only in accordance with a closing statement approved in writing by Lender and provide Lender with evidence that substantiates delivery of such notice to the title company to the reasonable satisfaction of Lender;

(iii)    satisfy any and all other conditions required to be satisfied for a Parcel Release under the Loan Documents and those other conditions reasonably requested by Lender; and

(iv)    pay all of Lender's fees, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with the Parcel Release, together with accrued and unpaid interest in respect of the principal amount of the Loan secured hereby to be repaid in the manner set forth in subsection (e)(i) above.

Section 11.2    Release of Additional Collateral Parcels.

Lender has received as additional collateral for the Loan (i) the 163 Security Instrument, which is a second priority deed of trust on the 163 Property given by Borrower's Affiliate, 163, LLC ("163") and (ii) the Val Vista Security Instrument, which is a first priority deed of trust on the Val Vista Property given by Borrower's Affiliate, A&N Investment, L.L.C. ("A&N").

(a)    Lender has agreed to permit a partial release of the lien of the 163 Security Instrument upon the sale of any portion of the 163 Property (each, a "163 Parcel"), subject to 163's compliance with the terms and conditions applicable to a partial release of lien as set forth in the 163 Security Instrument. In connection with the sale of any 163 Parcel, Borrower shall cause 163 to remit to Lender all net sale proceeds 163 would otherwise be entitled to receive following payment of any portion of such proceeds then due the holder of the first deed of trust on the 163 Property.

(b)    Lender has agreed to permit a partial release of the lien of the Val Vista Security Instrument upon the sale of any portion of the Val Vista Property (each, a "Val Vista Parcel"), subject to A&N's compliance with the terms and conditions applicable to a partial release of lien as set forth in the Val Vista Security Instrument. In connection with the sale of any Val Vista Parcel, Borrower shall cause A&N to remit to Lender all net sale proceeds A&N

88

{10347125:14}

would otherwise be entitled to receive following payment of any portion of such proceeds then due the holder of the first deed of trust on the Val Vista Property.

[Signature Page Follows]

{10347125:14}

[Signature Page to Loan Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

MIDDLE MOUNTAIN 156, LLC, an Arizona limited liability company

By:    Middle Mountain 39, LLC, an Arizona limited liability company

       By:    _____
       Name: Nicholas W. Bonanno, Jr.
       Title:  Manager

By:    Allen D. Jenkins & Associates, LLC, an Arizona limited liability company

       By:    _____
       Name: Allen D. Jenkins
       Title:  Manager


[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[Signature Page to Loan Agreement – Continued]

LENDER:

**LEHMAN BROTHERS HOLDINGS INC.**, d/b/a Lehman
Capital, a Division of Lehman Brothers Holdings Inc., a
Delaware corporation

By: _____
    Name:      Chris Westfahl
    Title:       Authorized Signatory

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

**(Signature Page to Loan Agreement - Continued)**

The undersigned, while not directly liable to Lender for payment of the Debt except as specifically set forth in the Guaranty or the Environmental Indemnity, are signing this Agreement to acknowledge their agreement to the terms hereof:

**INDEMNITOR/GUARANTOR:**

_____
NICHOLAS W. BONNANO, JR.

_____
RITA BONNANO

_____
ALLEN D. JENKINS

_____
TAMERA R. JENKINS

[SIGNATURES CONTINUE ON FOLLOW PAGE]

**(Signature Page to Loan Agreement - Continued)**

The undersigned, while not directly liable to Lender for payment of the Debt except to the extent set forth in the 163 Security Instrument and Val Vista Security Instrument, are signing this Agreement to acknowledge their agreement to the terms hereof:

**INDEMNITOR/GUARANTOR:**

**163, LLC,**
an Arizona limited liability company

By: _____
    Name:    Allen D. Jenkins
    Title:    Manager

**A&N INVESTMENT PROPERTIES, L.L.C.**
an Arizona limited liability company

By:    IBSR LIMITED PARTNERSHIP, an
    Arizona limited partnership, its Member

    By:    IBSR MANAGEMENT, INC., an
    Arizona corporation, its General Partner

    By: _____
        Name: Nicholas W. Bonanno, Jr.
        Its:    President

[END OF SIGNATURES]

<u>SCHEDULE I</u>

Organizational Chart of Borrower

## MIDDLE MOUNTAIN 156, LLC
### An Arizona Limited Liability Company
Sole Purpose: Lehman (SPE) Borrower and Owner of Main Collateral Property

Suzanne M. Hay
**CSC Entity Services**
### INDEPENDENT MANAGER

| MIDDLE MOUNTAIN 39, LLC | ALLEN D. JENKINS & ASSOCIATES LLC |
|---|---|
| An Arizona Limited Liability company | An Arizona Limited Liability Company |
| Sole Purpose: Member of Middle Mountain 156, LLC | Sole Purpose: Member of Middle Mountain 156, LLC |
| MANAGER: NICHOLAS W. BONANNO, JR. | MANAGER: ALLEN D. JENKINS |
| Sole Member: IBSR Limited Partnership, an | Members: Tamera R. Jenkins |
| Arizona limited Partnership | Allen D. Jenkins |
| **MEMBER- 99%** | **MEMBER-1%** |

### A&N INVESTMENT PROPERTIES, LLC
### An Arizona Limited Liability Company
Purpose: Owner of Property that is additional collateral for Lehman Loan (SPE)
Guarantor of the Lehman Loan to Middle Mountain 156, LLC
MANAGER: NICHOLAS W. BONANNO, JR.
MEMBER: IBSR LIMITED PARTNERSHIP,
AN ARIZONA LIMITED PARTNERSHIP

### DESERT TRANQUILITY NURSERY, INC.
### An Arizona Corporation
Purpose: Owner of Property that is additional collateral for Lehman Loan (SPE)
Guarantor of the Lehman Loan to Middle Mountain 156, LLC
PRESIDENT: NICHOLAS W. BONANNO III
VICE PRESIDENT/TREASURER: HEATHER BONANNO

## SCHEDULE II

Bankruptcy Matters

1.  Chapter 7 Voluntary Joint Petition in Bankruptcy filed by Allen D. Jenkins and Marla L. Jenkins on April 26, 1991 in the United States Bankruptcy Court for the District of Arizona, judgment entered May 2, 1991.

2.  Chapter 7 Bankruptcy Judgment entered March 23, 1993 against Nicholas Bonanno and Rita Bonanno in the United States Bankruptcy Court for the District of Arizona, discharging obligations from bankruptcy filing of June 16, 1989.

3.  Chapter 11 Bankruptcy Petition filed November 8, 2002 by N.W.B. Incorporated, Nicholas Bonanno as principal, judgment entered November 14, 2002.

## SCHEDULE III

Project Schedule

| Task | Estimated Timeframe from loan closing (items are consecutive) |
|---|---|
| Complete Negotiations with City of Phoenix | 1-2 Month |
| Obtain Easements | 1-2 Month |
| Complete Design Plans | 3 Months |
| Obtain Final Engineering Approval | 1 Month |
| Construction (Water and Sewer to the Site) | 4-6 Months |
| **TOTAL** | **10-12 Months** |

EXHIBIT A-1

LEGAL DESCRIPTION OF THE PROPERTY

PARCEL NO. 1:

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA.

PARCEL NO. 2:

THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT THAT PORTION OF SECTION 26 BEING THE PHOENIX-ROCK SPRINGS HIGHWAY (BLACK CANYON INTERSTATE HIGHWAY NO. 17) WHICH IS THAT PORTION OF SECTION 26 LYING EASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT ON THE NORTH LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, WHICH IS 80.36 FEET WESTERLY OF THE NORTHEAST CORNER THEREOF;

THENCE SOUTH 9 DEGREES 57 MINUTES 36 SECONDS EAST 478.57 FEET, TO A POINT ON THE EAST LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26 AND TO THE END OF THIS LINE DESCRIPTION. THE PORTION OF SECTION 26 THAT ENCOMPASSES THE PHOENIX-ROCK SPRINGS HIGHWAY WAS DEDICATED TO THE STATE OF ARIZONA BY WARRANTY DEED DATED JULY 9, 1963, RECORDED SEPTEMBER 5, 1933 IN DOCKET 4718, PAGE 237, ACCORDING TO THE RECORDS OF THE COUNTY RECORDER OF THE COUNTY OF MARICOPA, STATE OF ARIZONA.

PARCEL NO. 3:

THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

AND THAT PART OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 26, LYING WEST OF THE CENTERLINE OF THE PHOENIX-ROCK SPRINGS HIGHWAY;

EXCEPT THAT PORTION OF THE NORTHWEST QUARTER OF AND A PORTION OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

{10347125;14}                              A-1-1

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 26;

THENCE SOUTH 89 DEGREES 38 MINUTES 14 SECONDS WEST ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF SECTION 26, A DISTANCE OF 283.48 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE 17;

THENCE SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST, ALONG SAID RIGHT-OF-WAY LINE, 2012.91 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, 671.09 FEET TO A POINT ON THE SOUTH LINE OF SAID NORTHEAST QUARTER OF SECTION 26;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, ALONG SAID SOUTH LINE OF THE NORTHEAST QUARTER AND THE SOUTH LINE OF THE NORTHWEST QUARTER, 1178.61 FEET;

THENCE NORTH 00 DEGREES 18 MINUTES 18 SECONDS WEST, 172.10 FEET;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, 319.00 FEET TO A POINT ON THE WEST LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE 00 DEGREES 18 MINUTES 57 SECONDS WEST, ALONG SAID WEST LINE, 489.46 FEET;

THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS EAST, 1385.32 FEET TO THE POINT OF BEGINNING;

AND EXCEPT THE SOUTH 172 FEET OF THE WEST 319 FEET OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

PARCEL NO. 4:

THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

A-1-2

PARCEL NO. 5:

THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL MINERALS IN THE LAND AS SET FORTH IN THE PATENT THEREOF; AND

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAYBE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE AS AN ACCESS ROAD AND UTILITIES CERTAIN LANDS FOR THE BENEFIT OF THE ABOVE-DESCRIBED PARCEL OF LAND AS SET FORTH IN GRANT OF EASEMENT RECORDED IN DOCKET 14214, PAGE 275.

PARCEL NO. 6:

THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL MINERALS IN THE LAND AS SET FORTH IN THE PATENT THEREOF; AND

TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE AS AN ACCESS ROAD AND UTILITIES CERTAIN LANDS FOR THE BENEFIT OF THE ABOVE-DESCRIBED PARCEL OF LAND AS SET FORTH IN GRANT OF EASEMENT RECORDED IN DOCKET 14214, PAGE 275.

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

PARCEL NO. 7:

THE SOUTH 172 FEET OF THE WEST 319 FEET OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST

{10347125;14}

OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA.

PARCEL NO. 8:

A PORTION OF THE NORTHWEST QUARTER AND A PORTION OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 26;

THENCE SOUTH 89 DEGREES 38 MINUTES 14 SECONDS WEST ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF SECTION 26, A DISTANCE OF 283.46 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE 17;

THENCE SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, 2012.91 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 671.09 FEET TO A POINT ON THE SOUTH LINE OF SAID NORTHEAST QUARTER OF SECTION 26;

DESCRIBED ABOVE, ALL AS SET FORTH IN THAT CERTAIN GRANT OF EASEMENTS RECORDED JANUARY 29, 1976 IN DOCKET 11522, PAGE 464, OVER, ACROSS AND UNDER THE FOLLOWING DESCRIBED REAL PROPERTY:

BEGINNING AT A POINT IN THE EAST-WEST MID SECTION LINE OF SAID SECTION 26 THAT BEARS NORTH 89 DEGREES 44 MINUTES 26 SECONDS EAST 2300.97 FEET FROM THE EAST QUARTER CORNER OF SAID SECTION 26;

THENCE FROM SAID POINT OF BEGINNING AND LEAVING SAID MID SECTION LINE NORTH 58 DEGREES 16 MINUTES 39 SECONDS EAST 126.45 FEET;

THENCE NORTH 89 DEGREES 44 MINUTES 26 SECONDS EAST 405.24 FEET TO A POINT IN THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE SEVENTEEN LAST SAID POINT BEARS SOUTH 09 DEGREES 54 MINUTES 15 SECONDS EAST 337.15 FEET FROM AN ARIZONA STATE HIGHWAY DEPARTMENT BRASS DISK STAMPED "A.H.D. 1 039+00" MARKING SAID RIGHT-OF-WAY LINE;

THENCE ALONG SAID RIGHT-OF-WAY LINE SOUTH 09 DEGREES 54 MINUTES 15 SECONDS EAST 66.95 FEET TO A POINT IN THE EAST-WEST MIDSECTION LINE OF SAID SECTION 26;

{10347125:14}

THENCE LEAVING SAID RIGHT-OF-WAY LINE ALONG SAID MIDSECTION LINE
SOUTH 89 DEGREES 44 MINUTES 26 SECONDS WEST 524.32 FEET TO THE POINT OF
BEGINNING

A-1-5

## EXHIBIT A-2

## LEGAL DESCRIPTION OF THE 163 PROPERTY

Parcel 3, according to the map on file in the office of the county recorder of Yavapai County, Arizona, in Book 7 of Results of Survey, Page 56.

Except all coal and other minerals as reserved in Patent to said land.

<u>EXHIBIT A-3</u>

## LEGAL DESCRIPTION OF THE VAL VISTA PROPERTY

PARCEL 1:

The Southeast quarter of the Northwest quarter of Section 26, Township 5 South, Range 6 East of the Gila and Salt River Meridian, Pinal County, Arizona.

PARCEL 2:

The Northeast quarter of the Northwest quarter of Section 26, Township 5 South, Range 6 East of the Gila and Salt River Meridian, Pinal County, Arizona.

# EXHIBIT B

## PROMISSORY NOTE

$44,000,000.00

New York, New York
July 13, 2006

FOR VALUE RECEIVED, **MIDDLE MOUNTAIN 156, LLC**, an Arizona limited liability company, as maker, having its principal place of business at 20837 North 41ˢᵗ Avenue, Glendale, Arizona 85308 ("Borrower"), hereby unconditionally promises to pay to the order of **LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL, a division of LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation having an address at 399 Park Avenue, New York, New York 10022 ("Lender"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum FORTY-FOUR MILLION AND 00/100 DOLLARS ($44,000,000.00) (the "Loan") or so much thereof as may be advanced pursuant to that certain Loan Agreement, dated the date hereof, between Borrower and Lender (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate, and to be paid in accordance with the terms of this Note and the Loan Agreement. All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Loan Agreement.

### ARTICLE 1 - PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article 2 of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

### ARTICLE 2 - DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the occurrence of any other Event of Default and in addition, Lender shall be entitled to receive interest on the entire unpaid principal sum at the Default Rate pursuant to the terms of the Loan Agreement. This Article 2, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

It is expressly agreed that if default be made in the payment of the whole or any part of the Debt evidenced hereby, or if an Event of Default be made in the performance of any of the terms, agreements, covenants or conditions contained herein or in the Security Instrument (as defined herein) or any of the other Loan Documents which are given to secure and which secure the payment of this Note or any of the other Obligations, then in any of said events, the entire unpaid principal sum due hereunder plus all accrued interest shall, at the option of the holder hereof, at once become and be due and payable without notice to Borrower or any other person. In the event of any default in the payment of this Note and if the same is collected by an attorney, Borrower agrees to pay all costs of collection, including reasonable attorneys' fees.

{10347123;5}

## ARTICLE 3 - LOAN DOCUMENTS

This Note is secured by that certain Deed of Trust, Security Agreement and Fixture Filing of even date herewith between Borrower, Trustee and Lender (the "Security Instrument"), and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4 - SAVINGS CLAUSE

This Note and the Loan Agreement are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Note, the Loan Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

## ARTICLE 5 - NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6 - WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of

{10347123;5}                                    - 2 -

the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. If Borrower is a partnership, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership, and the term "Borrower," as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. If Borrower is a limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising the limited liability company, and the term "Borrower" as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company and their members shall not thereby be released from any liability. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, corporation or limited liability company which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.) If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

## ARTICLE 7 - TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8 - EXCULPATION

Notwithstanding anything to the contrary contained in this Note, the liability of Borrower to pay the Debt and for the performance of the other agreements, covenants and obligations contained herein and in the Security Instrument, the Loan Agreement and the other Loan Documents shall be limited as set forth in Section 9.4 of the Loan Agreement.

## ARTICLE 9 - GOVERNING LAW, JURISDICTION, WAIVER OF TRIAL BY JURY

(a)    THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY LEGAL REQUIREMENTS OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS AND SECURITY

{10347123:5}                                    - 3 -

INTERESTS CREATED PURSUANT TO THE SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE APPLICABLE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THE LOAN AGREEMENT, THIS NOTE AND THE OTHE LOAN DOCUMENTS. THIS CHOICE OF GOVERNING LAW IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATION LAW SECTION 5-1401.

ANY SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK AND BORROWER WAIVES ANY OBJECTIONS WHICH BORROWER MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.   ANY SUIT, ACTION OR PROCEEDING BROUGHT BY BORROWER ARISING OUT OF OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS OR THE LENDER-BORROWER RELATIONSHIP CREATED THEREBY (WHETHER IN CONTRACT OR IN TORT) SHALL ONLY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT DELANEY CORPORATE SERVICES, 41 STATE STREET, SUITE 405, ALBANY, NEW YORK 12207 AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  THIS CHOICE OF FORUM IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATION LAW SECTION 5-1402.

BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGE OF ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF

(10347123:5)                                     - 4 -

(

PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK, OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

NOTHING IN THIS NOTE WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS NOTE, THE LOAN AGREEMENT, THE SECUIRTY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

## ARTICLE 10 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## [NO FURTHER TEXT ON THIS PAGE]

{10347123.5}

[Signature Page to Promissory Note]

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

MIDDLE MOUNTAIN 156, LLC, an Arizona limited liability company

By:     Middle Mountain 39, LLC, an Arizona limited liability company

By: _____
Name: Nicholas W. Bonanno, Jr.
Title:   Manager

By:     Allen D. Jenkins & Associates, LLC, an Arizona limited liability company

By: _____
Name: Allen D. Jenkins
Title:   Manager

ACKNOWLEDGMENT

STATE OF _ARIZONA_ )
                                           ) ss.:
COUNTY OF _MARICOPA_ )

       On the 26TH day of _JUNE_ in the year 2006 before me, the undersigned, personally
appeared _NICHOLAS W. BONNANO JR. AND_ ALLEN D. JENKINS, personally known to me or proved to me on the
basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their
capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the
person upon behalf of which the individual(s) acted, executed the instrument.

                                   Signature and Office of
                                   individual taking acknowledgment



OFFICIAL SEAL
JUDITH P. WALKER
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires Nov. 5, 2006

{10347123;24}                            A-

**EXHIBIT C**

## GUARANTOR FULL REPAYMENT GUARANTY

THIS GUARANTOR FULL REPAYMENT GUARANTY ("**Guaranty**"), dated effective as of the 13th day of July, 2006, is made and given by NICHOLAS W. BONANNO, JR. and RITA BONNANO, his wife, each an individual having an address at 20837 North 41ˢᵗ Avenue, Glendale, Arizona 85308 (jointly and severally, "**Bonanno**") and ALLEN D. JENKINS and TAMERA R. JENKINS, his wife, each an individual having an address at 5417 West Ironwood Drive, Glendale, Arizona 85302 (jointly and severally, "**Jenkins**," together with Bonanno are hereinafter referred to herein collectively as "**Guarantor**") to and for the benefit of LEHMAN BROTHERS HOLDINGS INC., doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., having its principal place of business at 399 Park Avenue, 8ᵗʰ Floor, New York, New York 10022 ("**Lender**").

Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in that certain Loan Agreement dated the date hereof, between Middle Mountain 156, LLC, an Arizona limited liability company (the "**Borrower**") and Lender (as the same may hereafter be amended, modified or supplemented from time to time, the "**Loan Agreement**").

### W I T N E S S E T H:

A.    Borrower is the owner of certain premises located at SCW Interstate 17 and Dixileta Drive in Phoenix, Arizona, which premises are legally described on Schedule A attached hereto (the "**Property**").

B.    Guarantor owns an indirect membership interest in Borrower.

C.    Lender is prepared to make a loan ("**Loan**") to Borrower in the principal amount of $44,000,000.00, pursuant to the Loan Agreement, to be evidenced by that certain secured promissory note of even date herewith in the principal amount of $44,000,000.00 made by Borrower to Lender (the "**Note**"). The Note, together with any and all other documents which evidence or secure the Loan, are sometimes collectively referred to herein as the "**Loan Documents**").

D.    Lender has required, among other collateral, as security for making the Loan and the observance and performance of all the terms, covenants and provisions of the Loan Documents on the part of the Borrower to be observed and performed, a security interest in the Property, as evidenced by each of that certain Deed of Trust, Security Agreement and Fixture Filing of even date herewith, made by Borrower in favor of Lender (the "**Security Instrument**").

E.    As an inducement to Lender to make the Loan to Borrower and with full knowledge that Lender would not make the Loan without this Guaranty, Guarantor has agreed to enter into, execute and deliver this Guaranty to and for the benefit of Lender.

:10347195:5:

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, receipt and sufficiency of which are acknowledged, and to induce Lender to make the Loan, Guarantor unconditionally covenants and agrees as set forth below.

1.     **Guaranty**.

(a)     This is a guaranty of payment and not of collection.  Subject to the terms and conditions hereof, including without limitation Section 3 below, Guarantor unconditionally, absolutely, and irrevocably, as primary obligor and not merely as a surety guarantees to Lender the punctual and complete payment when due, whether at or after maturity, upon acceleration or otherwise, of that portion of the amounts due and outstanding under the Loan including, without limitation, the principal sum, all accrued interest, default interest and amounts advanced by Lender under the Loan Documents (such payment obligation is referred to hereinafter as the "**Guaranteed Obligation**");

(b)     Guarantor also agrees to pay on demand any and all expenses, including, without limitation, reasonable attorneys fees and disbursements incurred by Lender in enforcing or collecting any or all of the obligations under this Guaranty ("**Lender's Expenses**").   Lender's Expenses shall not be deemed to constitute a component of the Guaranteed Obligation but shall be considered separate and distinct therefrom.

2.     **Guaranty Absolute**.

(a)     Guarantor guarantees that the Guaranteed Obligation will be paid strictly in accordance with the terms of the Loan, regardless of any law, statute, rule, regulation, decree or order now or subsequently in effect in any jurisdiction affecting or purporting to affect in any manner any of such terms or the rights or remedies of Lender.

(b)     Any payment or payments made by Borrower or any other person or received or collected by Lender from Borrower or any other person by virtue of any action or proceeding or any other set-off or appropriation or application at any time or from time to time in respect of any indebtedness, obligations or liabilities of Borrower under the terms of the Loan may be applied by Lender in satisfaction of such indebtedness, obligations and liabilities in such order as Lender may determine, in accordance with the terms of the Loan.

(c)     The liability of Guarantor under this Guaranty shall be absolute and unconditional, and shall not be affected, diminished, released, terminated, discharged or impaired, in whole or in part, by, and Lender may proceed to exercise any right or remedy under this Guaranty irrespective of, any or all of the following:

(i)     any lack of genuineness, regularity, validity, legality or enforceability, or the voidability of, all or any of the terms of the Loan;

(ii)     the failure of Lender to exercise or to exhaust any right or remedy or take any action against Borrower or any collateral or other security available to Lender;

(iii)    the election, exercise or exhaustion of any right, remedy or action against Borrower or any collateral or other security available to Lender;

(iv)    any collection, award, receipt or settlement by Lender of any Guaranteed Obligation, collateral, other security or any funds pursuant to any exercise of any right, remedy or action by Lender from, or against, as the case may be, Borrower or any collateral or other security available to Lender, except solely and expressly to the extent that any of the payment obligation guaranteed hereunder shall have been satisfied thereby and consequently reduced subject, however, to any of the applicable terms and provisions of this Guaranty respecting reinstatement of the Guaranteed Obligation, as provided for in Subsection (d) hereinbelow;

(v)    any amendment or modification of the terms of any or all of the Loan;

(vi)    any change in the time, manner or place of payment of all or any of the Guaranteed Obligation or any extensions of time for payment, whether in whole or in part, under the terms of the Loan to be paid;

(vii)    any amendment or waiver of, or any assertion or enforcement or failure or refusal to assert or enforce, or any consent or indulgence granted by Lender with respect to a departure from, any term of the Loan, including, without limiting the generality of the foregoing, the waiver by Lender of any default of Borrower, or the making of any other arrangement with, or the accepting of any compensation or settlement from, Borrower;

(viii)    any failure or delay of Lender to exercise, or any lack of diligence in exercising, any right or remedy with respect to the Loan or this Guaranty;

(ix)    any dealings or transactions between Lender and Borrower under the Loan, whether or not the Guarantor shall be a party to or cognizant of the same;

(x)    any bankruptcy, insolvency, assignment for the benefit of creditors, receivership, trusteeship or dissolution of or affecting Borrower;

(xi)    any exchange, surrender or release, in whole or in part, of any security which may be held by Lender at any time for or under the terms of the Loan or in respect of the Guaranteed Obligation;

(xii)    any other guaranty now or subsequently executed by Guarantor or the release of Guarantor from liability for the payment of the guaranteed obligations under any other guaranty or indemnity or any of the terms of the Loan on the part of Borrower to be paid, whether by operation of law or otherwise;

(xiii)    any rights, powers or privileges Lender may now or subsequently have against any person, entity or collateral in respect of the Guaranteed Obligation;

(xiv)    Lender's consent to any assignment or successive assignments of the Loan by Borrower;

(xv)    any other circumstance which might in any manner or to any extent constitute a defense available to Borrower, or vary the risk of Guarantor, or might otherwise constitute a legal or equitable discharge or defense available to a surety or Guarantor, whether similar or dissimilar to the foregoing;

(xvi)    any and all notice of the creation, renewal or extension of the Guaranteed Obligation and notice of or proof of reliance by Lender upon this Guaranty or acceptance of this Guaranty; or

(xvii)    any change, restructuring or termination of the organizational structure or existence of Borrower, whether occurring before or after any default by Borrower under the Loan, and with or without further notice to or assent from Guarantor.

(d)    This Guaranty shall continue to be effective or be reinstated, as the case may be, and the rights of Lender under this Guaranty shall continue with respect to, the Guaranteed Obligation at any time paid by Borrower thereafter required to be restored or returned by Lender upon the insolvency, bankruptcy or reorganization of Borrower, or for any other reason, all as though such Guaranteed Obligation had not been so paid or applied.

3.    **Liability of Guarantor**.

(a)    Guarantor agrees that (i) this Guaranty shall be directly enforceable against Guarantor without first resorting to any other guaranty or exhausting remedies against any other Guarantor and regardless of whether or not Lender elects to also pursue its remedies against Borrower and/or any collateral or other security available to Lender; (ii) suit may be commenced against Guarantor without commencing suit against any other Guarantor and without joining any other Guarantor as defendants; and (iii) any recovery against Borrower shall not reduce Guarantor's liability for payment of the Guaranteed Obligation unless and until the Guaranteed Obligation is fully satisfied.  Guarantor waives any right to require that an action be brought against Borrower or any other person or to require that resort be had to any security or any balance of any deposit account or credit on the books of Lender in favor of Borrower or Guarantor or any other person.  Guarantor waives (A) to the extent waivable, the benefit of any statute of limitations affecting Guarantor's liability or the enforcement thereof and (B) any and all defenses available to a surety or a Guarantor except payment and performance in full.

(b)    Nothing in this Guaranty shall be construed to modify, limit or otherwise abridge (a) the Guarantor's liability, acting in any other capacity, for the Borrower's obligations under the Loan and (b) the Guarantor's liability (i) pursuant to the terms of the Guaranty of Recourse Obligations of Borrower and the Environmental Indemnity Agreement and (ii) any other guaranty which Guarantor has executed in connection with the Loan.

4.    **Continuing Guaranty**.  Guarantor agrees that this Guaranty is a continuing

guaranty and shall remain in full force and effect until the payment in full of the Guaranteed Obligation and Lender's Expenses. If, following such payment and performance, Lender is required to return, repay or disgorge any payment received by reason of any proceeding under the Bankruptcy Code of the United States or any state insolvency or debtor protection act, then this Guaranty shall continue in full force and effect as to such payment returned, repaid or disgorged.

5.    **Certificate of Lender**.  A certificate by Lender as to the amount or extent of any payments or advances under the Loan or the outstanding principal or interest amounts of the Loan shall, in the absence of manifest error, be conclusive evidence as to the subject matter of such certificate against Guarantor in any legal proceedings arising out of or connected with this Guaranty.

6.    **Representations and Warranties**. Guarantor hereby represents and warrants to Lender as follows:

(a)    Guarantor has full power, authority and legal right to enter into this Guaranty and to perform Guarantor's obligations under its terms.

(b)    Guarantor has duly executed and delivered this Guaranty.  This Guaranty constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

(c)    No authorization, consent, approval, exemption, permit or license of, or filing with, any governmental or public body or authority is required to authorize, or is otherwise required in connection with, the valid execution or delivery by Guarantor of this Guaranty, or the performance of Guarantor's obligations under this Guaranty, except such as have been obtained and are in full force and effect.  All conditions required to the execution, delivery and performance under this Guaranty have been satisfied on or before the date of this Guaranty.

(d)    Guarantor is not insolvent and is not a party to, or otherwise bound by or subject to, any agreement or instrument, the observance of the terms and provisions of which would materially impair Guarantor's ability to perform its obligations under, and to be bound by, this Guaranty.  Neither the execution and delivery by Guarantor of this Guaranty, nor compliance by Guarantor with the terms and provisions of this Guaranty, will conflict with, constitute a default under, or result in a breach of, any of the terms, conditions or provisions of, any law or decree or any regulation, order, writ, injunction, determination or award of any court, arbitrator or governmental department, commission, board, bureau, agency or instrumentality (domestic or foreign), or any agreement or instrument to which Guarantor is a party or by which they or any of their properties may be affected.

(e)    All financial statements, if any, which have been furnished by Guarantor to Lender in connection with the Loan and this Guaranty, and all such financial statements which

may be subsequently furnished to Lender by Guarantor, have been and shall be prepared in accordance with generally accepted accounting principles consistently applied; are and shall be true, correct and complete; and do and shall fairly present the financial condition of Guarantor, all as at their respective dates.

(f)    There is no action, suit or proceeding pending or, to the best of the knowledge of Guarantor, threatened, against or affecting Guarantor or before any arbitrator of any kind or before any governmental department, commission, board, bureau, agency of instrumentality (domestic or foreign) other than actions fully covered by insurance, the defense of which has been assumed by Guarantor's insurance carriers.

7.    **Waivers.**  Guarantor expressly waives the following:

(a)    notice of acceptance of this Guaranty and of any change in the financial condition of Borrower;

(b)    promptness, diligence, presentment and demand for payment of the Guaranteed Obligation;

(c)    protest, notice of dishonor, notice of default and any other notice with respect to the Guaranteed Obligation and/or this Guaranty;

(d)    any demand for payment under this Guaranty;

(e)    the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defenses of prior payment by Borrower, or by any other Person permitted under the Loan, of the Guaranteed Obligation which Guarantor is called upon to pay under this Guaranty;

(f)    all rights and remedies accorded by applicable law to Guarantor, or sureties, including, without being limited to, any extension of time conferred by any law now or subsequently in effect;

(g)    the right to trial by jury in any action or proceeding of any kind arising on, under, out of, or by reason of or relating, in any way, to this Guaranty or the interpretation, breach or enforcement hereof;

(h)    the right to interpose any setoff or counterclaim of any nature or description in any action or proceeding arising under or with respect to this Guaranty;

(i)    any right or claim of right to cause a marshalling of the assets of Borrower or to cause Lender to proceed against Borrower and/or any collateral or security held by Lender at any time or in any particular order; and

(j)    any defense based on the failure to make Guarantor a defendant in any

action to foreclose or enforce Lender's rights under the Security Instrument.

8. **Further Assurances.** Guarantor agrees, upon the written request of Lender, to execute and deliver to Lender from time to time any additional reasonable instruments or documents reasonably considered necessary by Lender or its counsel to cause this Guaranty to be, become or remain valid and effective in accordance with its terms.

9. **Waiver of Rights Against Borrower; Subordination**.

(a)    Until the Guaranteed Obligation has been discharged in full, Guarantor irrevocably waives all rights of subrogation and any other claims that Guarantor may now or subsequently acquire against Borrower that arise from the existence, payment, performance or enforcement of Guarantor's obligations under this Guaranty or any other documents executed in connection with this Guaranty, including, without limitation, any right of reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Lender against Borrower, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from Borrower, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right.

(b)    If any amount shall be paid to Guarantor in violation of the preceding subsection 9(a), such amount shall be held in trust for the benefit of Lender and shall forthwith be paid to Lender to be credited and applied to all amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan, or to be held as collateral for any amounts payable under this Guaranty subsequently arising. Guarantor acknowledges that it has and will receive direct and indirect benefits from the financing arrangements contemplated by the Loan and that the waiver set forth in this subsection is knowingly made in contemplation of such benefits.

(c)    All indebtedness, liabilities and obligations of Borrower to Guarantor, whether secured or unsecured and whether or not evidenced by any instrument, now existing or subsequently created or incurred, are and shall be subordinate and junior in right of payment to the Guaranteed Obligation.

10. **Amendment in Writing.** No amendment or waiver of any provision of this Guaranty nor consent to any departure by Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11. **Remedies.** The obligations of Guarantor under this Guaranty are independent of Borrower's obligations under the Loan. A separate action or actions may be brought and prosecuted against Guarantor to enforce this Guaranty, irrespective of whether any action is brought against Borrower or whether Borrower is joined in any such action or actions. Any one or more successive and/or concurrent actions may be brought on this Guaranty against Guarantor

either in the same action, if any, brought against Borrower or in separate actions, as often as Lender, in its sole discretion, may deem advisable.

     12.   **Notices.**   All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery or refusal of delivery, if delivered in person with receipt acknowledged by the recipient thereof, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Guarantor:

        Mr. and Mrs. Nicholas W. Bonnano, Jr.
        20837 North 41st Avenue
        Glendale, Arizona 85308

And:

        Mr. and Mrs. Allen D. Jenkins
        5417 West Ironwood Drive
        Glendale, Arizona 85302

With a copy to:

        Beus Gilbert
        4800 North Scottsdale Road
        Suite 6000
        Scottsdale, Arizona 85251
        Attention: Steven Bienstock, Esq.

If to Lender:

        Lehman Brothers Holdings Inc.
        399 Park Avenue, 8th Floor
        New York, New York 10022
        Attention: Mr. Charles W. Schoenherr
        MTS #WH2565 / Asset # 1141401

With copies to:

        Lehman Brothers Holdings Inc.
        399 Park Avenue, 8th Floor
        New York, New York 10022

Attention: F. Robert Brusco, Esq.
MTS # WH2565 / Asset # 1141401

and

Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019
Attention: James J. Thomas

And an additional
copy to Servicer:

TriMont Real Estate Advisors, Inc.
Monarch Tower
3424 Peachtree Road N.E. - Suite 2200
Atlanta, Georgia 30326
Attention: Mr. J. Gregory Winchester
MTS # WH2565 / Asset # 1141401

or addressed as such party may from time to time designate by written notice to the other parties. Either party by notice to the other may designate additional or different addresses for subsequent notices or communications. For purposes of this Section 12, "**Business Day**" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

13.    **Modification, Changes, etc.**  Guarantor recognizes that, in general, borrowers and guarantors who experience difficulties in honoring their loan obligations in an effort to inhibit or impede lenders from exercising the rights and remedies available to lenders pursuant to security instruments, notes, loan agreements, guarantees or other instruments evidencing or affecting loan transactions, frequently present in court the argument, without merit, that some loan officer or administrator of that lender made an oral modification or made some statement which could be interpreted as an extension or modification of one or more debt instruments and that the borrower relied to its detriment upon such "oral modification of the loan document." For that reason, and in order to protect Lender from such allegations in connection with the Loan and the transactions contemplated by this Guaranty, Guarantor acknowledges that this Guaranty and all instruments referred to herein can be extended, modified or amended only in writing executed by Lender and Borrower or Guarantor, as the case may be, and that none of the rights or benefits of Lender can be waived permanently except in a written document executed by Lender. Guarantor further acknowledges his/her/its understanding that no officer or administrator of Lender has the power or the authority from Lender to make an oral extension or modification or amendment of any such instrument or agreement on behalf of Lender.

14.    **Governing Law/Consent to Jurisdiction/Waiver of Jury Trial.**

{10347195:5}                                    9

(a)    THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY LEGAL REQUIREMENTS OF THE UNITED STATES OF AMERICA.    TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY, AND THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THIS CHOICE OF GOVERNING LAW IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATION LAW SECTION 5-1401.

(b)    ANY SUIT, ACTION OR PROCEEDING AGAINST GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT MAY AT LENDER'S SOLE OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, AND, GUARANTOR WAIVES ANY OBJECTIONS WHICH GUARANTOR MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.    GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTOR DOES HEREBY DESIGNATE AND APPOINT DELANEY CORPORATE SERVICES, 41 STATE STREET, SUITE 405, ALBANY, NEW YORK 12207 AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.

(c)    GUARANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGE OF ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK, OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(d)    NOTHING IN THIS GUARANTY WILL BE DEEMED TO

{10347195;5}                                      10

PRECLUDE LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING WITH
RESPECT HERETO IN ANY OTHER JURISDICTION.

      (e)    GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY
JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO
TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW
OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY OR THE OTHER LOAN
DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN
CONNECTION HEREWITH OR THEREWITH. THIS WAIVER OF RIGHT TO TRIAL
BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS
INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE
AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.
LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY
PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.

      15.    **Severability.**  If any term, covenant, condition or provision of this Guaranty or its
application to any circumstance or to Guarantor shall be invalid or unenforceable to any extent,
the remaining terms, covenants, conditions and provisions of this Guaranty or their application to
any circumstances or to Guarantor other than those as to which any term, covenant, condition or
provision is held invalid or unenforceable, shall not be affected thereby and each remaining term,
covenant, condition and provision of this Guaranty shall be valid and shall be enforceable to the
fullest extent permitted by law.

      16.    **Benefit of Guaranty.**  The provisions of this Guaranty are for the benefit of
Lender and its successors and assigns, including any other holders of the Note. Nothing in this
Guaranty shall impair as between the Borrower and Lender, the obligations of Borrower under
the Loan or under any other agreements, documents, instruments or certificates which may be
delivered under or pursuant to, or in connection with, such Loan, including but not limited to the
Loan Agreement. Lender may freely assign its rights hereunder in connection with an
assignment of the Loan in accordance with the terms of the Loan and may delegate its duties
under this Guaranty to any such assignee. This Guaranty shall bind and inure to the benefit of the
Lender and Guarantor and their respective successors, assigns, heirs and personal representatives.

      17.    **Headings; Capitalized Terms.**  The headings used in this Guaranty are for
convenience only and are not to be considered in connection with the interpretation or
construction of this Guaranty. Capitalized terms used in this Guaranty and not otherwise defined
shall have the meaning set forth in the Loan Agreement.

      18.    **Miscellaneous.**  This is a guaranty of payment and performance and not of
collection, and upon any Event of Default of Borrower with respect to the Guaranteed
Obligations, Lender may, at its option, proceed (in accordance with the terms hereof) directly
and at once, upon written notice, against Guarantor to collect and recover the full amount of
the liability hereunder or any portion thereof, without proceeding against Borrower or any
other person, or foreclosing upon, selling, or otherwise disposing of or collecting or applying

against any of the collateral for the Loan.  Guarantor hereby waives the pleading of any statute of limitations as a defense to the obligation hereunder.

## [SIGNATURE PAGE FOLLOWS]

**[Signature Page to Full Repayment Guaranty]**

**IN WITNESS WHEREOF**, the Guarantor has executed and delivered this Guaranty as of the date first above written.

**GUARANTOR**:

NICHOLAS W. BONANNO, JR.

RITA BONANNO

ALLEN D. JENKINS

TAMERA R. JENKINS

## SCHEDULE A

### PROPERTY DESCRIPTION

PARCEL NO. 1:

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA.

PARCEL NO. 2:

THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT THAT PORTION OF SECTION 26 BEING THE PHOENIX-ROCK SPRINGS HIGHWAY (BLACK CANYON INTERSTATE HIGHWAY NO. 17) WHICH IS THAT PORTION OF SECTION 26 LYING EASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT ON THE NORTH LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, WHICH IS 80.36 FEET WESTERLY OF THE NORTHEAST CORNER THEREOF;

THENCE SOUTH 9 DEGREES 57 MINUTES 36 SECONDS EAST 478.57 FEET, TO A POINT ON THE EAST LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26 AND TO THE END OF THIS LINE DESCRIPTION. THE PORTION OF SECTION 26 THAT ENCOMPASSES THE PHOENIX-ROCK SPRINGS HIGHWAY WAS DEDICATED TO THE STATE OF ARIZONA BY WARRANTY DEED DATED JULY 9, 1963, RECORDED SEPTEMBER 5, 1933 IN DOCKET 4718, PAGE 237, ACCORDING TO THE RECORDS OF THE COUNTY RECORDER OF THE COUNTY OF MARICOPA, STATE OF ARIZONA.

PARCEL NO. 3:

THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

AND THAT PART OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 26, LYING WEST OF THE CENTERLINE OF THE PHOENIX-ROCK SPRINGS HIGHWAY;

EXCEPT THAT PORTION OF THE NORTHWEST QUARTER OF AND A PORTION OF

THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 26;

THENCE SOUTH 89 DEGREES 38 MINUTES 14 SECONDS WEST ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF SECTION 26, A DISTANCE OF 283.48 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE 17;

THENCE SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST, ALONG SAID RIGHT-OF-WAY LINE, 2012.91 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, 671.09 FEET TO A POINT ON THE SOUTH LINE OF SAID NORTHEAST QUARTER OF SECTION 26;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, ALONG SAID SOUTH LINE OF THE NORTHEAST QUARTER AND THE SOUTH LINE OF THE NORTHWEST QUARTER, 1178.61 FEET;

THENCE NORTH 00 DEGREES 18 MINUTES 18 SECONDS WEST, 172.10 FEET;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, 319.00 FEET TO A POINT ON THE WEST LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE 00 DEGREES 18 MINUTES 57 SECONDS WEST, ALONG SAID WEST LINE, 489.46 FEET;

THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS EAST, 1385.32 FEET TO THE POINT OF BEGINNING;

AND EXCEPT THE SOUTH 172 FEET OF THE WEST 319 FEET OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

PARCEL NO. 4:

THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

PARCEL NO. 5:

THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL MINERALS IN THE LAND AS SET FORTH IN THE PATENT THEREOF; AND

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAYBE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE AS AN ACCESS ROAD AND UTILITIES CERTAIN LANDS FOR THE BENEFIT OF THE ABOVE-DESCRIBED PARCEL OF LAND AS SET FORTH IN GRANT OF EASEMENT RECORDED IN DOCKET 14214, PAGE 275.

PARCEL NO. 6:

THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL MINERALS IN THE LAND AS SET FORTH IN THE PATENT THEREOF; AND

TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE AS AN ACCESS ROAD AND UTILITIES CERTAIN LANDS FOR THE BENEFIT OF THE ABOVE-DESCRIBED PARCEL OF LAND AS SET FORTH IN GRANT OF EASEMENT RECORDED IN DOCKET 14214, PAGE 275.

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE,

PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

**PARCEL NO. 7:**

THE SOUTH 172 FEET OF THE WEST 319 FEET OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA.

**PARCEL NO. 8:**

A PORTION OF THE NORTHWEST QUARTER AND A PORTION OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 26;

THENCE SOUTH 89 DEGREES 38 MINUTES 14 SECONDS WEST ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF SECTION 26, A DISTANCE OF 283.46 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE 17;

THENCE SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, 2012.91 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 671.09 FEET TO A POINT ON THE SOUTH LINE OF SAID NORTHEAST QUARTER OF SECTION 26;

DESCRIBED ABOVE, ALL AS SET FORTH IN THAT CERTAIN GRANT OF EASEMENTS RECORDED JANUARY 29, 1976 IN DOCKET 11522, PAGE 464, OVER, ACROSS AND UNDER THE FOLLOWING DESCRIBED REAL PROPERTY:

BEGINNING AT A POINT IN THE EAST-WEST MID SECTION LINE OF SAID SECTION 26 THAT BEARS NORTH 89 DEGREES 44 MINUTES 26 SECONDS EAST 2300.97 FEET FROM THE EAST QUARTER CORNER OF SAID SECTION 26;

THENCE FROM SAID POINT OF BEGINNING AND LEAVING SAID MID SECTION LINE NORTH 58 DEGREES 16 MINUTES 39 SECONDS EAST 126.45 FEET;

THENCE NORTH 89 DEGREES 44 MINUTES 26 SECONDS EAST 405.24 FEET TO A POINT IN THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE SEVENTEEN LAST SAID POINT BEARS SOUTH 09 DEGREES 54 MINUTES 15 SECONDS EAST 337.15 FEET FROM AN ARIZONA STATE HIGHWAY DEPARTMENT BRASS DISK

{10347195:5}

STAMPED "A.H.D. 1 039+00" MARKING SAID RIGHT-OF-WAY LINE;

THENCE ALONG SAID RIGHT-OF-WAY LINE SOUTH 09 DEGREES 54 MINUTES 15 SECONDS EAST 66.95 FEET TO A POINT IN THE EAST-WEST MIDSECTION LINE OF SAID SECTION 26;

THENCE LEAVING SAID RIGHT-OF-WAY LINE ALONG SAID MIDSECTION LINE SOUTH 89 DEGREES 44 MINUTES 26 SECONDS WEST 524.32 FEET TO THE POINT OF BEGINNING.

# EXHIBIT D

# LEHMAN BROTHERS

## Facsimile

| | |
|---|---|
| FROM | Abbey Kosakowski |
| RE | Middle Mountain 156, LLC |
| TELEPHONE | 212.526-0538 |
| FACSIMILE | 646-758-5356 |
| DATE | August 3, 2007 |
| NO. OF PAGES INCLUDING COVER SHEET | 4 |

| | | | |
|---|---|---|---|
| TO | | TO | Steven Bienstock, Esq. |
| COMPANY | Middle Mountain 156, LLC | COMPANY: | Beus Gilbert |
| TELEPHONE | | TELEPHONE | |
| FACSIMILE | 623-587-4825 | FACSIMILE | 480-429-3100 |

| | | | |
|---|---|---|---|
| TO | Ms. Ann McCartney | TO | John McVey, Esq. |
| COMPANY | IMH Secured Loan Fund, LLC | COMPANY: | Stinson Morrison Hecker, LLP |
| TELEPHONE | | TELEPHONE | |
| FACSIMILE | 602-889-3412 | FACSIMILE | 602-240-6925 |

MESSAGE   ☐ URGENT   ☒ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ CONFIDENTIAL

Cc:     Charles W. Schoenherr (via e-mail, w/o encl.)
        David Broderick (via e-mail, w/o encl.)
        Wally Antoniewicz (via e-mail, w/o encl.)
        Anthony Barsanti (via e-mail, w/o encl.)
        Clyde E. Click (via e-mail, w/o encl.)
        Paul Sites (via e-mail, w/o encl.)

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipients named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by mail. Thank you.

LEHMAN BROTHERS INC.
399 PARK AVENUE 08 FLOOR
NEW YORK, NY 10022
TEL. +1 212 326 0170  FAX 646-834-0874
EMAIL JOELLE.HALPERIN@LEHMAN.COM

LEHMAN BROTHERS HOLDINGS INC.
399 Park Avenue, 8th Floor
New York, New York 10022

August 3, 2007

**<u>Via UPS and Facsimile</u>**

Middle Mountain 156, LLC
20837 North 41st Avenue
Glendale, Arizona 85308
Facsimile (632) 587-4825

> Re:    Loan (the "Loan") in the amount of $44,000,000.00, from Lehman
> Brothers Holdings Inc., d/b/a Lehman Capital, a Division of
> Lehman Brothers Holdings Inc. ("Lender") to Middle Mountain
> 156, LLC ("Borrower")

Gentlemen:

Except as otherwise expressly provided herein, capitalized terms utilized herein
have the respective meanings provided with respect to such terms in that certain Loan
Agreement, dated July 13, 2006, by and between Borrower and Lender (the "Loan
Agreement").

As you are aware, the Loan matured on August 1, 2007, and was not paid in full
on before said Maturity Date as required under the Loan Documents. You are hereby
notified that an Event of Default has occurred and is continuing under the Loan
Documents by reason of Borrower's failure to pay the Loan on or before the Maturity
Date. Lender does hereby demand immediate payment in full of the entire outstanding
balance of the Loan, including principal, interest and all other amounts payable under the
Loan Documents through the date of payment, including, without limitation, attorneys'
fees and expenses as provided in the Loan Documents, and interest at the Default Rate
from the Maturity Date, all to the full extent provided under the Loan Documents.

Please be advised that, as a result of such Event of Default, Lender may elect,
subject to and in accordance with the provisions of the Loan Documents, to exercise any
and all of its rights and remedies under the Loan Documents, including, without
limitation, the right of foreclosure under the Security Instrument.

Lender reserves all of its rights and remedies under the Loan Documents.
Nothing contained herein, and no delay in the exercise of any rights or remedies under
the Loan Documents, or arising by reason of any default or Event of Default under the

Middle Mountain 156, LLC
August 3, 2007
Page 2

Loan Documents, shall be deemed to constitute a waiver of any requirements, rights, remedies, defaults or Events of Default not specifically enumerated herein.

                                    Sincerely,

                                    LEHMAN BROTHERS HOLDINGS INC.,
                                    D/B/A LEHMAN CAPITAL, a Division of
                                    Lehman Brothers Holdings Inc.


                                    By:
                                        Authorized Signatory


cc:    **Via UPS**

       Mr. and Mrs. Nicholas W. Bonanno, Jr.
       20837 North 41st Avenue
       Glendale, Arizona 85308

       Mr. and Mrs. Allen D. Jenkins
       5417 West Ironwood Drive
       Glendale, Arizona 85302

       **Via UPS and Facsimile**
       Beus Gilbert
       4800 North Scottsdale Road
       Suite 6000
       Scottsdale, Arizona 85251
       Attention: Steven Bienstock, Esq.
       Facsimile (480) 429-3100

       **Via Facsimile**

       IMH Secured Loan Fund, LLC
       11333 North Scottsdale Road, Suite 160
       Scottsdale, Arizona 85254
       Attention: Ms. Ann McCartney
       Facsimile (602) 889-3412

       John McVey, Esq.
       Stinson Morrison Hecker, LLP
       1850 North Central Avenue, Suite 2100
       Phoenix, Arizona 85004
       Facsimile (602) 240-6925

Middle Mountain 156, LLC
August 3, 2007
Page 3

---

### Via Email

Charles W. Schoenherr
David Broderick
Abbey Kosakowski
Wally Antoniewicz
Clyde E. Click, Esq.
Paul Sites

# EXHIBIT E

# McKenna Long
# & Aldridge LLP
Attorneys at Law

Albany
Atlanta
Brussels
Denver
Los Angeles

New York
Philadelphia
Sacramento
San Diego
San Francisco
Washington, D.C.

303 Peachtree Street, NE • Suite 5300 • Atlanta, GA 30308
Tel: 404.527.4000 • Fax: 404.527.4198
www.mckennalong.com

CHARLES D. WEISS
(404) 527-8411

EMAIL ADDRESS
cweiss@mckennalong.com

October 18, 2007

**BY FEDERAL EXPRESS**

Mr. and Mrs. Nicholas W. Bonanno, Jr.
20837 North 41st Avenue
Glendale, Arizona 85308

Mr. and Mrs. Allen D. Jenkins
5417 West Ironwood Drive
Glendale, Arizona 85302

Re:  Loan (the "Loan") in the stated principal amount of $44,000,000.00, from
Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a Division of Lehman
Brothers Holdings Inc. ("Lender") to Middle Mountain 156, LLC ("Borrower")

Ladies and Gentlemen:

We are counsel to Lender in connection with the Loan.  Except as otherwise expressly
provided herein, capitalized terms utilized herein shall have the respective meanings provided
with respect to such terms in that certain Loan Agreement, dated July 13, 2006, by and between
Borrower and Lender (the "Loan Agreement").

As you are aware, the Loan matured on August 1, 2007 (the "Maturity Date"), and was
not paid in full on before said Maturity Date as required under the Loan Documents.  Pursuant to
a demand letter from Lender dated August 3, 2007 (the "August 3 Demand Letter"), Borrower
and the Guarantors were notified that an Event of Default had occurred and was continuing
under the Loan Documents by reason of Borrower's failure to repay the Loan in full on or before
the Maturity Date.  In the August 3 Demand Letter, Lender demanded immediate payment in full
of the entire outstanding balance of the Loan, including principal, interest and all other amounts
payable under the Loan Documents through the date of payment, including, without limitation,
attorneys' fees and expenses and interest at the Default Rate from the Maturity Date, all to the
full extent provided under the Loan Documents (collectively, the "Outstanding Indebtedness").
To date, no payments have been received by Lender subsequent to the August 3 Demand Letter,
and the Loan remains matured, in default and immediately due and payable in full.

Mr. and Mrs. Nicholas W. Bonanno, Jr.
Mr. and Mrs. Allen D. Jenkins
October 18, 2007
Page 2

Pursuant to that certain Guarantor Full Repayment Guaranty dated effective as of July 13, 2006, executed by each of Nicholas W. Bonanno, Jr., Rita Bonanno, Allen D. Jenkins and Tamera R. Jenkins (collectively, "you" or the "Guarantors") in favor of Lender, you are jointly and severally liable for full repayment of the Outstanding Indebtedness, and we hereby demand on behalf of Lender immediate payment in full of the Outstanding Indebtedness.

Please be advised that, as a result of the above-described Event of Default, Lender may elect at any time and in its sole discretion to exercise any and all of its rights and remedies under the Loan Documents and applicable law to collect the Outstanding Indebtedness, including, without limitation, the right of foreclosure under the Security Instrument, the Val Vista Security Instrument and the 163 Security Instrument, and the right to commence an action against each of the Guarantors seeking a money judgment against them for the entire Outstanding Indebtedness.

Please be further advised that, in the event Borrower or any Guarantor makes any subsequent payment of any amount less than the entire Outstanding Indebtedness (a "Partial Payment"), Lender will apply such Partial Payment to the Outstanding Indebtedness under the Loan Documents as a partial payment only. No such Partial Payment or the acceptance thereof shall constitute or be deemed or construed as a cure or waiver of any default under the Loan Documents, a satisfaction of the Loan, or a waiver, modification, relinquishment or forbearance by Lender of any of Lender's rights or remedies under the Loan Documents or at law or in equity, all of which rights and remedies are hereby expressly reserved.

Lender expressly reserves all of its rights and remedies under the Loan Documents and applicable law in connection with the existing Event of Default described herein and any other Events of Default that may now exist or hereafter arise. Nothing contained herein, and no delay in the exercise of any rights or remedies under the Loan Documents or applicable law, shall be deemed to constitute a waiver, release, relinquishment or agreement to forbear from the exercise of, any of such rights and remedies, all of same being hereby expressly reserved

Sincerely,

Charles D. Weiss

cc:     **Via Federal Express**
        Beus Gilbert
        4800 North Scottsdale Road
        Suite 6000
        Scottsdale, Arizona 85251
        Attention: Steven Bienstock, Esq.

Mr. and Mrs. Nicholas W. Bonanno, Jr.
Mr. and Mrs. Allen D. Jenkins
October 18, 2007
Page 3

**Via Facsimile**
IMH Secured Loan Fund, LLC (Fax No. 602-889-3412)
John McVey, Esq. (Fax No. 480-452-1620)
Desert Tranquility Nursery Lender, L.L.C. (Fax No. 602-955-4803)
Jerry L. Cochran, Esq. (Fax No. 602-952-7010)

**Via Email**
Abbey B. Kosakowski, Esq.
Brian Pittard
Wally Antoniewicz

ATLANTA:4967655.1

**EXHIBIT F**

# FORBEARANCE AGREEMENT

## (MIDDLE MOUNTAIN)

**THIS FORBEARANCE AGREEMENT** (this "Agreement") is made and entered into as of the 16th day of April, 2008 (the "Effective Date"), by and among: **LEHMAN BROTHERS HOLDINGS INC., a division of LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("Lender"); **MIDDLE MOUNTAIN 156 LLC**, an Arizona limited liability company ("Borrower"); **NICHOLAS W. BONANNO**, an individual resident of the State of Arizona ("N. Bonanno"); **RITA BONANNO**, an individual and a resident of the State of Arizona ("R. Bonanno"); **ALLEN D. JENKINS**, an individual and a resident of the State of Arizona ("A. Jenkins"; Borrower, N. Bonanno, and A. Jenkins occasionally being herein separately referred to as an "Indemnitor" and collectively referred to the "Indemnitors"); and **ALLEN D. JENKINS**, as executor of the last will and testament of **TAMERA R. JENKINS** late of that State of Arizona and County of Maricopa ("T. Jenkins"), as personal representative of the estate of T. Jenkins, or as successor in title, by survivorship, to property formerly jointly owned by T. Jenkins and A. Jenkins as tenancy by the entirety with right of survivorship or as joint tenancy with right of survivorship or as community property with right of survivorship, as the case may be ("Jenkins Executor"; N. Bonanno, R. Bonanno, A. Jenkins, and T. Jenkins occasionally being herein separately referred to as an "Original Guarantor" and collectively referred to as the "Original Guarantors"; N. Bonanno, R. Bonanno, A. Jenkins, and Jenkins Executor occasionally being herein separately referred to as a "Guarantor" and collectively referred to as the "Guarantors"); **163, LLC**, an Arizona limited liability company ("163"); **A & N INVESTMENT PROPERTIES, LLC**, an Arizona limited liability company ("A & N"; Borrower, A & N, and 163 occasionally being herein separately referred to as a "Mortgagor" and collectively referred to as "Mortgagors"). Borrower and the Original Guarantors are hereinafter occasionally separately referred to as an "Original Indemnitor" and are collectively referred to as the "Original Indemnitors". Borrower and the Guarantors are hereinafter occasionally separately referred to as an "Indemnitor" and are collectively referred to as the "Indemnitors". Borrower, each of the Guarantors, 163, and A & N are hereinafter occasionally separately referred to as a "Borrower Party" and are collectively referred to as the "Borrower Parties". Borrower, A & N, and 163 are hereinafter occasionally separately referred to as a "Borrower Party Entity" and collectively referred to as the "Borrower Party Entities".

## STATEMENT OF BACKGROUND

A.    On July 13, 2006 (the "Loan Closing Date"), Lender made a loan to Borrower in the original principal amount of $44,000,000.00 (the "Loan") pursuant to the terms of that certain Loan Agreement, dated as of July 13, 2006, between Borrower and Lender (the "Loan Agreement"), to refinance the Borrower's outstanding mortgage loan indebtedness then secured by that certain property containing approximately 196.4115 acres of land located in Maricopa County, Arizona, and being more particularly described on **Exhibit A** attached hereto and incorporated herein by this reference (the "Maricopa Property"), and to provide financing for Borrower's development of the Maricopa Property. The Loan is evidenced by that certain Promissory Note, dated as of July 13, 2006, from Borrower payable to the order of Lender in the original principal amount of $44,000,000.00 (the "Note"). The Loan is secured by, among other things: (i) that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13,

1

2006, from Borrower to Guaranty Title Agency of Arizona, Inc. (the "Trustee"), for the benefit of Lender, recorded July 13, 2006, as Document No. 20060939573, encumbering the Maricopa Property (as rerecorded October 31, 2007, as Document No. 20071175846, and as amended by Corrective Amendment of Deed Of Trust, Security Agreement and Fixture Filing, and Assignment of Leases and Rents, recorded January 29, 2008, as Document No. 20080077989 (the "Corrective Amendment"), herein collectively referred to as the "Maricopa Security Instrument"); (ii) that certain Assignment of Leases and Rents, dated as of July 13, 2006, from Borrower to Lender, recorded July 13, 2006, as Document No. 20060939574, and encumbering, among other things, all leases and rents related to the Maricopa Property (as rerecorded October 31, 2007, as Document No. 20071175847, and as amended the Corrective Amendment, herein collectively referred to as the "Maricopa Lease Assignment"); (iii) that certain Guaranty of Recourse Obligations of Borrower, dated as of July 13, 2006, from the Original Guarantors in favor of Lender (the "Recourse Guaranty"); (iv) that certain Guarantor Full Repayment Guaranty, dated as of July 13, 2006, from the Original Guarantors in favor of Lender (the "Payment Guaranty"; the Recourse Guaranty and the Payment Guaranty are herein collectively referred to as the "Guaranties"); (vi) that certain Environmental Indemnity Agreement, dated as of July 13, 2006, from Borrower and Original Indemnitors in favor of Lender related to the Maricopa Property (as amended, the "Environmental Indemnity"); (vii) that certain Assignment of Permits, Agreements, Licenses, Franchises and Authorizations, dated as of July 13, 2006, from Borrower in favor of Lender and related to the Maricopa Property (as amended, the "Maricopa Assignment"); (viii) that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13, 2006, from A & N to Trustee, for the benefit of Lender, recorded July 13, 2006, as Document No. 2006099255 and encumbering that certain real property located in Pinal County, Arizona, containing approximately 79.986 acres and being more particularly described on **Exhibit B** attached hereto and incorporated herein by this reference (the "Pinal Property) (the "Pinal Security Instrument"); and (ix) that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13, 2006, from 163 to Trustee, for the benefit of Lender, recorded July 13, 2006, as in Book 4415 of Official Records, at page 739, and encumbering that certain real property located in Yavapai County, Arizona, containing approximately 163.22 acres and being more particularly described on **Exhibit C** attached hereto and incorporated herein by this reference (the "Yavapai Property"; the Maricopa Property, the Pinal Property, and the Yavapai Property are collectively herein referred to as the "Properties") (the "Yavapai Security Instrument"). The Note, the Maricopa Security Instrument, the Guaranties, the Environmental Indemnity, the Maricopa Assignment, the Pinal Security Instrument, the Yavapai Security Instrument, and any and all other documents evidencing, securing, guarantying, or otherwise in any manner relating to the Loan, as heretofore modified or amended, are herein collectively referred to as the "Loan Documents."

      B.    Borrower defaulted on the Loan by failing to pay the Loan in full on its maturity (the "Maturity Default") on August 1, 2007 ( the "Maturity Date"). Such failure to pay the Loan on the Maturity Date was, and is a continuing, "Event of Default" under the Loan Documents entitling Lender to exercise any or all of Lender's rights and remedies under the Loan Documents, at law, and in equity. The entire unpaid principal balance of the indebtedness evidenced by the Note, the accrued and unpaid interest thereon, and all other sums required to be paid under the Note and the other Loan Documents were not timely paid in accordance with the Loan Documents on the Maturity Date and, as of the Effective Date, remain unpaid, and, accordingly, the Loan remains in default and is immediately due and payable in full.

ATLANTA:4981771.7

C.     The Borrower Parties and Lender have reached certain agreements regarding the obligations of the  Borrower Parties under the Loan, pursuant to which, among other things, from and after the Effective Date of this Agreement, Lender shall agree to forbear from exercising its rights and remedies under the Loan Documents until the "Termination Date" (as defined below), or such earlier date upon which a "Termination Event" (as defined below) occurs.

## STATEMENT OF AGREEMENT

**FOR AND IN CONSIDERATION** of the sum of Ten and No/100 Dollars ($10.00) in hand paid, the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, do covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

1.01     **Definitions**.  For purposes of this Agreement, the following capitalized terms shall have the meanings set forth below, and any other words or phrases used in this Agreement with initial capitalization, but which are not expressly defined in  this Agreement, shall have the definitions set forth in the Loan Agreement  which definitions are hereby incorporated herein by this reference:

"**163 Organizational Chart**" shall mean **Exhibit D** attached hereto and incorporated herein by this reference.

"**A & N Organizational Chart**" shall mean **Exhibit E** attached hereto and incorporated herein by this reference.

"**Applicable Interest Rate**" shall have the meaning set forth in Section  1.1 of the Loan Agreement, which definition is incorporated herein by this reference.

"**Bankruptcy Code**" shall mean the United States Bankruptcy Code, 11 U.S.C. § 101, et seq.

"**Borrower Organizational Chart**" shall mean **Exhibit F** attached hereto and incorporated herein by this reference.

"**Default Rate**" shall have the meaning set forth in Section 1.1 of the Loan Agreement, which definition is incorporated herein by this reference.

"**Dells III Loan**" shall mean that mortgage loan in the original principal amount of $3,050,000.00 from Dells III Lender, LLC ("Dells III"), evidenced by that certain Multiple Advance Note, dated as of January 17, 2006, executed by 163 payable to the order of Dells III in the original principal amount of $3,050,000.00 (the "Dells III Note") and secured by the Dells III Deed of Trust, as defined in the Yavapai Security Instrument, which definition is incorporated herein by this reference.

3

ATLANTA:4981771.7

"**Dells Loan Documents**" shall mean the Dells III Note, the Dells III Deed of Trust, and all other loan documents now evidencing, securing or guarantying the Dells III Loan and heretofore disclosed to Lender.

"**Event of Default**" shall have the meaning set forth in Section 1.1 of the Loan Agreement, which definition is incorporated herein by this reference.

"**Lender Parties**" shall mean, collectively, Lender, the Loan Servicer, their respective subsidiaries and affiliates, and all of their respective past, present, and future officers, directors, shareholders, members, managers, partners, employees, agents, representatives, loan servicers, attorneys, participants, heirs, successors, and assigns.

"**Loan Servicer**" shall mean TriMont Real Estate Advisors, Inc., a Georgia corporation, in its current capacity as loan servicer for Lender with respect to the Loan

"**Loan Title Policy/Policies**" shall mean, in the singular, any of, or, in the plural, all of, the Maricopa Loan Title Policy, the Pinal Loan Title Policy, and the Yavapai Loan Title Policy.

"**Maricopa Collateral**" shall mean the Maricopa Property, all rights appurtenant thereto, and all tangible and intangible personal property related thereto and which is security for the Loan.

"**Maricopa Loan Title Policy**" shall mean that certain First American Title Insurance Company ALTA 1992 Loan Policy No. GU005213-L, originally dated July 13, 2006, as heretofore endorsed and presently having an effective date of January 29, 2008.

"**Maricopa Permitted Encumbrances**" shall mean certain title exceptions which are listed in Schedule B-I or Schedule B-II of the Maricopa Loan Title Policy.

"**Pending Condemnation Action**" shall mean that certain now pending action styled State of Arizona ex rel. Victor M. Mendez, Director, Department of Transportation v. Middle Mountain 156, LLC, an Arizona limited liability company, Lehman Brothers Holdings, Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc., Middle Mountain 156 Lender, L.L.C. , an Arizona limited liability company; Maricopa County, Case No. CV2006-014089, in the Superior Court of the State of Arizona in and for Maricopa County

"**Permitted Encumbrances**" shall mean the Maricopa Permitted Encumbrances, the Pinal Permitted Encumbrances, and the Yavapai Permitted Encumbrances.

"**Pinal Collateral**" shall mean the Pinal Property, all rights appurtenant thereto, and all tangible and intangible personal property related thereto and which is security for the Loan.

"**Pinal Loan Title Policy**" shall mean shall mean that certain First American Title Insurance Company ALTA 1992 Loan Policy No. 221-187523-TAL, dated July 13, 2006, as heretofore endorsed.

"**Pinal Permitted Encumbrances**" shall mean certain title exceptions which are listed in Schedule B-I or Schedule B-II of the Pinal Loan Title Policy

4

"**Pre-Negotiation Agreement**" shall mean that certain letter agreement, dated as of September 6, 2007, executed by Lender, Mortgagors, and the Original Guarantors.

"**Termination Date**" shall mean May 15, 2008.

"**Yavapai Collateral**" shall mean the Yavapai Property, all rights appurtenant thereto, and all tangible and intangible personal property related thereto and which is security for the Loan.

"**Yavapai Loan Title Policy**" shall mean shall mean that certain First American Title Insurance Company ALTA 1992 Loan Policy No. 221-163376-TAL, dated July 13, 2006, as heretofore endorsed.

"**Yavapai Permitted Encumbrances**" shall mean  certain title exceptions which are listed in Schedule B-I or Schedule B-II of the Yavapai Loan Title Policy

**ARTICLE II**
**ACKNOWLEDGMENTS, WARRANTIES & REPRESENTATIONS**

The Borrower Parties, and each of them, jointly and severally, hereby acknowledge, warrant and  represent to, and agree with,  and for the benefit of,  Lender as follows:

2.01    **Authority of Borrower Party Entities.**  That each of the Borrower Party Entities is a duly organized, validly existing corporation, limited liability company, or limited partnership, as applicable, in good standing under the laws of the state in which it was organized; that each of the Borrower Party Entities is organized pursuant to the articles of incorporation and bylaws, articles of organization and operating agreement, certificate of limited partnership and limited partnership agreement, as applicable, of such Borrower Party Entity as certified and delivered to Lender in connection with the closing of the Loan (the "Borrower Party Entities' Organizational Documents"); that the Borrower Party Entities' Organizational Documents have not been modified or amended since the Loan Closing Date;  that each of the Borrower Party Entities has the power and authority to execute, deliver, and perform this Agreement to which it is a party; that the execution, delivery, and performance of this Agreement by each of the Borrower Party Entities have been duly and properly authorized pursuant to all requisite corporate, limited liability company, limited partnership, or action, as applicable, by such Borrower Party Entity; and that the execution, delivery, and performance of this Agreement by each of the Borrower Party Entities do not and will not violate any provision of the Borrower Party Entities' Organizational Documents applicable to such Borrower Party Entity, or any law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to such Borrower Party Entity, or result in a breach or constitute or cause a default under any indenture, agreement, lease, or instrument to which such Borrower Party Entity is a party; and that this Agreement constitutes the valid and legally binding obligations of such Borrower Party Entity and is enforceable against such Borrower Party Entity in accordance with the terms hereof, except as such enforcement may be limited by application of bankruptcy, moratorium, or reorganization laws, and general principles of equity.

2.02    **Authority of Guarantors.**  That the execution, delivery, and performance  of this Agreement by each of the Guarantors, do not and will not (a) violate any provision of any law,

5

rule, regulation, order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to such Guarantor, or (b) result in a breach or constitute or cause a default under any indenture, agreement, lease, or instrument to which such Guarantor is a party; and that this Agreement constitutes the valid and legally binding obligations of such Guarantor and is enforceable against such Guarantor, in accordance with the terms hereof, except as such enforcement may be limited by application of bankruptcy, moratorium, or reorganization laws, and general principles of equity; and that Jenkins Executor has full power and legal authority to execute, deliver, and perform under this Agreement for and on behalf of the estate of T. Jenkins.

2.03    **Status of Loan.**

(a)    **Loan Documents.**   That the Loan Documents constitute the valid and legally binding obligations of the Borrower Parties who are parties thereto, and of the estate of T. Jenkins and are enforceable against the Borrower Parties who are parties thereto, Jenkins Executor, the Properties, and all other collateral for the Loan in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, moratorium, or reorganization laws, and general principals of equity; that, except as may be expressly provided in this Agreement, this Agreement is not intended to be, and shall not be deemed or construed to be, a modification, amendment, or waiver of the Loan or all or any part of the Loan Documents; that none of the Borrower Parties has any defense, setoff, claim, counterclaim, or cause of action of any kind or nature whatsoever with respect to the Loan or the Loan Documents, or with respect to any other documents or instruments now or heretofore evidencing, securing, guarantying, or otherwise in any way relating to the Loan, or with respect to the administration or funding of the Loan, or the acquisition, ownership, development, improvement, or financing of any of the Properties, or otherwise related to any of the Properties; and that the Borrower Parties do hereby expressly waive, release, and relinquish any and all such defenses, setoffs, claims, counterclaims, and causes of action, whether known or unknown, if any, which any one or more of them may now have.

(b)    **Indebtedness.**   That (i) as of February 29, 2008, (A) the outstanding unpaid principal balance of the Loan was $42,649,554.02 (excluding protective advances heretofore made by Lender), and (B) protective advances theretofore have been made by Lender in the aggregate amount of $132,854.14; (ii) Late Fees are due and owing in accordance with the terms of the Loan Agreement and other Loan Documents; (iii) Borrower is required to reimburse Lender for its Legal Fees in accordance with the terms of the Loan Agreement and other Loan Documents; (iv) the Loan has matured on the Initial Maturity Date, i.e., August 1, 2007, without payment thereof and is and shall remain in default and immediately due and payable in full (subject to the Forbearance Covenant), and, notwithstanding the execution and delivery of this Agreement, the Maturity Default and the Tax Payment Defaults (as defined hereinbelow) continue to exist and to constitute Events of Default under the Loan Documents; (v) interest remains unpaid and has accrued, and shall continue to accrue in accordance with the terms of the Loan Agreement and the other Loan Documents, a portion of which is to be charged at the Default Rate notwithstanding the execution and delivery of this Agreement; and (vi) Lender has no obligation to make, and Borrower is not entitled to receive, any further disbursement of proceeds of the Loan whether from the Water/Sewer Holdback, the Debt Service Holdback, or the Tax and Insurance Escrow Fund, or otherwise.

ATLANTA:4981771.7

(c)     **Partial Payments**.  That in the event any of the Borrower Parties shall hereafter make, and Lender shall hereafter accept, any payment of any amount less than the full outstanding unpaid balance due under the Loan and Loan Documents (a "Partial Payment"), Lender, in such case, will apply such Partial Payment to the indebtedness owing under the Loan and the Loan Documents as a partial payment only. Lender has no obligation to accept any Partial Payment and, if Lender chooses, at its sole and absolute discretion, to accept any Partial Payment, Lender shall have the right to apply such Partial Payment against the outstanding indebtedness under the Loan Documents in such manner as Lender may elect in its sole and absolute discretion, as is permitted by the Loan Documents. No such Partial Payment or the acceptance thereof by Lender shall constitute, or be deemed or construed as, a cure or waiver of any Event of Default under the Loan Documents or as a reinstatement of the Loan or the Loan Documents, or as an extension of the maturity of the Loan, nor shall the same constitute any course of conduct or course of dealing between any of the Borrower Parties and Lender. In addition, no such Partial Payment or the acceptance thereof by Lender shall constitute, or be deemed or construed as, a modification of the Loan Documents or the terms of this Agreement, a satisfaction of the Loan, or a waiver, modification, relinquishment, or forbearance by Lender of any of Lender's rights or remedies under the Loan Documents or at law or in equity, all of which rights and remedies are hereby expressly reserved.

(d)     **Protective Advances**.  Borrower Parties acknowledge and agree, in furtherance of and not in limitation of any of Lender's rights and remedies under the Loan Documents, that Lender (i) as of February 29, 2008, had theretofore funded protective advances in the aggregate amount of $132,854.00 for payment of ad valorem real estate taxes related to the Maricopa Property and the Pinal Property (the "Prior Protective Advances") due to the failure of the Mortgagors to timely pay taxes on the Properties (such Events of Default being herein collectively referred to as the "Tax Payment Defaults") and (ii) may thereafter, in its sole and absolute discretion, and with absolutely no obligation to do so, make such additional protective advances under the Loan to protect and preserve its interests and rights under the Loan Documents for the purpose of, among other things, funding the payment of real estate taxes and/or insurance premiums related to the Maricopa Property, the Pinal Property, the Yavapai Property, debt service on the Dells III Loan, and other expenses of the Maricopa Property, the Pinal Property, or the Yavapai Property as Lender shall determine to so fund (collectively, "Additional Protective Advances"; the Prior Protective Advances and the Additional Protective Advances are herein collectively referred to as the "Protective Advances"). Any Additional Protective Advance shall be made only at Lender's sole and absolute discretion and at Lender's election in the event Lender determines such an advance is necessary or advisable to protect or preserve its interests under the Loan Documents in the Maricopa Property, the Pinal Property, the Yavapai Property, or any other collateral for the Loan. Any Additional Protective Advance shall be made on such conditions as Lender shall require, in its sole and absolute discretion. The Prior Protective Advances and all Additional Protective Advances (if any) shall constitute principal indebtedness evidenced by the Note and secured by the each of the Security Instruments and all of the other Loan Documents and shall accrue interest at the Default Rate from the date of each such advance. No Protective Advance shall constitute, or be deemed or construed as, a cure or waiver of the Maturity Default or any other then existing Event of Default under the Loan Documents, as a reinstatement of the Loan or the Loan Documents, or as an extension of the maturity of the Loan, nor shall the same constitute any course of conduct or course of dealing between any of the Borrower Parties and Lender. In addition, no such Protective Advance shall

7

constitute, or be deemed or construed as, a modification of the Loan Documents or the terms of this Agreement, a satisfaction of the Loan, or a waiver, modification, relinquishment, or forbearance by Lender of any of Lender's rights or remedies under the Loan Documents or at law or in equity, all of which rights and remedies are hereby expressly reserved

(e)    **Reaffirmation of Guaranties**. That each of the Guaranties constitutes the valid, legally binding obligation of the applicable Guarantor who is a party thereto and of the estate of T. Jenkins, enforceable against such Guarantor in accordance with its terms, except as such enforcement may be limited by bankruptcy, moratorium, or reorganization laws, and general principles of equity; that this Agreement is not intended to be, and shall not be deemed or construed to be, a modification, amendment, or waiver of any Guarantor's obligations, any Guaranty, or any of the other Loan Documents; that the Payment Guaranty is and remains a full recourse guaranty of payment by the Guarantors of the entire Debt of the Loan; that no Guarantor has any defense, setoff, claim, counterclaim, or cause of action of any kind or nature whatsoever with respect to the Loan, any Guaranty, or any of the other Loan Documents, or with respect to any other documents or instruments now or heretofore evidencing, securing, guarantying, or otherwise in any way relating to the Loan, or with respect to the administration or funding of the Loan, or the acquisition, ownership, development, improvement, operation, or financing of any of the Properties; that each Guarantor has waived, released, and relinquished, and does hereby expressly waive, release, and relinquish, any and all such defenses, setoffs, claims, counterclaims, and causes of action, whether known or unknown, if any; and that Guarantors have consented, and do hereby consent, to the execution and delivery of this Agreement and have acknowledged and agreed, and do hereby acknowledge and agree, that the obligations of Guarantors under the Guaranties or any of the other Loan Documents shall not be diminished in any way by the execution and delivery of this Agreement or by the consummation of any of the transactions contemplated hereby.

(f)    **Reaffirmation of the Environmental Indemnity**. That the Environmental Indemnity constitutes the valid, legally binding obligation of each Indemnitor, enforceable against such Indemnitor in accordance with its terms, except as such enforcement may be limited by bankruptcy, moratorium, or reorganization laws, and general principles of equity, and that this Agreement is not intended to be, and shall not be deemed or construed to be, a modification, amendment, or waiver of the Environmental Indemnity, any of the other Loan Documents, or any obligation of any Indemnitor under the Environmental Indemnity or any of the other Loan Documents; that no Indemnitor has any defense, setoff, claim, counterclaim, or cause of action of any kind or nature whatsoever with respect to the Loan, the Environmental Indemnity, or any of the other Loan Documents, or with respect to any other documents or instruments now or heretofore evidencing, securing, guarantying, or otherwise in any way relating to the Loan, or with respect to the administration or funding of the Loan or the acquisition, ownership, development, improvement, operation, or financing of any of the Properties; that each Indemnitor has waived, released, and relinquished, and does hereby expressly waive, release, and relinquish, any and all such defenses, setoffs, claims, counterclaims, and causes of action, whether known or unknown, if any; and that the Indemnitors have consented, and do hereby consent, to the execution and delivery of this Agreement and have acknowledged and agreed, and do hereby acknowledge and agree, that the obligations of Indemnitors under the Environmental Indemnity or any of the other Loan

Documents shall not be diminished in any way by the execution and delivery of this Agreement or by the consummation of any of the transactions contemplated hereby.

(g)     **No Satisfaction, Novation, Release, or Waiver**.   That the Loan has matured without payment and is immediately due and payable in full, subject, however, to the Forbearance Covenant and the other terms and conditions of this Agreement; that any and all notices thereof required by the Loan Documents to be sent to any or all of the Borrower Parties have been properly and timely provided and are otherwise hereby waived by the Borrower Parties; that this Agreement is not intended to be, and shall not be deemed or construed to be, a cure, satisfaction, reinstatement, novation, or release of the Loan or the Loan Documents, or any of them, or a waiver by Lender of any of the rights of Lender under the Loan Documents, or any of them, or at law or in equity, or of any Default or Event of Default under any of the Loan Documents, except as otherwise expressly provided herein; and that, except as otherwise expressly provided in this Agreement, Lender has reserved, and does hereby reserve, with respect to each now existing Default or Event of Default all of its rights and remedies under the Loan Documents, at law, and in equity.

(h)     **Ownership Interests**.   That true, correct, and complete copies of the organizational structure charts of the Borrower, A & N, and 163 are attached hereto as **Exhibit F** (the "Borrower Organization Chart"), **Exhibit E** (the "A & N Organizational Chart"), and **Exhibit D** (the "163 Organizational Chart"), respectively, and are incorporated herein by this reference; and that, as of the Effective Date, (i) the Borrower Organizational Chart accurately represents the ownership structure of Borrower, (ii) the A & N Organizational Chart accurately represents the ownership structure of A & N, and (iii) the 163 Organizational Chart accurately represents the ownership structure of 163.

2.04     **Title to the Properties, and Legal Proceedings**.   That, except for (a) the Maricopa Permitted Encumbrances, the Pinal Permitted Encumbrances, and the Yavapai Permitted Encumbrances related to the Maricopa Property, the Pinal Property, and the Yavapai Property, (b) liens and security interests granted or created by the Loan Documents and related to the Properties, (c) the Dells III Loan Documents encumbering only the Yavapai Property, and (d) the Pending Condemnation Action, there are no pending or threatened suits, judgments, arbitration proceedings, administrative claims, executions, or other legal or equitable actions or proceedings against any of the Mortgagors or any of the Properties, or any liens, claims of lien, or other encumbrances against any of the Properties, or any pending or threatened condemnation proceedings or annexation proceedings affecting any of the Properties, or, except for the Colonial Sale Contract (as defined hereinbelow) or as otherwise disclosed on **Exhibit G** attached hereto and incorporated herein by this reference, any oral or written sale agreement, right of first refusal agreement, option agreement, letter of intent, or any other agreement or offer to purchase or to enter into any of the foregoing types of agreements related to the conveyance or proposed conveyance of the Properties or any part thereof or any rights related to any part of any of the Properties to any Person, including, without limitation, any Governmental Authority (collectively, "Sale Contracts"); that Borrower Parties have delivered to Lender true, correct, and complete copies of all existing written Sales Contracts (including, without limitation, all amendments thereto) related to the Properties or any part of any Property or any interest in any Property, and there are no oral Sale Contracts; that that certain Purchase and Sale Agreement, dated 6/20/06, between Colonial Realty  Limited Partnership ("Colonial") and Borrower (the

"Colonial Sale Contract") pertaining to that part of the Maricopa Property known as Parcel C containing approximately 29.6 acres and located as shown on **Exhibit H** attached hereto and incorporated herein by this reference (the "Maricopa Site Plan") has not been modified or amended in any respect, remains in full force and effect, and, pursuant to the Colonial Sale Contract, Colonial has deposited with Fidelity National Title Insurance Company, Phoenix, Arizona, earnest money in the aggregate amount of $600,000.00; and that the Borrower shall not terminate, rescind, revoke, repudiate, or, in any respect or to any extent, waive, modify, or amend the Colonial Sale Contract without the prior written consent of the Lender, which consent Lender may grant or withhold in its sole and absolute discretion. Notwithstanding the foregoing, Lender acknowledges that Colonial has certain rights pursuant to the terms of the Colonial Sales Contract to terminate said Contract without the consent of Borrower or Lender.

2.05    **No Creditors; No Encumbrances.**  That there are no creditors of Borrower other than Lender, and unsecured trade creditors incurred in the ordinary course of business as permitted  by and in compliance with the Loan Documents; that there are no creditors of A & N other than unsecured trade creditors incurred in the ordinary course of business as permitted by and in compliance with the Loan Documents; that there are no creditors of 163 other than Dells III and unsecured trade creditors incurred in the ordinary course of business as permitted by and in compliance with the Dells III Loan Documents and the Loan Documents; that Borrower owns and holds title to the Maricopa Property and the other Maricopa Collateral free and clear of all liens, claims, and encumbrances other than the liens and security interests granted in and created by the Loan Documents and the Maricopa Permitted Exceptions; that A & N owns and holds title to the Pinal Property and the other Pinal Collateral free and clear of all liens, claims, and encumbrances other than the liens and security interests granted in and created by the Loan Documents and the Pinal Permitted Exceptions, and that 163 owns and holds title to the Yavapai Property and the other Yavapai Collateral free and clear of all liens, claims, and encumbrances other than the liens and security interests granted in and created by the Dells III Loan Documents, the Loan Documents, and the Yavapai Permitted Exceptions.

2.06    **Status of the Properties.**

(a)    **Environmental Liability.**  That none of the Borrower Parties has received any notice of or is otherwise aware of (i) the presence, storage, use, treatment, transportation, release, or disposal on or at any of the Properties or any part thereof of petroleum, any petroleum product, any compound containing petroleum (including, without limitation, gasoline or diesel fuel), asbestos, any asbestos containing material, or any "hazardous substance" (as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 601, et seq.), or any other substance or material defined, designated, classified, regulated, or considered as toxic waste, hazardous, or toxic material, or a hazardous, toxic, radioactive, or dangerous substance under any law relating to any hazardous substance, or any other substance the presence, storage, use, treatment, transportation, release, or disposal of which is regulated by any Governmental Authority (any of the foregoing, herein, a "Hazardous Substance"); (ii) the existence on or at any of the Properties or any part thereof of any underground or aboveground storage tank which now contains or previously contained any petroleum product or any other Hazardous Substance; (iii) any investigation, inquiry, order, hearing, action, or other proceeding by or before any Governmental Authority in connection with any actual or alleged use, storage,

ATLANTA:4981771.7

holding, existence, release, emission, discharge, generation, processing, abatement, removal, disposition, handling, or transportation of any petroleum product, asbestos, any asbestos containing material, or any other Hazardous Substance on or at any of the Properties or any part thereof.

(b)     **Leases**.  That no part of any of the Properties is subject to any lease, license agreement, occupancy agreement, or any similar agreement, oral or written.

(c)     **Service Contracts Affecting Project**.  That each of the Properties is presently unimproved, and there is no service contract of any kind related to any of the Properties.

(d)     **Real Estate Brokerage Agreements**.  That, except as disclosed on **Exhibit I** attached hereto and incorporated herein by this reference, there is no real estate brokerage agreement, listing agreement, or any similar agreement related to any of the Properties or any part thereof (any such agreement, herein, a "Real Estate Brokerage Agreement"); and that Borrower has delivered to Lender a true, complete, and correct copy of each Real Estate Brokerage Agreement listed on said **Exhibit I**.

(e)     **Compliance with Laws**.  That none of the Borrower Parties has received any written notice from any Governmental Authority claiming that Borrower or any other Borrower Party or any part of any of the Properties is presently in non-compliance with any law, ordinance, rule, or regulation bearing upon the use of any of the Properties, including specifically, but without limitation, any such notice relating to zoning laws, housing codes, or building codes or regulations.

2.07     **Access**.  That each of the Properties has direct vehicular and pedestrian access to a dedicated hard surface publicly maintained road adjacent to such Property which access is usable without the necessity of any Additional Required Permit from any Governmental Authority or any access easement from any owner of any privately owned land adjacent to such Property.

2.08     **Utilities**.  That, except (a) as disclosed in that certain letter, dated May 16, 2006, from the City of Phoenix Development Services Department with respect to availability of potable water and sanitary sewer services to the Maricopa Property (the "Phoenix Utilities Letter") a true, correct, and complete copy of which has been delivered to Lender, or (b) as otherwise disclosed on **Exhibit J** attached hereto and incorporated herein by this reference ("Additional Utilities Requirements"), all public utilities services necessary or convenient to the full use of the Maricopa Property are located either in public right of way abutting such Property (which are situated so as to serve such Property without crossing any other land) or in recorded perpetual easements serving such Property which easements are insured by the applicable Loan Title Policy as being appurtenances to the title to such Property.

2.09     **Insurance**.  That all insurance coverages required by the Loan Documents are in full force and effect; that Borrower is not in material default with respect to any provision contained in any of the insurance policies providing such insurance coverages; and that Borrower has delivered to Lender true, complete, and accurate copies of Accord statements evidencing the existence of such liability insurance coverage for the Properties.

ATLANTA:4981771.7

2.10   **Taxes**.  That Lender paid the first installment of 2007 real estate taxes for the Maricopa Property and the Pinal Property, as well as previously delinquent 2006 real estate taxes for the Pinal Property by the Prior Protective Advances.

2.11   **Restrictive Covenants and Agreements Affecting the Properties**.

(a)   **Restrictive Covenants**.  That none of the Borrower Parties has received any notice asserting that any part of any Property does not presently comply with all applicable requirements of all restrictive covenants, easement agreements, development agreements, or other agreements of record relating to such Property or any portion thereof, and, to the best knowledge and belief of the Borrower Parties, no sum is owed by any of the Borrower Parties to any other party under any such covenants or agreements.

(b)   **No Breach**.  That none of the Borrower Parties has received any notice asserting that there is any breach or default, or any circumstance, event, or condition which, with notice or the lapse of time, or both, would become a breach or default, by any of the Borrower Parties under or with respect to any restrictive covenant, easement agreement, development agreement, or other agreement pertaining to any Property or any part thereof other than the Loan Documents.

2.12   **Onsite and Offsite Infrastructure Related to Properties**.   That neither Borrower, nor any other Borrower Party, has caused to be constructed, commenced construction of, or entered into any contract for the construction of, any of the Water Work (as defined in the Loan Agreement) to serve the Maricopa Property or any other road or utilities infrastructure or other improvements either on-site at, or off-site from, but intended to serve, the Maricopa Property, the Pinal Property, or the Yavapai Property, and no Person has,  has asserted, or is entitled to assert, the existence of, any mechanic's or materialman's lien  against any of the Properties or any part thereof arising from or related to the performance of any work on or for, or the providing of any labor, materials, equipment, or services for on-site or off-site infrastructure or other improvements of any type whatsoever on, related to, or otherwise for the benefit of  any of the Properties or any part thereof.

2.13   **Zoning**.  The zoning classification of each of the Properties remains the same as of  the Effective Date hereof as existed on the Loan Closing Date, and there is no application presently pending for any change to the zoning classification of any of the Properties or for the issuance of any variance or any special use permit related to any of the Properties.

**ARTICLE III**
**COVENANTS OF BORROWER PARTIES**

The Borrower Parties, and each of them, jointly and severally, covenant and agree with Lender that:

3.01   **Notice of Proceedings**.  The Mortgagors shall notify Lender in writing, promptly upon learning thereof, of the institution of any suit, administrative proceeding, adversary proceeding, or other legal proceedings which may affect any of the Mortgagors, any of the Properties or the operations, financial condition, or business of any of the Mortgagors.

ATLANTA:4981771.7

3.02    **Further Assurances**.  The Mortgagors, and each of them, shall execute and deliver to Lender such agreements, instruments, documents, and other writings as may be reasonably requested from time to time by Lender (and hereby authorize Lender to file all UCC financing statements as may be reasonably necessary) to perfect and to maintain the perfection of Lender's security interest in each of the Properties and all other collateral related thereto and to consummate the transactions contemplated by or in the Loan Documents or this Agreement.

3.03    **Releases of Collateral**.  Each of the Borrower Parties acknowledges and agrees that, due to the Maturity Default and the Tax Payment Defaults, none of the Mortgagors has or will have any right to require Lender to release, and Lender has and will have no obligation to release any of the Properties or any part thereof or any other collateral for the Loan from its deed of trust lien or its lien or security interest under any of the other Loan Documents in connection with any closing under the Colonial Sale Contract or any other Sale Contract.

3.04    **Financial Covenants; Prohibited Transfers**.

(a)    **Indebtedness; Transfer or Encumbrance**.  From and after the Effective Date hereof, the Mortgagors shall not incur any additional indebtedness, whether for borrowed money or in respect of any promissory note or other similar evidence of indebtedness or in connection with any lease arrangement, which indebtedness is secured by a security title upon or a security interest in (i) any Property or any part thereof, (ii) any other collateral for the Loan, or (iii) any other real or personal property owned by any Mortgagor.  Borrower Party, and none of the Mortgagors shall voluntarily transfer, convey, lease, license, pledge, encumber, or hypothecate, or enter into any Sale Contract (including, without limitation, any  right of first refusal agreement, option agreement, or any similar agreement) or any lease related to all or any part of any Property or any other collateral for the Loan, or any beneficial or other ownership, leasehold, or possessory interest therein, or create or allow to exist any lien or encumbrance on all or any part of any Property or any other collateral for the Loan.

3.05    **Modifications**.  None of the Borrower Parties shall directly or indirectly take any action of any kind or nature whatsoever seeking in whole or in part to modify, alter, or diminish the force or effect of any of the terms and conditions of this Agreement.  The foregoing shall not be construed as prohibiting any Borrower Party from requesting Lender to agree to modify this Agreement, but the Borrower Parties specifically understand and agree that Lender shall have no obligation of any kind to consent to any such requested modification and that no modification shall exist or be deemed to exist unless and until such time as all parties have executed and delivered complete documentation, in form and substance satisfactory to Lender evidencing such modification.

3.06    **Notices under Loan Documents**.  In Section 10.6 of the Loan Agreement and in all similar notice provisions of contained in any of the other Loan Documents, each reference  or requirement therein for copies of notices to Lender to be provided to Windels Marx Lane & Mittendorf LLP ("Windels Marx") as counsel for Lender shall be, and are hereby modified by deleting reference to Windels Marx and its address and substituting therefor McKenna Long & Aldridge LLP  and its address as set forth in Section 7.08, below.

ATLANTA:4981771.7

# ARTICLE IV
## LENDER COVENANTS

4.01    **Forbearance Covenant**.

(a)    **General Forbearance Covenant**. Subject to the limitations set forth in Section 4.01(d), below, Lender covenants and agrees that, unless and until a Termination Event shall have occurred, Lender shall not hereafter (i) commence any foreclosure proceedings against any Property or any other collateral for the Loan, (ii) seek any monetary judgment against or otherwise seek to impose personal liability on any Guarantor with respect to such Guarantor's obligations under any Guaranty, (iii) seek to impose personal liability on Borrower with respect to its obligations under, and subject to the nonrecourse limitations as set forth in, the Loan Documents or otherwise exercise any other remedy under or in connection with any of the Loan Documents or otherwise available at law or in equity, as a result of the now existing Maturity Default or Tax Payment Defaults thereunder (the foregoing covenant, subject to the terms and conditions of this Agreement, being herein referred to as the "Forbearance Covenant").

(b)    **Workout/Loan Restructuring Negotiations**. It is the present intent of Lender to commence negotiations with the Borrower Parties concerning the possible restructuring of the indebtedness of the Loan or means by which to effectuate an amicable resolution of the now existing Events of Defaults (including, without limitation, the Maturity Default) and the other obligations of the Borrower Parties to Lender which are created, evidenced, guaranteed, or secured by or related to the Loan Documents. The foregoing to the contrary notwithstanding, the parties hereto acknowledge and agree that neither Lender, nor any Borrower Party, shall have any obligation to continue with any such negotiations, or to ultimately reach any agreement with respect to any such restructuring or other amicable resolution, and that any party hereto, in such party's absolute and sole discretion, may terminate such negotiations at any time and for any reason or no reason, with or without cause or notice. It is further understood that such negotiations and all communications related thereto shall be governed in all respects by that certain Pre-Negotiation Agreement, dated as of September 6, 2007, executed by Lender, Mortgagors, and the Original Guarantors, and which provides, among other things, that such negotiations and communications related thereto shall be made with a view toward compromise and settlement, and that such negotiations and communications shall be protected accordingly and shall not be admissible as evidence on any issue which may hereafter be before any court or administrative body.

(c)    **Termination of Forbearance Covenant**. The Borrower Parties expressly acknowledge and agree that, upon the occurrence of any Termination Event hereunder, Lender shall have the immediate right, at any time and from time to time, to exercise any and all rights and remedies available against the Borrower Parties, or any of them, and/or against any or all of the Properties and/or any or all other collateral for the Loan, under this Agreement, the Guaranties (including, without limitation, commencement of a suit or suits thereon against Guarantors to the same extent as Lender would be entitled if the Forbearance Covenant had never been a part of this Agreement), the other Loan Documents, and at law or in equity, to the same extent as Lender would be entitled if the Forbearance Covenant had never been part of this Agreement.

14

(d) **Limitations on Applicability**. The Borrower Parties understand and specifically acknowledge and agree that the Forbearance Covenant does not relate or extend to any actions that Lender may take under the Loan Documents, at law, or in equity to preserve and protect any of the collateral described in the Loan Documents or the interests of Lender in any such collateral, including, without limiting the generality of the foregoing, the filing of actions, or the defending of or intervention in actions (such as lien foreclosure proceedings) brought by the holder of the Dells III Loan, any Borrower Party, any affiliate of any Borrower Party, or any other Person relating to any such collateral or the interests of Lender therein, the sending of notices to any persons or entities concerning the existence of security interests or liens in favor of Lender relating to such collateral (but specifically excluding the commencement or continuation of any action to foreclose on such collateral), taking any and all actions as may be reasonable or necessary to preserve any and all claims of Lender under Guaranties and the Environmental Indemnity against T. Jenkins and/or the estate of T. Jenkins actions including the filing of a claim in the probate estate of T. Jenkins, delivering notice of claim to Jenkins Executor or any other personal representative for the estate of T. Jenkins, filing a request for notice, filing an action against Jenkins Executor or any other personal representative for the estate of T. Jenkins, and the filing of UCC-1 Financing Statements and UCC Amendments (continuations) related thereto.

(e) **Existing Sales Contract**. Notwithstanding Section 3.03, above, and subject to full compliance by the Borrower with its obligations under Section 2.04, above, in the event that there is a closing under the Colonial Sale Contract, Lender agrees to release that part of the Maricopa Property which is subject to the Colonial Sale Contract from Lender's Deed of Trust lien and Lender's lien and security interests under any of the other Loan Documents upon Lender's receipt of the net sales proceeds from such closing.

4.02 **Lender Acknowledgments**. Lender acknowledges that pursuant to Section 2.1.4 of the Loan Agreement, the proceeds of the Loan were used to refinance the then existing indebtedness on the Maricopa Property and not any then existing indebtedness on the Yavapai Property or the Pinal Property, and that the provisions of Sections 4.1.13, 4.1.20, 5.1.20, 7.1, and 7.3 of the Loan Agreement are applicable only to the Maricopa Property and not to the Yavapai Property or the Pinal Property.

## ARTICLE V
## RELEASE AND COVENANT NOT TO SUE

5.01 **Release and Covenant Not To Sue Lender Parties**. The Borrower Parties and each of them, jointly and severally, on behalf of themselves and all of their respective heirs, successors, and assigns, do hereby remise, release, acquit, waive, satisfy, and forever discharge the Lender Parties from any and all manner of debts, accountings, bonds, warranties, representations, covenants, promises, contracts, controversies, agreements, liabilities, obligations, expenses, damages, judgments, executions, objections, defenses, setoffs, actions, claims, demands, and causes of action of any nature whatsoever, whether at law or in equity, whether known or unknown, either now accrued or hereafter maturing, which the Borrower Parties, or any of them, now have or hereafter can, shall, or may have by reason of any matter, cause, or thing from the beginning of the world to and including the Effective Date of this Agreement, arising out of or relating to (a) the Loan, including, but not limited to, the

ATLANTA:4981771.7

administration or funding thereof, (b) the Loan Documents or the indebtedness evidenced and secured thereby, (c) the acquisition, ownership, development, financing, and/or operation of any Property or any part thereof, and (d) any other agreement or transaction between any of the Borrower Parties or any of their respective affiliates and any of the Lender Parties; and the Borrower Parties, jointly and severally, for themselves and all of their respective heirs, successors, and assigns, hereby covenant and agree never to institute or cause to be instituted or continue prosecution of any suit or other form of action or proceeding of any kind or nature whatsoever against any of the Lender Parties by reason of or in connection with any of the foregoing matters, claims, or causes of action. Lender acknowledges and agrees that the foregoing release and covenant not to sue do not apply to any breach by Lender of Lender's obligations under this Agreement or the Loan Documents which may occur after the Effective Date of this Agreement.

## ARTICLE VI
## TERMINATION EVENTS; REMEDIES

6.01    **Termination Events**.  For purposes of this Agreement, each of the following shall constitute a "Termination Event":

(a)    **Misrepresentations**.    Any representation or warranty of any of the Borrower Parties in this Agreement shall be untrue or inaccurate in any material respect.

(b)    **Denial of Acknowledgments**.    Any of the Borrower Parties shall repudiate or deny the truth of any acknowledgment of the Borrower Parties set forth in this Agreement.

(c)    **Judgments**.    Any judgment shall be rendered against any of the Mortgagors in an amount in excess of $25,000.00.

(d)    **Third Party Lawsuits Involving Lender**.    As a result of any lawsuit, administrative proceeding, or other judicial or quasi-judicial proceeding commenced by any third party and relating to any Property or any part thereof, any other collateral for the Loan, or any of the transactions contemplated by any of the Loan Documents or this Agreement, Lender or any of its directors, officers, employees, affiliates, agents, legal counsel, participants, or Loan Servicer shall be exposed to any liability or other judicial or quasi-judicial relief.

(e)    **Breach of Covenant Not to Sue**.    Any of the Borrower Parties shall breach the covenant not to sue contained in Section 5.01, above.

(f)    **Attempt to Modify Transaction**.    Any of the Borrower Parties shall breach the covenant contained in Section 3.05, above.

(g)    **Breach of Other Covenants**.    Any of the Borrower Parties shall breach, default under, or fail to fully perform any of their respective covenants, agreements, and obligations under this Agreement (other than as described in any other provision of this Section 6.01) and shall fail to cure such breach within five (5) days of written notice thereof from Lender.

ATLANTA:4981771.7

(h)     **Non-Payment Defaults Under Loan Documents**. The occurrence or existence hereafter of any additional Default or Event of Default under any of the Loan Documents (including, without limitation, any default or event of default under the Dells Loan Documents, and specifically excluding the now existing Tax Payment Defaults and the Maturity Default), and the failure of Borrower to cure such Default or Event of Default within any applicable grace or cure period, if any, applicable to such Default or Event of Default.

(i)     **Bankruptcy or Insolvency Action**.

(i)     Any of the Borrower Parties shall file any voluntary petition under any Chapter of the Bankruptcy Code, or shall file any petition for dissolution or liquidation, or shall in any manner seek any relief under any local, state, federal, or other insolvency laws or other laws providing for relief of debtors; or

(ii)     Any involuntary petition under any chapter of the Bankruptcy Code shall be filed against any of the Borrower Parties, or any of the Borrower Parties shall become the subject of any dissolution, liquidation, or insolvency proceeding or any other proceeding pursuant to any local, state, federal, or other insolvency laws or other laws providing for relief of debtors; or

(iii)     Any Property or any part thereof or any interest therein shall become the property of any bankruptcy estate or the subject of any local, state, federal, or other bankruptcy, dissolution, liquidation, or insolvency proceedings; or

(iv)     Any other collateral for the Loan or any part thereof or any interest therein shall become the property of any bankruptcy estate or the subject of any local, state, federal, or other bankruptcy, dissolution, liquidation, or insolvency proceedings.

(j)     **Lawsuits Against Lender; Inconsistent Positions**.  Any of the Borrower Parties shall (i) file any lawsuit or commence any other administrative, judicial, or quasi-judicial proceeding, or (ii) assert any counterclaim or cross-claim in any lawsuit or other such proceeding, seeking to enjoin or restrain Lender from taking any remedy enforcement or other action permitted hereunder, the Loan Documents, or under applicable law, or seeking to recover damages from any of the Lender Parties or otherwise establish liability on the part of any of the Lender Parties in any manner whatsoever.

(k)     **Termination Date**.  Borrower shall have failed to repay the Debt in full or the parties hereto shall have failed to execute and deliver a debt restructuring agreement or some other workout agreement related to the Loan on or before the Termination Date (the parties hereto acknowledging and agreeing that none of the parties hereto has or shall have any obligation to execute and deliver any such restructuring or other workout agreement, and that such restructuring or other workout agreement, if any, must be satisfactory to each of the parties hereto in his or its sole and absolute discretion).

6.02     **Lender's Rights Upon Occurrence of Termination Event**.     Upon the occurrence of a Termination Event hereunder, all of Lender's covenants and obligations under this Agreement shall immediately and without further notice to any of the Borrower Parties terminate and be of no further force or effect, and Lender shall immediately be entitled, and

ATLANTA:4981771.7

without further notice to any of the Borrower Parties, to exercise any or all of Lender's rights and remedies under this Agreement, the Loan Documents, and at law and in equity (all of such rights and remedies being cumulative), including specifically, but without limitation, (i) the right to seek to obtain the ex parte appointment of a receiver for any or all of the Properties; (ii) the right to elect to take any and all actions which Lender deems necessary or appropriate to foreclose on any or all of the Properties (by either judicial or, if then available, non-judicial foreclosure) pursuant to the terms of the Loan Documents and applicable law and to take any and all other actions deemed necessary or appropriate by Lender in order to vest complete and exclusive ownership, possession, and control of any or all of the Properties in Lender or its designee at any foreclosure sale of any or all of the Properties; (iii) the right to sue Borrower on the Note; and (iv) the right to sue any one or more of the Guarantors under the Guaranties.

6.03    **Tolling and Waiver of Statute of Limitations**.    The Borrower Parties hereby covenant and agree that, in consideration of Lender's covenants and agreements contained in this Agreement, including, without limitation, the Forbearance Covenant, any and all statutes of limitations or similar laws or rules of procedure provided for under any applicable law, which would affect Lender's right to commence suit against the Guarantors in accordance with the terms and conditions of the Guaranties or against any of the other Borrower Parties under any of the other Loan Documents are hereby tolled, and the Guarantors and the other Borrower Parties do hereby waive the right to assert as a defense any such statute or rule in any suit brought by Lender against any of the Guarantors or any of the other Borrower Parties with respect to the Loan, the Guaranties, the other Loan Documents, or this Agreement.

# ARTICLE VII
# MISCELLANEOUS

7.01    **Survival of Provisions**.    Except as expressly herein provided, the covenants, acknowledgments, representations, agreements, and obligations contained in this Agreement shall survive the consummation of the transactions contemplated by this Agreement.

7.02    **No Limitation of Remedies**.    No right, power, or remedy conferred upon or reserved to or by Lender in this Agreement is intended to be exclusive of any other right, power, or remedy conferred upon or reserved to or by Lender hereunder, under the Loan Documents, or at law or in equity, but each and every remedy shall be cumulative and concurrent and shall be in addition to each and every other right, power, and remedy given hereunder or under the Loan Documents, or now or hereafter existing at law or in equity.

7.03    **No Waivers**.    Except as specifically and expressly set forth in this Agreement, nothing contained in this Agreement shall constitute a waiver of any rights or remedies of any party under the Loan Documents or at law or in equity. No delay or failure on the part of any party hereto in the exercise of any right or remedy hereunder shall operate as a waiver thereof, and no single or partial exercise of any right or remedy hereunder shall preclude other or further exercise thereof or the exercise of any other right or remedy. No action or forbearance by any party contrary to the provisions of this Agreement shall be construed to constitute a waiver of any of the express provisions hereof or thereof. Any party may in writing expressly waive any of such party's rights under this Agreement without invalidating this Agreement or any portion hereof.

ATLANTA:4981771.7

7.04     **No Partnership, Joint Venture, or Agency**.  This Agreement shall not in any respect be interpreted, deemed, or construed as making Lender a partner or joint venturer with the Borrower Parties, or any of them.  This Agreement shall not be interpreted, deemed, or construed as making Lender the agent or representative of any of the Borrower Parties.  In no event shall Lender be liable for debts or claims accruing or arising against the Borrower Parties, or any of them. The relationship of Lender to Borrower is that of "lender" and "borrower", and the relationship of Lender and the Guarantors is that of "lender" and "guarantor".

7.05     **Successors or Assigns**.  Whenever in this Agreement any party is named or referred to, the heirs, executors, legal representatives, successors, successors-in-title, and assigns of such party shall be included, and all covenants and agreements contained in this Agreement shall bind and inure to the benefit of each such party's respective heirs, executors, legal representatives, successors, successors-in-title, and assigns whether so expressed or not.

7.06     **Construction of Agreement**.  Each party acknowledges that it has participated in the negotiation of this Agreement, and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party's having, or being deemed to have, structured, dictated, or drafted such provision; that the Borrower Parties, and each of them, at all times have had access to an attorney in the negotiation of the terms of and in the preparation and execution of this Agreement, and the Borrower Parties, and each of them, has had the opportunity to review and analyze this Agreement for a sufficient period of time prior to the execution and delivery hereof; that no representations or warranties have been made by or on behalf of Lender, or relied upon by the Borrower Parties, or any of them, pertaining to the subject matter of this Agreement, and all prior statements, representations, and warranties, if any, are totally superseded and merged into this Agreement, which represents the final and sole agreement of the parties with respect to the matters which are the subject hereof and thereof; that all of the terms of this Agreement were negotiated at arm's-length and that this Agreement were prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the parties upon the others; and that the execution and delivery of this Agreement constitute the free and voluntary act of each of the Borrower Parties.

7.07     **No Admissions**.  The Borrower Parties expressly acknowledge and agree that the waivers, estoppels, releases, and covenants not to sue contained in this Agreement shall not be construed as an admission of wrongdoing, liability, or culpability on the part of Lender Parties or as an admission by Lender Parties of the existence of any claims of any of the Borrower Parties against  any of Lender Parties. The Lender Parties expressly acknowledge and agree that the waivers, estoppels, releases, and covenants not to sue contained in this Agreement shall not be construed as an admission of wrongdoing, liability, or culpability on the part of any Borrower Parties or an admission by any of the Borrower Parties of the existence of any claims of any of the Lender Parties against any of the Borrower Parties except for those claims arising as a result of Borrower's or any Mortgagor's default  under the Loan Documents.

7.08     **Notices**.  Any and all notices, elections, approvals, consents, demands, requests, and responses thereto permitted or required to be given under this Agreement ("Communications") shall be in writing, shall be signed by or on behalf of the party giving the same, and shall be deemed to have been validly given or served by delivery of the same in

ATLANTA:4981771.7

person to the intended addressee, or by depositing the same with United Parcel Service, or another reputable private courier service for next business day delivery, or by depositing the same in the United States mail, postage prepaid, registered or certified mail, return receipt requested, in any event addressed to the intended addressee at its address provided hereinbelow or at such other address as may be designated by such party as herein provided. All such Communications shall be effective upon such personal delivery, or one (1) business day after being deposited with the private courier service, or three (3) business days after being deposited in the United States mail as required above.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, demand, or request sent.  By giving to the other party hereto at least fifteen (15) days' prior written notice thereof in accordance with the provisions hereof, the parties hereto shall have the right from time to time to change their respective addresses, and each shall have the right to specify as its address any other address within the United States of America.  Any Communication, if given to Lender, must be addressed as follows, subject to change as provided hereinabove:

> Lehman Brothers Holdings Inc.
> 399 Park Avenue, 8th Floor
> New York, New York 10022
> Attn:  Abbey B. Kosakowski, Esq.

With copies to:
> TriMont Real Estate Advisors, Inc.
> Monarch Tower
> Suite 2200
> 3424 Peachtree Road NE
> Atlanta, GA  30326
> Attention:  Mr. J. Gregory Winchester

and to:
> Charles D. Weiss, Esq.
> McKenna Long & Aldridge LLP
> 303 Peachtree Street, Suite 5300
> Atlanta, Georgia 30308

and, if given to any of the Borrower Parties, must be addressed as follows, subject to change as provided hereinabove:

> [Name of Borrower Party]
> c/o Middle Mountain 156, LLC
> 20837 North 41st Avenue
> Glendale, Arizona 85308
> Attention:  Mr. Nicholas W. Bonanno, Jr.

With a copy to:
> Beus Gilbert PLLC
> 4800 North Scottsdale road
> Suite 6000
> Scottsdale, Arizona 85251
> Attention: Steven W. Bienstock, Esq.

20

7.09    <u>Governing Law, Submission to Jurisdiction</u>.

(a)    THIS AGREEMENT WAS NEGOTIATED IN PART IN THE STATE OF NEW YORK, WHICH STATE THE LENDER AND EACH BORROWER PARTY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE LENDER AND EACH BORROWER PARTY AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (EXCLUDING APPLICATION OF ANY PRINCIPLE OF CONFLICT OF LAWS WHICH WOULD DIRECT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401.

(b)    ANY SUIT, ACTION, OR PROCEEDING AGAINST ANY BORROWER PARTY ARISING OUT OF OR RELATING  TO THIS AGREEMENT MAY, AT LENDER'S OPTION, BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, OR IN THE STATE OF ARIZONA, AND IN EITHER INSTANCE, BORROWER PARTIES WAIVE ANY OBJECTIONS WHICH THEY MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR <u>FORUM NON CONVENIENS</u> OF ANY SUCH SUIT, ACTION, OR PROCEEDING, AND BORROWER PARTIES HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION  OF ANY SUCH COURT IN ANY SUIT, ACTION, OR PROCEEDING. BORROWER PARTIES  HEREBY DESIGNATE  AND APPOINT DELANEY CORPORATE SERVICES, 41 STATE STREET, SUITE 405, ALBANY, NEW YORK 12207, AS  THEIR  AUTHORIZED AGENT   TO  ACCEPT  AND ACKNOWLEDGE ON THEIR BEHALF ANY AND ALL PROCESS WHICH MAY BE SERVED  IN ANY SUCH SUIT, ACTION, OR PROCEEDING IN ANY FEDERAL  OR STATE COURT IN NEW YORK, NEW YORK, AND AGREE THAT SERVICE  OF PROCESS ON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO THE BORROWER PARTIES IN THE MANNER PROVIDED HEREINBELOW IN THIS AGREEMENT SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER PARTIES IN ANY SUCH SUIT, ACTION, OR PROCEEDING IN THE STATE OF NEW YORK. THIS CHOICE OF FORUM IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1402.

7.10    <u>Waiver of Trial by Jury</u>.  AS PART OF THE CONSIDERATION FOR NEW VALUE THIS DAY GIVEN BY LENDER AND BY THE BORROWER PARTIES, EACH TO THE OTHER, EACH OF THE LENDER AND THE BORROWER PARTIES

ATLANTA:4981771.7

**HEREBY EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE LOAN DOCUMENTS.**

7.11    **Headings**.    The headings of the articles, sections, and subsections of this Agreement are for the convenience of reference only, are not to be considered a part hereof or thereof, and shall not limit or otherwise affect any of the terms hereof or thereof.

7.12    **Pronouns**.    All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa.

7.13    **Modifications**.    The terms of this Agreement may not be changed, modified, waived, discharged, or terminated orally, but only by an instrument or instruments in writing and signed by all parties thereto.

7.14    **Time of Essence**.    Time is of the essence of this Agreement.

7.15    **Counterparts**.    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument.

7.16    **Future Negotiations**.    The Borrower Parties acknowledge and agree (a) that Lender has no obligation whatsoever to discuss, negotiate, or agree to any restructuring of the Loan, or any modification, amendment, restructuring, or reinstatement of the Loan Documents or to forbear from exercising its rights and remedies under the Loan Documents, except as expressly provided in this Agreement; and (b) that if there are any future discussions among Lender and any of the Borrower Parties concerning any such restructuring, modification, amendment, or reinstatement, then no restructuring, modification amendment, reinstatement, compromise, settlement, agreement, or understanding with respect to the Loan, the Loan Documents, any Property or any part thereof or any interest therein, or any aspect of any of the foregoing, shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by authorized representatives of the parties hereto, and that none of the parties hereto shall assert or claim in any legal proceedings or otherwise that any such agreement exists except in accordance with the terms of this Section.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

ATLANTA:4981771.7

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement, as of the above stated Effective Date.

LENDER:

LEHMAN BROTHERS HOLDINGS INC., d/b/a Lehman Capital, a Division of Lehman Brothers Holdings Inc., a Delaware corporation

By: _____
Name: Abbey B. Kosakowski
Title: Authorized Signatory

[SIGNATURES CONTINUE ON FOLLOWING PAGES]

23

ATLANTA:4981771.7

**BORROWER:**

**MIDDLE MOUNTAIN 156, LLC**, an Arizona
limited liability company

By:  Middle Mountain 39, LLC, an Arizona limited
     liability company, its Member

     By: *[signature]*
         Name: Nicholas W. Bonanno
         Title: Manager

By:  Allen D. Jenkins & Associates, LLC, an
     Arizona limited liability company, its Member

     By: *[signature]*
         Name: Allen D. Jenkins
         Title: Manager

**GUARANTORS:**

*[signature]*

**NICHOLAS W. BONANNO, JR.,** Individually

*[signature]*

**RITA BONANNO,** Individually

*[signature]*

**ALLEN D. JENKINS,** Individually

*[signature]*

**ALLEN D. JENKINS,** as executor of the last will
and testament of **TAMERA R. JENKINS** late of
that State of Arizona and County of Maricopa
("T. Jenkins"), as personal representative of the
estate of T. Jenkins, or as successor in title, by
survivorship, to property formerly jointly owned by
T. Jenkins and A. Jenkins as tenancy by the entirety
with right of survivorship or as joint tenancy with
right of survivorship or as community property with
right of survivorship, as the case may be

**[SIGNATURES CONTINUE ON FOLLOWING PAGES]**

ATLANTA:4981771.7

**OTHER MORTGAGORS:**

**A & N INVESTMENT PROPERTIES, LLC,**
an Arizona  limited liability company

By: _____
     Name: Nicholas W. Bonanno, Jr.
     Title: Manager


**163, LLC,** an Arizona  limited liability company

By: _____
     Name: Allen D. Jenkins
     Title: Manager

25

## SCHEDULE OF EXHIBITS

**EXHIBIT A** - LEGAL DESCRIPTION OF MARICOPA PROPERTY

**EXHIBIT B** - LEGAL DESCRIPTION OF PINAL PROPERTY

**EXHIBIT C** - LEGAL DESCRIPTION OF YAVAPAI PROPERTY

**EXHIBIT D** - 163 ORGANIZATIONAL CHART

**EXHIBIT E** - A & N ORGANIZATIONAL CHART

**EXHIBIT F** - BORROWER ORGANIZATIONAL CHART

**EXHIBIT G** - SALE CONTRACTS

**EXHIBIT H** - MARICOPA SITE PLAN

**EXHIBIT I** - REAL ESTATE BROKERAGE AGREEMENTS

**EXHIBIT J** - ADDITIONAL UTILITIES REQUIREMENTS

ATLANTA:4981771.7

# EXHIBIT A

# LEGAL DESCRIPTION

# (MARICOPA)

**PARCEL NO. 1:**

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA.

**PARCEL NO. 2:**

THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT THAT PORTION OF SECTION 26 BEING THE PHOENIX-ROCK SPRINGS HIGHWAY (BLACK CANYON INTERSTATE HIGHWAY NO. 17) WHICH IS THAT PORTION OF SECTION 26 LYING EASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT ON THE NORTH LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, WHICH IS 80.36 FEET WESTERLY OF THE NORTHEAST CORNER THEREOF;

THENCE SOUTH 9 DEGREES 57 MINUTES 36 SECONDS EAST 478.57 FEET, TO A POINT ON THE EAST LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26 AND TO THE END OF THIS LINE DESCRIPTION. THE PORTION OF SECTION 26 THAT ENCOMPASSES THE PHOENIX-ROCK SPRINGS HIGHWAY WAS DEDICATED TO THE STATE OF ARIZONA BY WARRANTY DEED DATED JULY 9, 1963, RECORDED SEPTEMBER 5, 1963 IN DOCKET 4718, PAGE 237, ACCORDING TO THE RECORDS OF THE COUNTY RECORDER OF THE COUNTY OF MARICOPA, STATE OF ARIZONA.

**PARCEL NO. 3:**

THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

AND THAT PART OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 26, LYING WEST OF THE CENTERLINE OF THE PHOENIX-ROCK SPRINGS HIGHWAY;

EXCEPT THAT PORTION OF THE NORTHWEST QUARTER OF AND A PORTION OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 26;

THENCE SOUTH 89 DEGREES 38 MINUTES 14 SECONDS WEST ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF SECTION 26, A DISTANCE OF 283.46 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE 17;

THENCE SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST, ALONG SAID RIGHT-OF-WAY LINE, 2012.91 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, 671.09 FEET TO A POINT ON THE SOUTH LINE OF SAID NORTHEAST QUARTER OF SECTION 26;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, ALONG SAID SOUTH LINE OF THE NORTHEAST QUARTER AND THE SOUTH LINE OF THE NORTHWEST QUARTER, 1178.61 FEET;

THENCE NORTH 00 DEGREES 18 MINUTES 18 SECONDS WEST, 172.10 FEET;

ATLANTA:4981771.7

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, 319.00 FEET TO A POINT ON THE WEST LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE NORTH 00 DEGREES 18 MINUTES 57 SECONDS WEST, ALONG SAID WEST LINE, 489.46 FEET;

THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS EAST, 1385.32 FEET TO THE POINT OF BEGINNING;

AND EXCEPT THE SOUTH 172 FEET OF THE WEST 319 FEET OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

**PARCEL NO. 4:**

THE NORTH HALF OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

**PARCEL NO. 5:**

THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL MINERALS IN THE LAND AS SET FORTH IN THE PATENT THEREOF; AND

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE AS AN ACCESS ROAD AND UTILITIES CERTAIN LANDS FOR THE BENEFIT OF THE ABOVE-DESCRIBED PARCEL OF LAND AS SET FORTH IN GRANT OF EASEMENT RECORDED IN DOCKET 14214, PAGE 275.

**PARCEL NO. 6:**

THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL MINERALS IN THE LAND AS SET FORTH IN THE PATENT THEREOF; AND

TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE AS AN ACCESS ROAD AND UTILITIES CERTAIN LANDS FOR THE BENEFIT OF THE ABOVE-DESCRIBED PARCEL OF LAND AS SET FORTH IN GRANT OF EASEMENT RECORDED IN DOCKET 14214, PAGE 275.

EXCEPT ALL URANIUM, THORIUM OR ANY OTHER MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER OR NOT OF COMMERCIAL VALUE, PURSUANT TO THE PROVISIONS OF THE ACT OF AUGUST 1, 1946 (60 STAT. 755) AS SET FORTH IN THE PATENT OF SAID LAND.

PARCEL NO. 7:

THE SOUTH 172 FEET OF THE WEST 319 FEET OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA.

PARCEL NO. 8:

A PORTION OF THE NORTHWEST QUARTER AND A PORTION OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 26;

THENCE SOUTH 89 DEGREES 38 MINUTES 14 SECONDS WEST ALONG THE NORTH LINE OF SAID NORTHWEST QUARTER OF SECTION 26, A DISTANCE OF 283.46 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF INTERSTATE 17;

THENCE SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, 2012.91 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 09 DEGREES 56 MINUTES 54 SECONDS EAST ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 671.09 FEET TO A POINT ON THE SOUTH LINE OF SAID NORTHEAST QUARTER OF SECTION 26;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST ALONG SAID SOUTH LINE OF THE NORTHEAST QUARTER AND THE SOUTH LINE OF THE NORTHWEST QUARTER, 1178.61 FEET;

THENCE NORTH 00 DEGREES 18 MINUTES 57 SECONDS WEST, 172 FEET;

THENCE SOUTH 89 DEGREES 42 MINUTES 21 SECONDS WEST, 319.00 FEET TO A POINT ON THE WEST LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE NORTH 00 DEGREES 18 MINUTES 57 SECONDS WEST ALONG SAID WEST LINE 489.46 FEET;

THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS EAST, 1385.32 FEET TO THE POINT OF BEGINNING.

PARCEL NO. 9:

THAT PORTION OF THE SOUTHWEST QUARTER OF SECTION 26, TOWNSHIP 5 NORTH, RANGE 2 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, LYING NORTH OF THE CENTRAL ARIZONA PROJECT AQUEDUCT TRACT GR-10-6 AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE WEST QUARTER CORNER OF SAID SECTION 26;

THENCE FROM SAID POINT OF BEGINNING ALONG THE WEST BOUNDARY OF SAID SECTION 26, SOUTH 00 DEGREES 00 MINUTES 14 SECONDS WEST 1069.43 FEET TO A POINT ON THE NORTHERLY BOUNDARY OF THE CENTRAL ARIZONA PROJECT AQUEDUCT TRACT GR-10-6;

THENCE ALONG SAID NORTHERLY BOUNDARY LINE SOUTH 76 DEGREES 41 MINUTES 08 SECONDS EAST A DISTANCE OF 270.41 FEET TO A POINT;

THENCE CONTINUING ALONG SAID NORTHERLY BOUNDARY LINE NORTH 79 DEGREES 43 MINUTES 58 SECONDS EAST A DISTANCE OF 465.02 FEET TO A POINT;

THENCE CONTINUING ALONG SAID NORTHERLY BOUNDARY LINE NORTH 58 DEGREES 08 MINUTES 14 SECONDS EAST A DISTANCE OF 2007.63 FEET TO THE INTERSECTION OF SAID NORTHERLY BOUNDARY LINE WITH THE EAST-WEST MID-SECTION LINE OF SAID SECTION 26;

THENCE ALONG SAID MID-SECTION LINE SOUTH 89 DEGREES 44 MINUTES 26 SECONDS WEST A DISTANCE OF 2427.41 FEET TO THE POINT OF BEGINNING.

EXCEPT AN UNDIVIDED 25% INTEREST IN AND TO ALL OIL, GAS AND OTHER MINERALS LYING WITHIN THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 26, AS RESERVED IN DEEDS RECORDED NOVEMBER 6, 1973 IN DOCKET 10386, PAGE 339.

TOGETHER WITH A PERPETUAL EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN, AND USE AN ACCESS ROAD AND UTILITIES TO AND FROM AND AS APPURTENANT TO THE PARCEL DESCRIBED ABOVE, ALL AS SET FORTH IN THAT CERTAIN GRANT OF EASEMENTS RECORDED JANUARY 29, 1976 IN DOCKET 11522, PAGE 464, OVER, ACROSS AND UNDER THE FOLLOWING DESCRIBED REAL PROPERTY:

BEGINNING AT A POINT IN THE EAST-WEST MIDSECTION LINE OF SAID SECTION 26 THAT BEARS NORTH 89 DEGREES 44 MINUTES 26 SECONDS EAST 2300.97 FEET FROM THE EAST QUARTER CORNER OF SAID SECTION 26;

THENCE FROM SAID POINT OF BEGINNING AND LEAVING SAID MIDSECTION LINE NORTH 58 DEGREES 16 MINUTES 39 SECONDS EAST 126.45 FEET;

THENCE NORTH 89 DEGREES 44 MINUTES 26 SECONDS EAST 405.24 FEET TO A POINT IN THE WESTERLY RIGHT OF WAY LINE OF INTERSTATE SEVENTEEN LAST SAID POINT BEARS SOUTH 09 DEGREES 54 MINUTES 15 SECONDS EAST 337.15 FEET FROM AN ARIZONA STATE HIGHWAY DEPARTMENT BRASS DISK STAMPED "A. H. D. 1039+00" MARKING SAID WESTERLY RIGHT OF WAY LINE;

THENCE ALONG SAID RIGHT OF WAY LINE SOUTH 09 DEGREES 54 MINUTES 15 SECONDS EAST 66.95 FEET TO A POINT IN THE EAST-WEST MIDSECTION LINE OF SAID SECTION 26;

THENCE LEAVING SAID RIGHT OF WAY LINE ALONG SAID MIDSECTION LINE SOUTH 89 DEGREES 44 MINUTES 26 SECONDS WEST 524.32 FEET TO THE POINT OF BEGINNING.

# EXHIBIT B

# LEGAL DESCRIPTION

## (PINAL)

### PARCEL 1:

The Southeast quarter of the Northwest quarter of Section 26, Township 5 South, Range 6 East of the Gila and Salt River Base and Meridian, Pinal County, Arizona.

### PARCEL 2:

The Northeast quarter of the Northwest quarter of Section 26, Township 5 South, Range 6 East of the Gila and Salt River Base and Meridian, Pinal County, Arizona.

## <u>EXHIBIT C</u>

## <u>LEGAL DESCRIPTION</u>

## <u>(YAVAPAI)</u>

Parcel 3, according to the map  on file in the office of the County Recorder  of Yavapai County, Arizona, in Book 7 of Results of Survey, Page 56.

Except all coal and other minerals as reserved in Patent to said land.

**EXHIBIT D**

**163 ORGANIZATION CHART**

**LEHMAN BROTHERS HOLDINGS INC.**
**$44,000,000 LOAN TO MIDDLE MOUNTAIN 156, LLC**
**(04406.0222)**





EXHIBIT E
A & N ORGANIZATION CHART
LEHMAN BROTHERS HOLDINGS INC.
$44,000,000 LOAN TO MIDDLE MOUNTAIN 156, LLC
(0406.0222)

Rita W. Bonanno

Nicholas W. Bonanno, Jr.

Tees/ Settlors

Richard Dodd

SH (2%)

IBSR MANAGEMENT, INC.
(Az. Corp.)

GP (2%)

SH (98%)

IBSR LIMITED PARTNERSHIP
(Az. Ltd. P/S)

THE BONANNO FAMILY TRUST, DTD 6/12/79, AS AMENDED **

Member

(100%)

LP (98%)

A+N INVESTMENT PROPERTIES LLC
(Az. LLC)

Nicholas W. Bonanno, Jr.

Manager

FEE

Pinal County, Az. Land

ATLANTA:4981771.7

Nicholas W. Bonanno, Jr.

Rita W. Bonanno

Anthony Marcel Bonanno

Lisa Marie Sackmaster

Beneficiaries



EXHIBIT F
BORROWER ORGANIZATION

LEHMAN BROTHERS HOLDINGS INC.
$44,000,000 LOAN TO MIDDLE MOUNTAIN 156, LLC
(04406.0222)

* Member Managed
** Revocable Living Trust

# **EXHIBIT G**

## **SALE CONTRACTS**

1.    Letter Offer, dated September 21, 2007, from the Ellman Companies.

<u>**EXHIBIT H**</u>

<u>**MARICOPA SITE PLAN**</u>

## EXHIBIT H

## MARICOPA SITE PLAN



The Estates At Middle Mountain
I-17 & Dixileta                    Phoenix, Arizona

# EXHIBIT I

## REAL ESTATE BROKERAGE AGREEMENTS

**1.**     Real Estate Brokerage Agreement, dated _____, between Borrower and Triplett Land and Realty Company, related to Parcel C of the Maricopa Property, containing approximately 15.67 acres and located as shown on the **Exhibit H** to this Agreement

## <u>EXHIBIT J</u>

## <u>ADDITIONAL UTILITIES REQUIREMENTS</u>

Intentionally Left Blank

**EXHIBIT G**

## ALLONGE

This Allonge forms a part of that certain Promissory Note, dated as of July 13, 2006, made by **MIDDLE MOUNTAIN 156, LLC,** an Arizona limited liability company, to **LEHMAN BROTHERS HOLDINGS INC., d/b/a LEHMAN CAPITAL, a division of LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation, in the principal face amount of $44,000,000.00

Pay to the order of **MM ARIZONA HOLDINGS LLC,** a Delaware limited liability company, its successors and/or assigns, without recourse.

Executed as of this 19th day of May, 2008.

LEHMAN BROTHERS HOLDINGS INC., d/b/a
Lehman Capital, a division of Lehman Brothers
Holdings Inc., a Delaware corporation

By:
Name: Abbey B. Kosakowski
Title: Authorized Signatory

**EXHIBIT H**

## ASSIGNMENT OF LOAN DOCUMENTS

**THIS ASSIGNMENT OF LOAN DOCUMENTS** (this "Assignment"), is made as of the 19th day of May, 2008, by **LEHMAN BROTHERS HOLDINGS INC.**, d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation (hereinafter referred to as "Assignor"), to **MM ARIZONA HOLDINGS LLC**, a Delaware limited liability company (hereinafter referred to as "Assignee") (the word "Assignee" and "Assignor" to include the respective heirs, successors and assigns where the context requires or permits).

## W I T N E S S E T H:

**WHEREAS**, Assignor has made a loan (the "Loan") to Middle Mountain 156, LLC, an Arizona limited liability company (the "Borrower"), evidenced by that certain Promissory Note, dated as of July 13, 2006, made by Borrower to the order of Assignor in the principal amount of $44,000,000.00 (the "Note"); and

**WHEREAS**, the Loan is also evidenced by that certain Loan Agreement, dated as of July 13, 2006 by and among Borrower and Assignor (as such may hereafter be amended, restated, supplemented or otherwise modified from time to time, collectively, the "Loan Agreement"); and

**WHEREAS**, the Loan is secured by, among other documents and instruments, that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13, 2006, and made by Borrower as Trustor and Guaranty Title Agency of Arizona, Inc. as Trustee in favor of Assignor ( as heretofore re-recorded, modified and amended, the "MM 156 Deed of Trust"); and

**WHEREAS**, additionally, in connection with the Loan, Nicholas W. Bonanno, Jr., Rita Bonanno, Allen D. Jenkins and Tamera R. Jenkins executed and delivered (i) that certain Guarantor Full Repayment Guaranty, dated July 13, 2006, in favor of Assignor (the "Full Guaranty") and (ii) that certain Guaranty of Recourse Obligations of Borrower, dated July 13, 2006, in favor of Assignor (the "Recourse Guaranty"; and the Note, the Loan Agreement, the MM 156 Deed of Trust, the Full Guaranty and the Recourse Guaranty, together with any and all other documents evidencing and securing the indebtedness evidenced by the Note, are sometimes referred to collectively herein as the "Loan Documents"); and

**WHEREAS**, Assignor desires to transfer and assign the Loan Documents and the indebtedness evidenced thereby to Assignee and Assignee wishes to accept such assignment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      **Transfer and Assignment of Loan Documents**.  Assignor hereby sells, assigns, grants, conveys, transfers, sets over, endorses and delivers unto Assignee, without recourse, all right, title and interest of Assignor in, to and under the Loan Documents, including specifically, but without limitation, the instruments, agreements and other documents listed in Exhibit "A" attached hereto and made a part hereof, and does hereby grant and delegate to Assignee all of the duties and obligations of Assignor under the Loan Documents from and after the date hereof, to have and to hold the same unto the Assignee, its successors and assigns, forever.

ATLANTA:4968473.3

2.  **Absolute Assignment**. This Assignment is an absolute assignment made without recourse and, except as expressly provided to the contrary in the following sentence, without warranty or representation. In making this Assignment, Assignor represents and warrants only as follows:

(1)  Assignor has not previously sold, transferred, assigned, conveyed, pledged or endorsed the Note or any right, title or interest in the Loan Documents to any person or entity other than Assignee, and other than IMH Secured Loan Fund, LLC (the "Participant"), the participant in the Loan pursuant to that certain Participation Agreement dated as of July 13, 2006 (the "Participation Agreement"); and

(2)  Assignor has full right and power to sell and assign the same to Assignee subject to no interest or participation of, or agreement with, any person or entity other than Assignee and other than Participant, which has consented to the Assignment, as evidenced by its execution of a Limited Joinder to this Assignment.

3.  **Assumption of Obligations; Acknowledgments**. Assignee hereby accepts the Assignment, and hereby assumes all of the rights and obligations of Assignor arising out of or relating to the Loan Documents and the Participation Agreement from and after the date hereof.

4.  **Participation Agreement**. Assignor acknowledges and agrees that it will continue to be liable to Participant for all obligations of the Lender under the Participation Agreement and Participant has not released Assignor from any of its obligations under the Participation Agreement.

5.  **Successors and Assigns**. This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.  **Governing Law**. This Assignment shall be governed by and construed in accordance with the laws of the State of New York.

(THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK)

ATLANTA:4968473.3

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the day and year first above written.

<u>**ASSIGNOR:**</u>

**LEHMAN BROTHERS HOLDINGS INC.**, d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation

By: _____

Name: Abbey B. Kosakowski

Title: Authorized Signatory

<u>**ASSIGNEE:**</u>

**MM ARIZONA HOLDINGS LLC**, a Delaware limited liability company

By: _____

Name: Abbey B. Kosakowski

Title: Authorized Signatory

## LIMITED JOINDER

IN WITNESS WHEREOF, Participant has executed this Joinder to the Assignment of Loan Documents, solely to evidence its consent to the assignment of the Loan and the Loan Documents by Assignor to Assignee as of the day and year first above written.

**IMH SECURED LOAN FUND, LLC**
a Delaware limited liability company

by: Investors Mortgage Holdings, Inc., its Manager

By: _____
Name: Shane Albers
Title: chairman & CEO

## EXHIBIT "A"

1.  Loan Agreement dated July 13, 2006, between Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc. and Middle Mountain 156, LLC.

2.  $44,000,000.00 Promissory Note dated as of July 13, 2006 made by Middle Mountain 156, LLC in favor of Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

3.  Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13, 2006 by Middle Mountain 156, LLC, as trustor, and Guaranty Title of Arizona, Inc., as trustee in favor of Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc., as re-recorded on October 31, 2007, and as amended by that certain Corrective Amendment of Deed of Trust, Security Agreement and Fixture Filing, and Assignment of Leases and Rents dated December 14, 2007, but intended to be effective as of July 13, 2006 (the "Corrective Amendment").

4.  Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13, 2006 by A&N Investment Properties, L.L.C., as trustor, and Guaranty Title of Arizona, Inc., as trustee in favor of Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

5.  Deed of Trust, Security Agreement and Fixture Filing, dated as of July 13, 2006 by 163, LLC, as trustor, and Guaranty Title of Arizona, Inc., as trustee in favor of Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

6.  Assignment of Leases and Rents, dated as of July 13, 2006 by Middle Mountain 156, LLC to Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc., as re-recorded on October 21, 2007, and as amended by the Corrective Amendment.

7.  UCC-1 Financing Statement recorded July 13, 2006 in the Maricopa County, Arizona Records stating Middle Mountain 156, LLC as Debtor., as re-recorded on October 21, 2007, and as amended by the Corrective Amendment.

8.  UCC-1 Financing Statement recorded August 1, 2006 Arizona Secretary of State stating Middle Mountain 156, LLC as Debtor.

9.  UCC-1 Financing Statement recorded August 1, 2006 Arizona Secretary of State stating A&N Investment Properties, L.L.C. as Debtor.

10. UCC-1 Financing Statement recorded August 1, 2006 Arizona Secretary of State stating 163, LLC as Debtor.

11. Guaranty of Recourse Obligations of Borrower dated as of July 13, 2006 and executed and delivered by Nicholas W. Bonanno, Jr., Rita Bonanno, Allen D. Jenkins and Tamera

R. Jenkins to Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

12. Guarantor Full Repayment Guaranty dated as of July 13, 2006 and executed and delivered by Nicholas W. Bonanno, Jr., Rita Bonanno, Allen D. Jenkins and Tamera R. Jenkins to Lehman Brothers Holdings Inc., d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

13. Environmental Indemnity Agreement dated as of July 13, 2006, executed and delivered by Middle Mountain 156, LLC, Nicholas W. Bonanno, Jr. and Allen D. Jenkins to Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

14. Assignment of Permits, Agreements, Licenses, Franchises and Authorizations dated as of July 13, 2006 by Middle Mountain 156, LLC to Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

15. Borrower's Certification (Financial Statements and Equity Contribution) dated July 13, 2006, signed and delivered by Middle Mountain 156, LLC.

16. Borrower's Certification (Representations and Warranties) dated July 13, 2006, signed and delivered by Middle Mountain 156, LLC.

17. Certification of Organizational Structure of Middle Mountain 156, LLC dated July 13, 2006, signed and delivered by Middle Mountain 156, LLC.

18. Guarantor's Certification dated July 13, 2006, signed and delivered by Nicholas W. Bonanno, Jr.

19. Guarantor's Certification dated July 13, 2006, signed and delivered by Allen D. Jenkins.

20. Subordination Agreement dated July 13, 2006, executed by 163, LLC and Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

21. Subordination Agreement dated July 13, 2006, executed by Middle Mountain 156, LLC, A&N Investment Properties, L.L.C., and Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

22. Subordination Agreement dated July 13, 2006, executed by Middle Mountain 156, LLC, 163, LLC, and Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc.

23. Certification of Personal Property dated July 13, 2006, executed by Middle Mountain 156, LLC.

24. Certificate of Sources and Uses of Funds dated July 13, 2006, executed by Middle Mountain 156, LLC.

ATLANTA:4968473.3

25.  Payment Direction Letter dated July 13, 2006, executed by Middle Mountain 156, LLC.

26.  Post Closing Side Letter dated July 13, 2006, executed by Middle Mountain 156, LLC.

27.  Participation Agreement dated July 13, 2006, by and between Lehman Brothers Holdings Inc. d/b/a Lehman Capital, a division of Lehman Brothers Holdings Inc. and IMH Secured Loan Fund, LLC.

ATLANTA:4968473.3